**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| ———————————————— ) | | |
| CONSTRUCTION WORKERS PENSION ) | | Civ. No. 1:13-cv-2111 |
| TRUST FUND – LAKE COUNTY AND ) | | |
| VICINITY, Individually and on Behalf of ) | | CLASS ACTION |
| All Others Similarly Situated, ) | | |
| ) | | **CONSOLIDATED AMENDED** |
| Plaintiff, ) | | **COMPLAINT FOR VIOLATION** |
| ) | | **OF THE FEDERAL** |
| vs. ) | | **SECURITIES LAWS** |
| ) | | |
| NAVISTAR INTERNATIONAL ) | | DEMAND FOR JURY TRIAL |
| CORPORATION, et al., ) | | |
| ) | | |
| Defendants. ) | | |
| ———————————————— ) | | |

## TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ........................................................................................ 1

JURISDICTION AND VENUE .................................................................................... 8

PARTIES ....................................................................................................................... 9

CONFIDENTIAL WITNESSES ................................................................................ 16

SUBSTANTIVE ALLEGATIONS ............................................................................. 35

A.      Defendants Knew EGR Technology Was Plagued With Problems Even Before the
        0.2 NOx Requirement Took Effect, But Did Not Tell Investors ...................................... 35

B.      Defendants Continued to Mislead Investors After the EPA's 2010 Emissions
        Requirements Became Effective ........................................................................................ 45

C.      Navistar Misrepresents the Status of Its Application to the EPA and the Progress
        of its 0.2 NOx Engine Development .................................................................................. 53

D.      Navistar Finally Submits the 13-Liter EGR Engine for Certification at 0.2 NOx ........... 75

E.      The Truth Begins to Emerge .............................................................................................. 85

VIOLATIONS OF GENERALLY ACCEPTED ACCOUNTING PRINCIPLES ...................... 90

LOSS CAUSATION/ ECONOMIC LOSS ................................................................ 95

NO SAFE HARBOR .................................................................................................. 96

APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET ........ 97

CLASS ACTION ALLEGATIONS .......................................................................... 98

COUNT I .................................................................................................................... 99

COUNT II ................................................................................................................. 100

PRAYER FOR RELIEF ........................................................................................... 101

JURY DEMAND ...................................................................................................... 101

i

Lead Plaintiff Central States, Southeast and Southwest Areas Pension Fund ("Central States" or "Lead Plaintiff") makes the following allegations based upon personal knowledge as to its own acts, and upon information and belief as to all other matters based on the investigation conducted by and under the supervision of Lead Plaintiff's counsel. The investigation of Lead Plaintiff's counsel is predicated upon, among other things: (1) review and analysis of U.S. Securities and Exchange Commission ("SEC") filings by Navistar International Corporation ("Navistar" or the "Company"); (2) other regulatory filings and correspondence, including Navistar's filings with the U.S. Environmental Protection Agency ("EPA") and the EPA's correspondence with Navistar and its competitors; (3) press releases, news articles, media reports, and other public statements issued by or concerning Navistar and its industry; (4) securities analysts' reports, industry reports, advisories, and investor earnings call transcripts; (5) court records, including but not limited to the pleadings filed in litigation between Navistar and the EPA and litigation between Navistar and one of its former directors; (6) interviews with eighteen confidential witnesses; and (7) discussions with consultants. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities fraud class action brought by Central States on behalf of itself and all similarly situated persons or entities who, between June 9, 2009 and August 1, 2012, inclusive (the "Class Period"), purchased or otherwise acquired the common stock of Navistar (the "Class"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") against Navistar and certain of its officers and directors.

2.     This action alleges that for more than three years, Defendants made false and misleading statements and concealed material information relating to, among other things, the

Company's engine design and development efforts and associated warranty and recall expenses. Ultimately, Navistar's former Senior Vice President admitted that these statements, which the Company's shareholders believed to be the truth, were *"B.S. … We've had enough of it the past three years."* As a result of their statements, Defendants caused the Company's shares to trade at artificially inflated prices. When the truth about Defendants' false and misleading statements came to light through a series of partial disclosures, Navistar's stock price declined dramatically, causing injury to Lead Plaintiff and the Class.

3.     Navistar is a holding company whose subsidiaries and affiliates produce commercial and military trucks, buses, diesel engines, recreational vehicles, and chassis, as well as provide parts and service for trucks and trailers. Its principal operating subsidiaries are Navistar, Inc. and Navistar Financial Corporation. The Company operates in four segments: Truck, Engine, Parts, and Financial Services.

4.     During the Class Period, Defendants issued materially false and misleading statements concerning the Company's financial condition and business prospects, particularly with respect to the new engine technology it touted to investors. Prior to the Class Period, in 2001, pursuant to the Clean Air Act, the EPA enacted a rule requiring a 95% reduction in the emissions of nitrogen oxide ("NOx") from heavy-duty diesel engines. These emissions requirements mandated that new engines emit NOx at a rate of no more than 0.2 g/bhp-hr ("0.2 NOx") by 2010.[1] Under the rules, beginning with the 2010 model year, all new heavy-duty diesel engines would need to be certified by the EPA at 0.2 NOx (or below). However, a

---

[1]     g/bhp-hr means grams per brake horsepower hour. Brake horsepower is the measure of an engine's horsepower before the loss in power caused by the gearbox, alternator, or other components.

manufacturer with banked emissions credits would be able to sell engines certified at 0.5 NOx or below until the emissions credits were exhausted.[2]

5.    The EPA delayed the effective date of the rule until 2010 in order to give the industry nine years to refine the technology necessary to produce compliant engines.  Between 2001 and 2010, heavy-duty engine manufacturers invested hundreds of millions of dollars into compliant technologies.  By 2009, the entire heavy-duty truck industry, except Navistar, had settled on a technology called *selective catalytic reduction* ("SCR").  SCR converts NOx into nitrogen and water by using an after-treatment system that introduces liquid urea into engine exhaust prior to releasing the exhaust into the air.  Manufacturers using SCR were able to meet the 2010 standard on time.

6.    Although Navistar uses SCR engines in its diesel engines for the European market, it chose a different path for its North American market.  For the North American market, Navistar sought to develop a form of *exhaust gas recirculation* ("EGR") to meet the 2010 emissions rules.  Unlike SCR, EGR is an "in-cylinder" solution and does not require an after-treatment.  In court filings, Navistar admitted that it realized as early as 2009 that it would not be able to produce a compliant 0.2 NOx engine using EGR by 2010[3] and had invested in emissions

---

[2]    Emissions credits are earned when manufacturers sell engines below the required emissions level.

[3] *See* Final Brief of Petitioner Navistar, Inc., at 30-31, 61, *Navistar v. EPA*, No. 09-1113 (D.C. Cir. Apr. 5, 2010) (Navistar's petition in response to March 31, 2009 EPA guidance regarding the 2010 emissions standards):

> Navistar made the technological investments necessary to be *below* applicable emission standards for model years prior to 2010. … Navistar went to the cost and trouble of building engines cleaner than required by the regulations because it believed that [the EPA] would not grant licenses to pollute to manufacturers who could not comply with the 0.2g NOx Standard and who did not have sufficient credits to comply with the 2001 Rule."

(citations omitted) (emphasis in original).

3

credits in an attempt to buy extra time. The Company's 2010 emissions strategy, therefore, consisted of a bet that it would be able to create a compliant EGR engine before its emissions credits ran out.

7. Navistar's North American truck and engine market is a core segment of Navistar's business and is of vital importance to the Company's financial health. For example, $8.6 billion of Navistar's $11.5 billion net sales worldwide in 2009 was derived from the North American truck and engines market. Class 8 trucks[4] comprise a substantial majority of Navistar's truck and engine revenue. For example, in 2009, Navistar delivered 181,800 units in the North American truck market, of which 119,400 were Class 8 trucks, representing a 32% retail delivery market share. Navistar's Class 8 engine offerings include 11-, 13-, and 15-liter diesel engines.

8. Thus, the Company's financial prospects in 2010 and beyond were largely contingent on Navistar's ability to manufacture an EGR engine that would obtain 0.2 NOx certification from the EPA before its emissions credits ran out. For these reasons, from 2009 on, investors and analysts were particularly focused on Navistar's public updates on the progress of its EGR engine project and steps the Company had taken toward 0.2 NOx certification.

9. Between 2009 and November 2010, Defendants repeatedly stated that the Company had developed viable, "proven" EGR technology and investors should not be concerned about whether Navistar would be able to certify EGR engines at 0.2 NOx because it already had produced 0.2 NOx engines that were being tested. On these statements, Navistar

---

[4] Classes 4 through 6 are medium duty vehicles with a gross vehicle weight rating of between 14,000 and 26,000 pounds. Class 7 and 8 are heavy duty vehicles with a gross vehicle weight rating of 26,000 pounds and above. Specifically, a Class 8 truck is defined as having a gross vehicle weight rating of over 33,000 pounds. All tractor trailer trucks are Class 8 trucks.

stock rose from approximately $24 per share at the beginning of 2009 to approximately $54 per share by November 2010.

10.     Between November 2010 and March 2011, the Company repeatedly assured investors that its EGR solution "meets emissions in the cylinder," that it had developed a 13-liter EGR engine that could be EPA-certified at 0.2 NOx, and that it planned to submit the engine for certification "in the next couple of months." On November 4, 2010, for example, the Company's then-CEO and a director, defendant Daniel C. Ustian ("Ustian") stated, with respect to achieving 0.2 NOx through EGR technology, that the Company was "100% there in terms of our ability to do it." This news had the desired effect, with Navistar stock rising an additional $10 per share to approximately $64 per share at the beginning of March 2011.

11.     On March 9, 2011, Ustian claimed that the Company had submitted its 13-liter EGR engine to the EPA for certification at 0.2 NOx. This was a major development for Navistar's business prospects and was repeated in a Company-issued press release on April 5, 2011, in slides accompanying an earnings conference call, and in multiple statements thereafter by Defendants. By April 26, 2011, the price of the Company's common stock climbed to a high of $70.17 per share. While the stock was artificially inflated, insiders sold more than 100,000 shares for proceeds of nearly $7 million.

12.     Defendants continued to tout the Company's EGR technology to investors in the months that followed. Yet, unbeknownst to investors, in October 2011, the Company informed the EPA that it believed its emissions credits would be exhausted by February 2012. The Company did not disclose this information to its investors at that time.

13.     By the end of January 2012, Navistar's statements began to change tune, contradicting previous statements: now Defendants said that the Company was confident in EGR

and would be submitting for certification at 0.2 NOx soon. Indeed, in subsequently-filed court documents, the EPA stated that it did not receive an application from Navistar for certification of a 0.2 NOx EGR engine until January 31 or February 1, 2012, *over ten months after the Company said that it had submitted the application* on March 9, 2011. During the next six months, the Company repeatedly stated that it was confident its EGR submission would be certified at 0.2 NOx and that it was not developing an SCR back-up plan.

14.     The first inkling that something was amiss came on June 7, 2012, when prior to the markets' open, Navistar reported a loss of $172 million, or a loss of $2.50 per diluted share for its second fiscal quarter ended April 30, 2012,[5] due in part to increases in warranty expenses related to repairs of early 2010 and 2011 vehicles. In response to this disclosure, Navistar's stock price reacted sharply, dropping by $4.04 per share that day, or 14.35 percent, on extremely high trading volume.

15.     One month later, on July 6, 2012, Navistar stunned the market and the trucking world by disclosing that it would be forced to abandon its efforts to certify its EGR engines at 0.2 NOx and would pursue an SCR strategy because the EPA had found numerous insolvable problems with the 0.2 NOx EGR submission. Thus, contrary to Defendants' statements to investors beginning at the start of the Class Period, the EGR technology was not – and never had been – able to meet EPA requirements. By this time, the Company's banked emissions credits had expired and it was incurring penalties for each engine sold. In reaction to this revelation, Navistar's stock price declined by $4.37 per share that day, or 15.18 percent, on very high trading volume.

---

[5]     The Company reports its results of operations based on a fiscal year that ends on October 31.

16.     Another shoe fell for investors a few weeks later when, prior to the markets' open on August 2, 2012, Navistar issued a press release entitled "Navistar Announces Actions Designed to Enhance Competitive Position, Drive Profitable Growth and Increase Shareholder Value," announcing that it was withdrawing its full-year fiscal 2012 guidance until the release of its third quarter 2012 results in September.  Further, the Company disclosed that it had received a formal letter of inquiry from the SEC involving an investigation of various accounting and disclosure matters dating as far back as November 2010.

17.     In response to this disclosure, the price of Navistar's common stock fell $3.33 per share, or 13.44 percent, to close at $21.44 per share on August 2, 2012, on elevated volume.

18.     The true facts, which were either known or recklessly disregarded by Defendants during the Class Period but concealed from the investing public, were as follows:

(a)     Navistar had not achieved – and would never achieve – the EPA's 0.2 NOx emissions requirements through its EGR technology;

(b)     Navistar did not have engines ready to meet the 2010 EPA standards;

(c)     Navistar's public statements contained incomplete and misleading disclosures, including with respect to the status of the development of its EGR technology and the Company's warranty and recall expenses, among other things; and

(d)     based on the above, Defendants lacked a reasonable basis for their positive statements about the Company and its revenue outlook.

19.     On September 28, 2012, Jim Hebe, Navistar's former Senior Vice President, admitted that the Company had misled investors: "We have got the right emissions strategy,

7

finally. ***The public will see a more upfront approach from Navistar. … We're through with the B.S. … We've had enough of it the past three years***."[6]

20.     As a direct and proximate result of Defendants' materially false and misleading statements and omissions, Navistar's stock traded at artificially inflated levels during the Class Period.  However, as the truth began to be revealed through a series of partial disclosures, the price of Navistar stock dramatically declined, causing Lead Plaintiff and members of the Class to suffer significant losses.   Navistar's stock has not recovered and currently trades at $34.62.  Navistar has experienced lost earnings, a loss of approximately $2.5 billion in market capital, loss of market share, costs related to non-conformance penalties ("NCPs") from the EPA, and costs and expenses associated with responding to an SEC inquiry, and litigating with the EPA and other truck manufacturers over issues related to its emissions certification.  In addition, the Company now faces a derivative suit by one of its former directors, Abbie Griffin, which alleges – based in part on Ms. Griffin's personal knowledge – the false and misleading nature of Defendants' statements throughout the Class Period.[7]

## JURISDICTION AND VENUE

21.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

---

[6] Emphasis is added throughout unless otherwise indicated.

[7]  Ms. Griffin's complaint, *Griffin v. Correnti*, No. 8778-CS (Del. Ch. filed Aug. 7, 2013), is only partially unsealed.  It is currently pending in the Delaware Court of Chancery.  A derivative case has also been filed in this Court, entitled *Gould v. Cederoth*, No. 13-cv-2145 (N.D. Ill. filed Mar. 20, 2013), and is pending before the Honorable John J. Tharp, Jr.  Both cases have been stayed pending a decision on Defendants' motion to dismiss the above-captioned action.

1777281.1

22.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 28 U.S.C. § 1331 [15 U.S.C. § 78a(a)].

23.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 28 U.S.C. § 1391(b), because many of the events and omissions complained of herein occurred in substantial part in the Northern District of Illinois.

24.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities exchanges.

## PARTIES

25.     Lead Plaintiff **Central States, Southeast and Southwest Areas Pension Fund** is a multiemployer, collectively-bargained pension fund, established in 1955, which administers benefits for hundreds of thousands of participants, dependents and retirees.  Central States has approximately 100,000 active participants and makes benefit payments to more than 210,000 retirees and surviving spouses each month. The Fund is located in Rosemont, Illinois, in this District, and has net assets of $18.4 billion.  Central States purchased Navistar common stock on the open market during the Class Period as set forth in its attached Certification, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

26.     Defendant **Navistar International Corporation** is a Delaware corporation that maintains its principal executive offices in Lisle, Illinois.  The Company's stock is listed on the New York Stock Exchange (the "NYSE") under the ticker symbol "NAV."

27.     Defendant **Daniel C. Ustian** was Navistar and Navistar, Inc.'s President and Chief Executive Officer from 2003 until he resigned in August 2012; Chairman of the Board of

9

Directors (the "Board") from 2004 to August 2012; and a director from 2002 to August 2012. Defendant Ustian was also Navistar, Inc.'s President and Chief Operating Officer from 2002 to 2003; President of the Engine Group of Navistar, Inc. from 1999 to 2002; and Group Vice President and General Manager of the Engine & Foundry Group of Navistar, Inc. from 1993 to 1999. Ustian knowingly or recklessly made false and misleading statements concerning the Company's development of, and the supposed certification by the EPA of, EGR engine technology, as well as signed certain of the false and misleading SEC filings described herein. At times during 2010 and 2011, while Ustian was making false and misleading statements about Navistar's business, he sold a total of 84,192 shares of Navistar common stock for proceeds of $5,180,102. As stated in Navistar's proxy statement filed January 18, 2013, Ustian's total executive compensation for the year 2012 was $16,098,605, for 2011 was $15,167,755, and for 2010 was $10,382,469. Upon his resignation from Navistar, Ustian received a severance payment of $7.9 million.

28. Defendant **Andrew J. Cederoth** has been Navistar and Navistar, Inc.'s Executive Vice President and Chief Financial Officer ("CFO") since September 2009 and has been a Navistar, Inc. director since April 2009. Cederoth was also Navistar's interim principal financial officer from June 2009 to September 2009 and Senior Vice President, Corporate Finance from April 2009 to September 2009; Navistar, Inc.'s Vice President and CFO, Engine Division from 2006 to April 2009; and Navistar Financial Corporation's Vice President and Treasurer from 2001 to 2005. Cederoth knowingly or recklessly made false and misleading statements concerning the Company's development of, and the supposed certification by the EPA of, EGR engine technology, as well as signed certain of the false and misleading SEC filings described herein. In March 2011, while Cederoth and other Defendants were making false and misleading

10

statements about Navistar's business, Cederoth sold a total of 9,548 shares of Navistar common stock for proceeds of $642,962. As stated in Navistar's proxy statement filed January 18, 2013, Cederoth's total executive compensation for the year 2012 was $1,879,941, for 2011 was $3,147,513, and for 2010 was $2,096,691.

29. Defendant **Eugenio Clariond** was a Navistar director from 2002 until October 2012. Clariond knowingly or recklessly made false and misleading statements concerning the Company's development of, and the supposed certification by the EPA of, EGR engine technology, as well as signed certain of the false and misleading SEC filings described herein.

30. Defendant **John D. Correnti** is a Navistar director and has been since 1994. Correnti is also a member of Navistar's Audit Committee and has been since at least January 2010. Correnti knowingly or recklessly made false and misleading statements concerning the Company's development of, and the supposed certification by the EPA of, EGR engine technology, as well as signed certain of the false and misleading SEC filings described herein. At times during 2010 and 2011, while Correnti and other Defendants were making false and misleading statements about Navistar's business, Correnti sold a total of 4,000 shares of Navistar common stock for proceeds of $206,123.

31. Defendant **Diane H. Gulyas** was a Navistar director from 2009 until December 2012. Gulyas knowingly or recklessly made false and misleading statements concerning the Company's development of, and the supposed certification by the EPA of, EGR engine technology, as well as signed certain of the false and misleading SEC filings described herein.

32. Defendant **Michael N. Hammes** is Navistar's lead director and has been since December 2007 and a director and has been since 1996. Hammes knowingly or recklessly made false and misleading statements concerning the Company's development of, and the supposed

11

certification by the EPA of, EGR engine technology, as well as signed certain of the false and misleading SEC filings described herein.  In June 2010, at the same time Hammes and other Defendants were making false and misleading statements about Navistar's business, Hammes sold a total of 16,100 shares of Navistar common stock for proceeds of $869,321.

33.     Defendant **David D. Harrison** was a Navistar director from 2007 until October 2012.  Harrison was also a member of Navistar's Audit Committee from at least January 2010 until October 2012.  Harrison knowingly or recklessly made false and misleading statements concerning the Company's development of, and the supposed certification by the EPA of, EGR engine technology, as well as signed certain of the false and misleading SEC filings described herein.

34.     Defendant **James H. Keyes** is a Navistar Director and has been since 2002.  Keyes is also Chairman of Navistar's Audit Committee and has been since at least January 2010.  Keyes knowingly or recklessly made false and misleading statements concerning the Company's development of, and the supposed certification by the EPA of, EGR engine technology, as well as signed certain of the false and misleading SEC filings described herein.

35.     Defendant **Steven J. Klinger** was a Navistar director from 2008 to October 2012.  Klinger was also a member of Navistar's Audit Committee from at least January 2010 to October 2012.  Klinger knowingly or recklessly made false and misleading statements concerning the Company's development of, and the supposed certification by the EPA of, EGR engine technology, as well as signed certain of the false and misleading SEC filings described herein.

36.     Defendant **William H. Osborne** was a Navistar director from 2009 until April 2011.  Osborne was also Navistar, Inc.'s Vice President, Custom Products in at least April 2011.  Osborne knowingly or recklessly made false and misleading statements concerning the

Company's development of, and the supposed certification by the EPA of, EGR engine technology, as well as signed certain of the false and misleading SEC filings described herein.

37.　　Defendant **Dennis D. Williams** is a Navistar director and has been since 2006. Williams is also a member of Navistar's Audit Committee and has been since December 2012. Williams knowingly or recklessly made false and misleading statements concerning the Company's development of, and the supposed certification by the EPA of, EGR engine technology, as well as signed certain of the false and misleading SEC filings described herein.

38.　　Defendant **Stanley A. McChrystal** is a Navistar director and has been since February 2011.　McChrystal knowingly or recklessly made false and misleading statements concerning the Company's development of, and the supposed certification by the EPA of, EGR engine technology, as well as signed certain of the false and misleading SEC filings described herein.

39.　　Defendant **John P. Waldron** served as Vice President and Controller (Principal Accounting Officer) of Navistar from September 2006 until March 2010.　Previously, he served as Vice President and Assistant Corporate Controller of Navistar.　Waldron signed certain of the false and misleading SEC filings described herein.

40.　　Defendant **Richard C. Tarapchak** has served as Vice President and Corporate Controller (Principal Accounting Officer) of Navistar since March 2010.　Prior to this position, Tarapchak served as Vice President-Strategic Initiatives of Navistar, Inc. from 2008 until March 2010.　Tarapchak also served as Vice President and Chief Financial Officer of the Truck Group of Navistar, Inc. from 2005 to 2008, Director, Corporate Financial Analysis of Navistar, Inc. from 2003 to 2005, and Director, Finance and Operations of Navistar, Inc. from 2000 to 2003. Tarapchak signed certain false and misleading SEC filings described herein.

13

41.     Defendant **Jack Allen** is Executive Vice President and Chief Operating Officer of Navistar and has been since April 2013.  Prior to that and during the Class Period, he served as President of North America Truck and Parts, and, prior to that, was President of Navistar's Engine Group.  He has also served as Vice President and General Manager of the Company's Parts organization.  Allen's additional roles include Vice President, Sales, of the Company's Western Region and Vice President, Marketing and Development, of Navistar's Heavy Vehicle Center.  Allen joined the Company in 1981 as a Design Engineer.  During the Class Period, Allen knowingly or recklessly made false and misleading statements concerning the Company's development of, and the supposed certification by the EPA of, EGR engine technology.

42.     Defendant **Eric Tech** is Navistar's Senior Vice President, Strategy and Planning, and President, Global and Specialty Businesses.  Prior to that and during the Class Period, he was President of Navistar's Engine Group, a position he had held since 2008.  Tech joined Navistar in 2006, when he led the Engine Group's light, medium, and heavy-duty engine business.  During the Class Period, Tech knowingly or recklessly made false and misleading statements concerning the Company's development of, and the supposed certification by the EPA of, EGR engine technology.

43.     The defendants named in paragraphs 27-42 are referred to herein as the "Individual Defendants."

44.     During the Class Period, the Individual Defendants, as senior executive officers of Navistar, were privy to confidential and proprietary information concerning Navistar, its operations, its recall, warranty, and regulatory data, and information related to the true value of the Company's assets and liabilities.  The Individual Defendants also had access to material, adverse, non-public information concerning Navistar, as discussed in detail below.  Because of

14

their positions with Navistar, the Individual Defendants had access to non-public information about the Company's business, quality control, and regulatory information through access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and through reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew, or recklessly disregarded, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

45.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of Navistar's business.

46.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of Navistar's reports, press releases, and presentations to securities analysts and, through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

47.     As senior executive officers and as controlling persons of a publicly-traded company whose common stock is traded on the NYSE, and is, along with other Company securities, registered with the SEC and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the quality control, regulatory oversight, and outlook of the Company's products, and to correct any previously-issued statements that had become materially misleading or untrue so that the market price of Navistar's securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## CONFIDENTIAL WITNESSES

48.     **CW1** began working as a Senior Product Development Engineer for Navistar in April 1998. CW1 was promoted to Chief Program Engineer in July 2007, and left the Company on October 31, 2012. CW1 was part of a team that installed or mounted the engines in Navistar trucks. CW1 stated that he listened to nearly all analyst calls at which Ustian spoke and answered questions. CW1 stated that he knew from his work on the exhaust, cooling and air induction systems in Navistar trucks, as well as conversations with other engineers and his colleagues, that the statements Ustian made on these calls regarding the compliance with 2010 EPA emissions standards were untrue.

49.     In particular, in the summer of 2008, Navistar asked CW1 to undertake a review of the Cummins EGR engine project, and through that review CW1 became aware of many problems involved in using an EGR solution to meet 2010 EPA standards. CW1 explained that Navistar used a Cummins engine at the time in trucks it manufactured for Ford. CW1 learned from his involvement with the Cummins engine project that Cummins had performed extensive testing relating to the EGR solution. CW1 reviewed the detailed reports prepared by Cummins

16

relating to Cummins' decision not to pursue an EGR solution to meet the 2010 EPA standards and to focus instead on pursuing the SCR solution. CW1 learned from the reports and documents he reviewed during his analysis of the Cummins decision that there were significant technical problems associated with using the EGR solution to meet the 2010 EPA emissions standards. CW1 stated that as EPA emissions standards were tightened from 1.2 NOx in 2007 to 0.2 in 2010, the stricter standards required more and more exhaust gas to be recirculated through the engine. The exhaust gas being recirculated through the engine was inert gas which lowered the heat and torque generated by the engine and affected its performance. This posed problems for fuel efficiency. The increased exhaust gas also generated significant amounts of soot in the engines. Attempts to increase power to offset the decrease in power caused by the inert gas flowing through the engine caused increasing amounts of soot. As a consequence, the diesel particulate filter which collected the soot flowing through the engine would become saturated and stopped up, and eventually shut down the engine. In tests, according to CW1, the engine would stop within 20 minutes to two hours, depending on conditions. The engines were tested at peak torque. The conclusion of the Cummins engineers, according to CW1, was that the balance between power and exhaust gas flowing through the engine required a precise mix that was well beyond the capabilities of the EGR technology.

50.    Subsequent to the summer of 2008, CW1 stated that he learned and observed many of the same results found by Cummins in the work Navistar performed during its extensive testing and development of the EGR solution. CW1 said that even if engines might have technically achieved 0.2 NOx in tests, they did so in a "dyno cell" that did not reflect the reality of diverse conditions trucks encounter on the road. CW1 said that CW8 was a project manager

1777281.1

and engineering manager at Navistar in the test group that prepared reports of these tests. Navistar upper management, including the Individual Defendants, had access to the reports.

51.     During the summer of 2008, after CW1 completed his analysis of the Cummins EGR findings, CW1 stated that he reported these findings to Navistar director-level supervisors and vice presidents both orally and in writing.  He was told by at least one of the recipients of these findings not to repeat them to anyone else.

52.     **CW2** retired from Navistar on August 31, 2010, after 30 years at the Company. CW2 was the Chief Engineer for the Engine Group on several Navistar truck and engine launches over his career.  CW2 was the Chief Engineer on the 2007 and 2010 Navistar big bore (Class 8) engine and truck launches using the EGR solution to meet EPA requirements.  CW2 reported to Dr. Helmut Endres until late 2009 or early 2010 when Endres left Navistar.  CW2 reported to Mike Regula (current Navistar employee) after Endres left.

53.     CW2 joined CW1 in his review of the Cummins engine program, together with Aaron Peterson and Ning Lei.  Their analysis showed that Cummins was having trouble making the EGR solution work and provided detail on why it was not successful.  The analysis noted problems with, and expressed concerns about, the EGR solution.

54.     According to CW2, he presented his team's analysis to Endres together with CW1, Peterson, and Lei, and Endres made the presentation to executive management, including Ustian.  CW2 stated that Ustian nonetheless continued to direct them to pursue the EGR solution after receiving the team's report.

55.     **CW3** left Navistar in March 2011.  As of October 2008, CW3 was a project development team lead for Navistar in its Fort Wayne, Indiana facility.  CW3 was on the Truck

side of the Company, and his group focused on the design and implementation of the after-treatment and exhaust components of Navistar engines. CW3 reported to CW1.

56.     Around October 2008, CW3 was asked by Truck side management to assist in developing a fall-back SCR solution in case the EGR solution Navistar was developing was not successful. CW3 assisted in putting together a proposal of the costs involved in fully developing the SCR backup plan. CW3 stated that the proposal and business case was put together for a presentation to the Navistar Board. The proposal and business case presented significant data on the difficulties regarding the physics of the EGR solution in comparison to the SCR solution. Both the Engine and Truck Groups submitted data for the proposal. CW1, CW4, Peterson, and others provided data and/or input for the proposal and business case on behalf of the Truck Group.

57.     According to CW3, the proposal and business case needed to be approved by the Navistar Board in order to obtain a program number to which development costs could be allocated. In or around February or March 2009, however, Dee Kapur, who reports to Ustian, issued an order to cease and desist development of the SCR backup plan.

58.     **CW4** was a powertrain manager who worked on exhaust after-treatment systems for Navistar from April 2009 until May 2011. CW4 worked in the Company's Fort Wayne, Indiana facility. CW4 reported to CW1, who reported to Matthew Baus.

59.     CW4 worked on the exhaust systems for the EGR solution and was familiar with vehicle after-treatment systems from a 10-year prior employment with Tenneco.

60.     According to CW4, Ustian met with the Company's engine and truck engineers in the spring of 2010 in a large boardroom at the Company's Melrose Park facility. The engineers present at the meeting provided data and a summary of the problems they were experiencing in

meeting 0.2 NOx with the EGR solution.  CW4 stated that Ustian's response to the engineers was "go work on it – make it go away."  According to CW4, his colleagues referred to Ustian and other executive management as the "Chicago Mafia"; they were a close-knit group, he said, that acted irresponsibly and did not make data-driven decisions.

61.     According to CW4, he and CW1 met from time to time with Steve Ostarello, the vice president who oversaw the EGR project.  When CW4 and CW1 raised problems they were encountering in trying to get the EGR solution down to 0.2 NOx, according to CW4, Ostarello told CW1, "shut up, you're causing problems again – you're not being a team player."  CW4 said that this attitude was prevalent at the Company.

62.     According to CW4, Navistar's testing was never accurate because it was performed in a "dyno" or "dyno-cell," or dynamometer, which is a closed and controlled environment used in the development of new technologies.  It is closed to the atmosphere and provides an environment in which each and every calibration can be controlled to observe how changes in one calibration affect others.  CW4 stated that "dyno" results do not and cannot indicate how systems will perform once actually produced outside the controlled environment of the "dyno."  For example, particulate levels for Navistar's engines were consistently and substantially in excess of "dyno" results.  The results in a "dyno," according to CW4, were never reproducible in the real world.  CW4 gave the example of the addition of an air compressor to an engine to help cool the exhaust and bring NOx emissions down to a level below the legal limit.  According to CW4, however, such an air compressor did not exist in the real world.

63.     According to CW4, CW5, Chief Engineer of the Engine Group, authored a presentation dated August 27, 2010, entitled, "Go Fast 0.2 NOx In-Cylinder Solution – Scope."  On page 2 of this presentation, according to CW4, was a chart entitled "Big Bore NOx Credit

Status," which contained a timeline showing that Navistar's emissions credits would be exhausted in either Q1 or Q2 2012, but that the technology for an 0.2 NOx in-cylinder solution could not go into production until at least Q1 2014 for a 13-liter engine, Q3 2014 for an 11-liter engine, and Q1 2015 for a 15-liter engine. Underneath the timeline was the statement, "As credits run out, there is a **1.75 year gap** before 13 L Big Bore EGR in-cylinder solution becomes available" (emphasis in original). According to CW4, the Company's executive management, including Ustian, would have been aware of this presentation, which was written by the Chief Engineer and concerned the development of the Company's most important technology.

64.     **CW5** began working for Navistar in 2005 and left in October 2012. CW5 began as an engineering manager for heavy-duty engines in the Engine Group at Navistar and became a Chief Engineer in July 2009. At a meeting in September or October 2009, CW5 was asked to be the Chief Engineer on the engine that was being developed by Navistar to meet 2010 EPA emissions standards using EGR. CW5 stated that he was asked to be the Chief Engineer for this project by outside consultants who worked for Ustian, including Harish Chawla, Ed Anesi, Russ Zukouski, and Gormandi Bebi. The outside consultants were former executives of original equipment manufacturers that Ustian sold to when he was on the business side of the Engine Group before becoming CEO and Chairman of Navistar. CW5 said that these outside consultants were not engineers.

65.     According to CW5, the consultants informed him at their initial meeting that the launch date of the 0.2 NOx engine using the EGR solution would be January 2012. CW5 stated that it was Zukouski's idea to focus on the launch of the 0.2 NOx engine using the EGR solution and it was supported by the other consultants. The consultants made clear at the meeting, according to CW5, that they reported to Ustian and were acting at his direction.

21

66.     When Navistar asked CW5 to take over as Chief Engineer for the 11- and 13-liter engines, CW5 told his supervisors that the EGR technology was not achievable given fuel economy and performance parameters and the stage of EGR development at the time.   CW5 stated that the entire engineering community was saying that the physics of EGR was not possible.  CW5 did not believe it was possible to deliver for launch a certified truck and engine based on the initial deadline he was given of January 2012.   At his initial meetings with consultants in September and October 2009, according to CW5, he had been promised that he would be provided the necessary resources to accomplish the task and was told that Navistar had tested the recipe to make the 0.2 NOx engine using the EGR solution in the lab.  CW5 knew at the time that the EGR technology would require significant work in order for the engine and truck to be ready for launch by January 2012.  CW5 told management this, and told them his concerns regarding the technology.  CW5 also had discussions with other team members about the program. In particular, CW5 told his supervisor, Dave Bergman, that just because Ustian and his outside consultants believed it could be done did not mean that CW5 and others could defy the law of physics to make it happen, especially given the short amount of time they had to accomplish it.  CW5 agreed to give it his best efforts and he and his colleagues and partners did give it their all.  CW5 accepted the project because he was told the 0.2 NOx "recipe" was working.

67.     CW5 said his team agreed to report monthly on their progress.  CW5 reported to Titus Iwaszkiewicz, who according to CW6 was General Manager and Director, Power Train Product Development; Iwaszkiewicz reported to Ostarello; Ostarello reported to Ramin Younessi, Vice President, Product Development & Strategy; and Younessi reported to Kapur and Ustian.  CW5 would meet with Iwaszkiewicz, Ostarello and Dennis Mooney, Vice President of

Powertrain and Global Engineering Integration, every Friday to discuss the team's progress. After two or three months and after running tests on the 0.2 NOx recipe, CW5 and his team quickly realized the recipe did not work. This was reported up through the reporting chain of Iwaszkiewicz and Ostarello, and to executive management, including Ustian and Younessi, through monthly meetings of Iwaszkiewicz, Ostarello, and Younessi. CW5 recalls Iwaszkiewicz being emotionally beat up after returning from reporting the findings to Ustian. Iwaszkiewicz told CW5 that he had told Ustian the truth about where they were in the development. Around the middle to end of 2010, CW5 and the others were certain that they could not deliver for launch a 2010-compliant engine without the use of credits and informed the reporting chain and asked for a later launch date. CW5 and the other team members were provided a new launch date of the end of 2013 or the first quarter of 2014. CW5 said his team discussed at the meetings with Ostarello that they would run out of credits before the end of 2013 or first quarter of 2014 and were told by Ostarello to focus on the engine and truck and let the executive team deal with the EPA credit issue.

68. CW5 said that his team initially reported the engine development program through the reporting chain as an overall "level red" when they had a launch date of January 2012.[8] This was based on the amount of time given to launch and the cost involved in making this happen. When the launch date was changed to the last quarter of 2013 or first quarter of 2014 the overall program color code was reported up the chain as a "yellow." CW5 felt the "yellow" overall color was appropriate as his team was given the additional time to meet the launch date although he still had reservations regarding the physics and technology of the EGR solution. CW5 voiced this risk and concern through his reporting chain.

---

[8] Navistar used the colors red, yellow and green to indicate whether a program was experiencing significant delays, moderate delays, or was on track, respectively.

69.     CW5 heard from colleagues that Navistar was experiencing significant warranty issues on the versions of the EGR solution using credits.  CW5 said it was normal to experience warranty issues on newly-developed engines.  CW5 explained that Navistar was developing completely new engines to meet the 2007 emissions requirements, then the 2010 emissions requirements using credits, and finally the 2010 emissions requirements without credits.  CW5 explained that because of the relatively short time periods for each engine program they did not have the appropriate time to fully test and validate each program before launch.  This was the cause of the excessive warranty costs.  CW5 stated that Navistar and any company should reserve on its financial statements for the expected warranty loss.  CW5 said normally, for Navistar, these reserves exceeded the expected actual costs.  CW5 stated the engines developed to comply with the 2010 emissions requirements using credits were experiencing warranty issues related to failures in the EGR valve as the engines incurred more mileage in actual use.

70.     CW5 stated that throughout the development of the 0.2 NOx engine using the EGR solution, the majority of the engineering community within Navistar did not believe they could produce an engine and truck certified for launch without the use of credits within the timeframes provided by management and voiced their concern to the executive team and the outside consultants that Ustian hired to advise him on the project.  The outside consultants were not viewed favorably within the Navistar engineering community as they did not have engineering backgrounds.  CW5 stated that the Navistar engineering community uniformly felt that Ustian did not want to hear the problems they were experiencing.  According to CW5, the Navistar engineering community was frustrated.  CW5 had numerous discussions with his colleagues about their frustrations.  CW5 and others on his team were worried about their jobs

and knew if they pushed back they would lose their jobs. It was known to be politically unwise to question the EGR solution.

71.   **CW6** started working for Navistar in 1986. CW6 was General Manager and Director of North American Product Development, Highway Tractors, from September 2009 until he left Navistar on March 31, 2013. CW6 was Chief Engineer for Product Development from May 2006 through September 2009. CW6 was a product manager and product development engineer prior to becoming a chief engineer.

72.   According to CW6, during the 2002 through 2004 time period, Navistar made a determination to pursue an EGR solution in meeting 2007 and 2010 EPA emissions standards. CW6 said it was his understanding that Navistar laid out all of the options and made a determination on the best path to pursue taking into account the costs and benefits of pursuing an EGR-, instead of an SCR-based solution.

73.   During the 2002-2004 timeframe, CW6 attended meetings where management discussed alternative directions they could take to meet the stricter EPA emissions standards. After making the decision to pursue an EGR solution, there was a directive from top management that Navistar would pursue the EGR solution and it would be the singular focus of the Company. CW6 stated that management made it known that either you were on board to focus on that strategy or you could leave the Company.

74.   Beginning at least by 2010, CW6 attended monthly (or sometimes bimonthly) presentations where the Engine Group would provide updates on the status of meeting the 2010 NOx emissions standards without the use of EPA credits. CW6 said that these presentations were given by Iwaszkiewicz and attended mostly by vice presidents, general managers, directors,

chief engineers and project managers, including Younessi, Ostarello, Baus, Kevin Carlstrom, and CW13. CW7, CW5, and Dileep Khadilkar would also attend on occasion.

75. According to CW6, Younessi would relay updates from the monthly program review meetings to executive management, including Kapur, Tech, and Ustian, among others, at monthly executive management program review meetings. CW6 stated that executive management sent out a proposed agenda for the executive management program review meetings to various programs, including the 0.2 NOx EGR development program, as notification that the program would be addressed at a particular monthly meeting, and indicating the purpose of the discussion. CW6 recalled that the executive management program review meetings would include the 0.2 NOx development program on their agenda approximately 10 out of 12 months of the year. CW6 stated that Iwaszkiewicz and/or others received invitations, on occasion, to present to executive management on specific topics related to the 0.2 NOx program.

76. CW6 said that Navistar was unable to achieve submission of an engine and truck for certification that met the 0.2 NOx standards by October 2011, and that at that point they were not able to produce the engine and truck for production by March 2012. Everyone who attended the monthly update meetings knew that Navistar did not achieve its intended goals. CW6 said he recalls discussions at the monthly meetings and outside the meetings with colleagues about the risks of running out of EPA credits before meeting the 0.2 NOx EPA standards. CW6 said he recalls discussions that some classes of engines and trucks were at risk of being assessed a fine by the EPA because they had used all of their credits.

77. **CW7** worked for Navistar from August 2005 through March 2012. In October 2010, CW7 became the lead Vehicle Program Chief Engineer for the 2010 EPA emissions-compliant engines at 0.2 NOx. In that capacity, he was responsible for integrating the Navistar-

developed 2010 EPA-compliant engines using the EGR solution into Navistar trucks. Like CW5, CW7 reported to Iwaszkiewicz, who reported to Ostarello, who reported to Younessi, who reported to Ustian.

78.     According to CW7, Ustian took an "EGR solution or bust" approach in developing a 2010 EPA-compliant engine. It was an all-chips-in approach. CW7 stated that Ustian pursued the EGR solution even when Navistar engineers were telling him that they had significant concerns that the technology was not achievable. CW7 described the atmosphere at Navistar as frustrating and paranoid. Employees who voiced concerns about the viability of the program were worried they would lose their jobs. CW7 said he knew by early 2011 that the EGR solution his team was trying to develop would not be successful.

79.     According to CW7, Navistar had very smart employees who knew what technology would work and what would not and who had told Ustian and others within the Company that the EGR technology would not achieve 2010 EPA emissions standards. CW7 said that everyone working on the project had voiced their concerns to their reporting chains and had also discussed them amongst themselves. According to CW7, Ustian had early information that the EGR solution would not work but "only heard what he wanted to hear."

80.     CW7 stated that Iwaszkiewicz regularly met with Ostarello, Younessi, and Mooney to report on the status of the EGR program and would occasionally ask CW7 to attend those meetings to present and answer questions. CW7 stated that his purpose in attending was to explain the major issues the program was experiencing and to discuss potential solutions to those problems.

81.     CW7 stated that the EGR program was delayed when he was initially assigned to it. CW7 stated that Navistar did not even plan the integration of the proposed 0.2 NOx engine

1777281.1

into Navistar trucks until October 2010 when he was assigned to lead the team. As of October 2010, CW7 stated that there was still significant work to be done to get a truck with a 2010 EPA-compliant engine certified to operate.

82. From the time CW7 was assigned to the EGR project, CW7 said he gave the project an overall rating of red due to the late start and the significant cost overruns. CW7 stated that he reported his rating both orally and in writing to his reporting chain.

83. **CW8** worked for Navistar for approximately 15 years. CW8 was a Project Manager and Senior Project Manager at Navistar from October 1997 through September 2007, and was involved in the design and release of powertrain systems for medium-duty trucks manufactured by International Truck & Engine Corporation. From September 2007 until he left the Company in October 2012, he was a first-line engineering manager in the heat transfer test group for engine cooling systems.

84. CW8 stated that he was aware that the diesel engines Navistar was developing had experienced significant problems in the Company's attempt to lower emissions from 0.5 to 0.2 NOx. CW8 said that one problem involved the diesel particulate filter. The particulate filter would stop up and shut down the engine as more exhaust flowed through the engine. According to CW8, the higher EGR rates also lowered fuel economy, decreased durability, and increased cooling demands on the engine. CW8 said there was a "horrific" investment made by the Company to qualify the cooling systems to support the EGR solution.

85. CW8 said that in 2012 his test group performed cooling system tests on three or four 13-liter engines manufactured by Navistar that he was told were fully compliant with the 0.2 NOx emissions standards. CW8 said that he did not, however, run any tests to determine whether the pre-production engine actually met 0.2 NOx. According to CW8, his group never

28

tested the cooling system on a production version of the engine by the time he left in October 2012, and is unaware of any Navistar-built 2010 EPA emissions-compliant engine that was tested and seated in a Navistar truck. CW8 further stated that his group would have tested any production or pre-production engine that Navistar attempted to submit to the EPA for certification at 0.2 NOx.

86.     **CW9** was an engineer at Navistar from the mid-1990s through December 2012. From 2009 until 2011, he was Chief Engineer of Bus Products. From 2011 until 2012, he was Chief Engineer of Product Validation.

87.     According to CW9, it was clear in late 2008 into 2009 that Navistar would not meet the EPA's 2010 deadlines. Between 2009 and 2011, CW9 received quarterly reports and participated in meetings with engineers from the Engine Engineering section, "as a liaison" because his job entailed buying the engines from them that would be placed inside Navistar's bus line. The intent of these reports and meetings was, in part, to update him on the progress of the EGR project.

88.     **CW10** was a Product Development Engineer, Senior Team Lead at Navistar from January 2011 through September 2012.

89.     When CW10 began working at Navistar in January 2011, he knew that Navistar was behind in creating the EGR engine the Company had promised in order to meet 2010 EPA emissions requirements. He described the pace of the project as hurried and stated that "everyone knew it would not be six months" until the project was finished, but much longer.

90.     **CW11** worked at Navistar from 2007 until his departure in August 2012. From 2007 until 2011, he was Director of Quality and Tooling for the Truck Group. From 2011 until 2012, he was General Manager of Manufacturing Operations for the Truck Group. CW11 stated

that every morning beginning in February 2011 and until he left the Company, he participated in three mandatory daily call-in meetings held via conference call. The calls included senior executives who reported to Ustian and Cederoth. The first of the meetings was held at 9:00 a.m. and was the "engineering and quality" meeting. It included about 20 individuals from several Navistar offices and manufacturing facilities, including the corporate headquarters in Lisle, Illinois; Indianapolis; Melrose Park; and Huntsville, Alabama. The senior people from the Engine Group would participate in the calls and it was typically here that CW11 would learn about the EGR delays. CW11 referred to these teleconferences as the "launch readiness" updates. These meetings included Ostarello.

91. CW11 said that written information relaying what happened on these calls was provided to Ustian. Information concerning warranty issues was reported to executive-level management in operations reports. This was true even though, according to CW11, Ustian was "not free and open"; "he did not want to hear bad news" and "he kept a limited circle of advisors." CW11 said that Ustian's message to those around him was "find a way to make this [EGR technology] work."

92. **CW12** was Navistar's Senior Vice President, North American Sales Operations throughout the Class Period until he left the Company in October 2012.

93. CW12 stated that Navistar's Board members were "f--king idiots" and that Defendant Hammes was negligent in his duties as lead director. CW12 said that Ustian told him directly not to discuss an alternate solution to the EGR technology or he would be fired.

94. **CW13** worked at Navistar from at least July 2008 until April 2013. CW13 was Vice President, Global Engine and Marketing from August 2012 until April 2013; Vice President and General Manager, North American Business Operations from July 2011 until August 2012;

1777281.1

General Manager, North American Business for the Engine Group from November 2009 until July 2011; and General Manager, Big Bore Engines from July 2008 until October 2009. CW13 primarily reported to Defendant Tech.

95.     According to CW13, Navistar would circulate to the Director level and above periodic summary reports on each of its engine and truck programs. Defendant Tech was responsible for preparing and disseminating these reports. The reports showed the status of each component within the program. The component used color coding to differentiate the status of the program. If the component was timely on budget with few issues it would show the color green. Yellow indicated that the program was delayed or not on budget. The color red meant that the specific issue was critical in not meeting its stated goal and required that steps be identified to bring it back to green or yellow. CW13 stated that the big bore engine program relating to the EGR solution in general began showing "a lot more yellow" beginning in 2011. CW13 recalls that many components began to show red in 2012. As these reds became more pronounced, the summary reports led to internal discussions about ending the EGR program.

96.     CW13 stated that he learned from these reports that key suppliers of EGR components were having trouble meeting their commitment to developing the components necessary to build the 2010 EPA emissions-compliant engines. The suppliers were asking for more time and money to develop the components, including specialty turbo charges, fuel pumps, and electronics. According to CW13, Navistar was asking these key suppliers to support the EGR solution when everyone in the industry was using an SCR solution. This required the component manufacturers to develop a unique solution for Navistar, which became costly. CW13 stated that Navistar had to continually refine its EGR recipe to cope with problems such

31

as requests from the component suppliers and increased soot in the engines, which increased the overall cost of the program significantly.

97.     CW13 participated in meetings beginning in April 2012 to determine whether Navistar would continue the EGR solution strategy or switch to a new strategy to meet 2010 EPA emissions standards.  Among other things, meeting participants discussed what they would tell their dealerships, vendors/ suppliers and the public.  Navistar decided based on these meetings that it would purchase engines from Cummins.

98.     CW13 received a monthly operations review as part of his normal company updates.  The monthly operations review would emanate from Defendant Tech down to the staff.  According to CW13, the report would include information on sales, warranty costs, engineering costs, and other costs.  CW13 stated that the 2010 EPA-compliant engines were sold in low volumes during the first half of 2010.  During the second half of 2010 the sales volume went way up.  As the engine miles increased the monthly operations review reports began to pick up an increase in warranty issues.  By mid-2011, according to CW13, the EGR solution engines were experiencing significant warranty issues.  Ustian and upper management had access to these reports as Tech was a direct report to Ustian.

99.     CW13 stated that Navistar brought some of the problem engines to Navistar for testing and determined that the problem was due to an issue with the EGR valve.  CW13 noticed no decrease in warranty issues in 2012 because the re-engineered EGR valve was not completed until late 2011 and Navistar had manufactured and sold many EGR engines before the fix, and those EGR engines were still in operation.

100.    **CW14** began working for Navistar in October 1998.  From June 2010 until he left in June 2012, CW14 was Chief Engineer, Advanced Chassis – Vehicle Systems.  According to

CW14, stricter EPA emissions standards required significant alterations to the engine cooling systems in Navistar's trucks. It also increased the amount of exhaust gas recirculating in the engine. The exhaust gas was inert and significantly squelched the temperature within the engine which affected engine performance. CW14 stated that changes in the cooling system required increases in the size of the truck hood to accommodate the size of the cooling package. According to CW14, changes in the hood design were significant design expenditures. CW14added that the exhaust gas also produced soot that recirculated within the engine. CW14 stated that the soot produced long-term engine warranty issues for Navistar.

101. CW14 heard of instances where Ustian advisors or associates raised issues that were not consistent with Ustian's stated beliefs or consistent with his management direction. These Ustian advisors or associates would no longer be asked to contribute and would lose status within Navistar as a result of taking an alternative position.

102. **CW15** worked at Navistar from June 2001 until October 2012. CW15 was a senior business analyst at the time of his departure; prior to that he was an analyst, and prior to that he was a web developer.

103. CW15 attended an all-employees meeting approximately one month after Navistar moved his office to Lisle, Illinois in late 2011. According to CW15, Ustian stated at the meeting that the EGR engine problems that had caused significant warranty costs were fixed and under control. A month or two later, however, a colleague who worked in the service and warranty group at Navistar told CW15 that Navistar was continuing to experience significant service and warranty claims. According to CW15, Navistar's service and warranty issues related to the engine valves.

33

104.    **CW16** worked at Navistar from 2007 until October 2012.  Beginning in 2007, CW16 was a Finance Director for Navistar Parts and Service.  In late 2008, CW16 became Finance Director and Controller of Navistar Defense.  In 2009, CW16 became Controller of Navistar Defense.

105.    According to CW16, in 2011 it became apparent from information and data that Navistar was experiencing an increase in failures of components of the engine.  The increase in failures of components of the engine was linked to an increase in exhaust gas flowing through the engines, which was a consequence of Navistar's attempt to use EGR to comply with 2010 EPA emissions requirements.  The increase in exhaust caused a buildup of soot.  According to CW16, John Miller, Vice President of Finance, Parts & Engines, told CW16 that he had conversations with Cederoth about the warranty reserve issue and that Cederoth was aware of the issue.

106.    **CW17** worked at Navistar beginning in 2002.  CW17 was promoted from Plant Controller to Finance Director, Manufacturing in September 2009.  CW17 became the Director of Finance, North American Truck Group in August 2012 and left Navistar in February 2013.

107.    CW17 was familiar with the increase in Navistar's warranty costs during the Class Period, and stated that the EGR engines began to experience more warranty issues or failure rates as mileage use increased.  CW17 stated that field data began to show increases in warranty costs in mid-2011.  According to CW17, these costs were larger than what Navistar had reserved for and grew exponentially each quarter.  According to CW17, he would hear at monthly finance meetings that warranty costs were higher than Navistar expected.

108.    **CW18** began working for Navistar in July 2001.  CW18 was the Director of Finance, North American Engine Operation, from September 2012 to January 2013.  Prior to this

34

he was Director of Finance, Global Truck from September 2010 through September 2012 and Director, Finance Transformation from February 2009 through September 2010. CW18 was the Division Controller, Parts, from April 2007 through February 2009.

109. According to CW18, warranty issues arose at Navistar in mid-2011. The problem, according to CW18, was that Navistar "did not do a good enough job of forecasting warranty issues." CW18 stated that the warranty issue was related to the EGR technology in big bore engines. The problem was initially with the EGR valve. Although the EGR valve was later fixed, CW18 stated that warranty issues persisted when he transferred to the Engine Group in September 2012. It was CW18's understanding that after Navistar fixed the EGR valve, the Company began to experience high failure rates as a result of the EGR cooler, which led to significant warranty costs in September 2012.

## SUBSTANTIVE ALLEGATIONS

### A. Defendants Knew EGR Technology Was Plagued With Problems Even Before the 0.2 NOx Requirement Took Effect, But Did Not Tell Investors

110. In order to sell model year 2010 engines above 0.2 NOx using emissions credits, Navistar was required to obtain certification at 0.5 NOx. Engines emitting more than 0.5 NOx were not legal for sale even *with* emissions credits.

111. During the second half of 2009, however, Navistar had not yet achieved EPA certification for a model year 2010 15-liter EGR engine at 0.5 NOx. The Company's strategy was to "bridge the gap" until the 15-liter EGR engine was certified at 0.5 NOx by stockpiling model year 2009 15-liter engines purchased from Cummins to be installed in Navistar trucks. The EPA challenged the stockpiling strategy, and as a result, the Company's ability to offer any 15-liter engine at all for the 2010 model year was imperiled. Navistar attempted to "transition" 15-liter customers to its 13-liter engine, which would be certified at 0.5 NOx prior to the 15-liter

engines' certification, in an effort to reduce the catastrophic impact of this potential disaster. As this plan increased analyst and investor skepticism about the quixotic EGR strategy, Defendants began to disseminate false and misleading statements about the progress of the 15-liter engine and Navistar's development of EGR technology.

112. The Class Period begins on June 9, 2009. That day, the Company issued a press release announcing its financial results for the second quarter of 2009 and conducted its quarterly earnings conference call. During the call, Ustian was questioned about how the Company planned to manage the expected gap between the time when its current 15-liter engine would no longer meet emission requirements and when it planned to release the 0.5 NOx-compliant 15-liter EGR engine:

> Q - **Analyst:** And then, just following up on what you said about – you haven't really closed the gap all the way yet for next year, how concerned should we be about that?
>
> A - **Ustian:** *Well, you shouldn't be concerned.* There are different ways to do it. Obviously, the best one is to be ready earlier and we have found ways to close that gap up. In fact by the end of this year we have found ways to be able to get that engine out in customers' hands. So we continue to work on that and until we get firmly entrenched in how we are going to do it, Ann, I would be remiss to say that in this environment without especially talking to our customers first about it. *So we continue to make progress on it and we will have a solution.*
>
> Q - **Analyst:** For the 15 liter you will have at least a couple of 15 liters right there in customer's hands, is that what I heard?
>
> A - **Ustian:** By the end of this year, yes.
>
> Q - **Analyst:** By the end of this year, but not yet.
>
> A - **Ustian:** Right. We have some…
>
> Q - **Analyst:** Thank you.
>
> A - **Ustian:** …in our own – in the dinos, but not in customers' hands yet.
> Q - **Analyst:** Okay. So by the end of calendar year '09 you will have some out there?

A -   **Ustian:** Right.  That's right.

113.   On July 16, 2009, the Company issued a press release announcing that it was "on track with its 2010 engine testing and will be prepared for a successful engine launch in the months ahead."  The press release stated, in part:

> *'We are on track with our strategy of 2010 emissions compliance through the use of our EGR-only solution and are ahead of schedule in some cases*,' said Jack Allen, president of Navistar's North American Truck Group.
>
> * * *
>
> 'The development and testing of our EGR solution for 2010 *is in the advanced stages* and we are confident that our engines will deliver the performance, reliability and low operating costs our customers demand.'

114.   On September 9, 2009, the Company issued a press release announcing its financial results for the third quarter of 2009.  The press release stated with regard to EGR certification:

> Continuing on its path to meet the latest emissions requirements through its advanced EGR (exhaust gas recirculation) MaxxForce® engines, the company said *it is on track with its 2010 engine testing and will be prepared for a successful engine launch in the months ahead.*

115.   On September 10, 2009, the Company conducted a conference call with analysts to discuss its third quarter 2009 financial results.  One of the slides in the presentation that accompanied the call advertised Navistar's 2010 engine testing as *"[o]n [t]rack or [a]head of [s]chedule"* and touted that the Company would *"[r]eceive EPA certification prior to 2010 launch."*  During the call, Ustian stated:

> On slide 19, it shows where we are to the 2010 emissions products, and we're doing very well.  *We're slightly ahead of plan.*  We have 60 vehicles out there for test.  Senior management spent some time in Colorado with these tests, and we're very satisfied.  *We're ready to go.  So, our EPA certification will occur later this year.  The vehicles are driving very well.*  We're very satisfied with where we're at on that.

37

He also added:

We're responsible for meeting emissions. We believe it's the only system out there that does meet the emissions all the time. It's environmentally friendly all the time. We have advantage in cost and ultimately, we decide what that price is. So, we say we are controlling our own destiny as we head into 2010. *Our products are ready.* They're very competitive.

And then on slide 24, where do we go with this? *We have products that are running today at 0.2, the ultimate need.* We will be doing winter tests on those.

116. At a September 15, 2009 J.P. Morgan Diversified Industries Conference, analyst Ann Duignan questioned what the Company would do if it could not stockpile Cummins engines to "bridge the gap" until it achieved 0.5 NOx compliance in its 15-liter engine. Ustian responded as follows:

A - **Ustian:** *Our products are ready to go. They meet the standards. They'll be introduced on a timely basis as soon as that transition inventory is complete. And we see no challenge with our products going to the marketplace on time and meet the standards.* We think it's the opposite of whether the SCR standards can be met using the standards as they are written.

Ms. Duignan further probed whether the Company had a "Plan B":

Q: Yeah. Executives always have a contingency plan if their plan A doesn't go well. What's plan B for you?

A - **Ustian:** What's the –

Q: Could you – this SCR, EGR debate – if it doesn't go your way, are you ready to step up and supply Cummins engines?

A - **Ustian:** No, we're not.

Q: So what's Plan B?

A - **Ustian:** Plan B is we're going to make Plan A work.

Q: **Analyst:** Try much harder.

A - **Ustian:** If I may, I mean we – there's a lot of discussion that goes on in an area –

Q -     [inaudible]?

A -     **Ustian:** There's discussion that goes on in Class 8 15-liter. There's no discussion that ever goes on with what the core part of it is, mid-range product, bus product, regional products all of these have – don't use a 15-liter. Our strategy is all-encompassing. It isn't narrow to one little segment of that market. *It's all-encompassing and we use one technology that covers all of that and there is no risk to it.*

*There is absolutely no risk in 85% of this and now you want to debate whether there's a two- or three-month period of risk out there and we say we can manage through and that there is no risk to this strategy. The products are ready. They're running in the market. We have 60 of them that are in all different aspects of the environment. They're all running. They're all less than the emissions standards. Why would we want to invest in some other technology and waste that money?*

Q -     **Analyst:** I think that –

A -     **Ustian:** This is a technology that has proven for many, many years. It's not like it's some rocket science.

Q -     **Analyst:** *But I think it's a bit misleading to say there is no risk.* You don't have enough products out there, per the question earlier, to satisfy prospect – customers that so they're willing to come to buy the product, even the 13-liter. So I mean, I recognize what you're saying and I think if you're right, you're going to do very well. *But I think it is a bit misleading to say there is no risk.*

117.    At a November 9, 2009 Gabelli & Company Automotive Aftermarket Symposium, one of the slides that Ustian used in his presentation reiterated that the 2010 emissions strategy was "on/ahead of schedule." Ustian stated:

> *And we're the only ones in the market that we can answer the state of emissions with combustion and that's what it's called, Advanced EGR In-Cylinder.*
>
> * * *
>
> And so, for the emissions, I've heard more than this on whether EGR or SCR, there's a lot of tales out there about what our product development is in Navistar by people that are outside of Navistar. So let me try to clear up some of those tales and tell you where we are at inside the company. *We are not only able to meet emissions – the emissions level that you have to be at in 2010 is 0.5. All of our vehicles will be at that or below that; most of them will be at 0.4. The durability of this will improve, not degrade, in 2010.*

In response to a question from an analyst, Ustian added:

Q: **Analyst:** Hi, Dan. Dan Colonis, Ferguson Capital. Have you stated when you'll be able to reach 0.2 with EGR and also how much time you have with the credits?

A - **Ustian:** *Yeah, we have 0.2 engines running today. And they're going to go through winter tests this winter.*

118. On December 21, 2009, the Company issued a press release announcing its fourth quarter and full year 2009 financial results. The press release stated, in part:

Continuing on its path to meet the latest emissions requirements through its advanced EGR (exhaust gas recirculation) MaxxForce engines, *the company said it is prepared for a successful engine launch in the months ahead.* In early December, 28 IC Bus school buses meeting 2010 emissions requirements were delivered to the Columbus, Miss. school district, marking the first 2010-compliant diesel buses to the delivered to its customers. In preparation for the launch of its 2010-compliant engines, Navistar engineers have conducted extensive testing and validation over the last two years, accumulating more than 15.7 million test miles.

119. The same day, Navistar filed a Form 10-K with the SEC for 2009. The Form 10-K included Navistar's previously-reported financial results and was signed by Defendants Ustian, Cederoth, Waldron, Clariond, Correnti, Gulyas, Hammes, Harrison, Keyes, Klinger, Osborne, and Williams. The Form 10-K also noted the following:

**Our Strategy**

Our long-term strategy is focused on three pillars:

Great Products

- Growing our Class 8 tractor line, including an expanded line of ProStar and LoneStar trucks

- Focusing engine research and development in order to have a competitive advantage using exhaust gas recirculation ("EGR") and other technologies for compliance with 2010 emissions standards

- Introducing our advanced engine technology in new markets

120.    The Form 10-K also included, as Exhibit 31.1, a certification signed by CEO Ustian that provided:

I, Daniel C. Ustian, certify that:

1.    I have reviewed this annual report on Form 10-K of Navistar International Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

41

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):

a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

121.    The Form 10-K further included, as Exhibit 31.2, a substantially identical certification signed by CFO Cederoth.

122.    On the following day, December 22, 2009, the Company conducted a conference call with analysts to discuss its fourth quarter and full year 2009 financial results.  During the call, Ustian described the status of Navistar's EGR development:

Let's talk a little bit about where we are on 2010 emissions.  And one of the Naked City stories has been we can't get to emissions on time.  *And the facts are, all of our engines are running between not only at 0.5, many of them are running at 0.4.*

\* \* \*

*We also have some vehicles out there at 0.2 that are out there for winter testing.*  And that is – that's the way the process works.  We start with winter testing long before we need to change over.  *And we have some vehicles out there at 0.2 today going through winter tests.*

But to show you that we are on time, we have already delivered our first 201 engines, and I think in a vehicle, I don't know of anyone else that has it.  I know they don't have it in school buses.  But last week we delivered engines and vehicles that meet 2010 emissions.  *The story on this was they don't meet 2010 emissions; they are not certified.  They <u>are</u> certified.*  And there was a customer in Columbus, Mississippi.  If you step back to what our strategy is, we will certify them on time to deliver the product, and really not much earlier than that.  And that's exactly what we did with these buses.  We also have given to the EPA some other engines for their certification that will be timed appropriately as we launch the rest of our vehicles in 2010.

123.    Defendants' statements in paragraphs 112-122 above, including that investors "shouldn't be concerned," about the Company's ability to satisfy EPA emissions standards; that the Company "continue[d] to make progress on [the EGR project] and we will have a solution"; that "[w]e are on track with our strategy of 2010 emissions compliance … and are ahead of schedule in some cases"; that the Company was "on track with its 2010 engine testing and will be prepared for a successful engine launch in the months ahead"; that the Company was "ahead of plan" and "ready to go" with respect to achieving the 2010 emissions standards; that the Company's "products are ready" and "[w]e have products that are running today at 0.2"; that the Company's products "meet the standards"; that there was "no risk" to the Company in achieving EPA emissions standards; that "we have 0.2 engines running today"; that as of December 2009, the Company was "prepared for a successful engine launch in the months ahead"; that one of the "pillars" of the Company's strategy was development of its EGR technology; and that the Company already had vehicles running at 0.2 NOx and that they "are certified," were false and misleading when made, and/or omitted material facts, for the following reasons, among others, which Defendants knew of and/or recklessly disregarded:

a)    The Company's EGR engine technology had not met the EPA's 2010 0.2 NOx emissions requirements and never would, as Defendants later admitted;

b)    The EPA had not certified any of Navistar's engines at 0.2 NOx, and never would, as Defendants later admitted;

c)    Navistar had not submitted an application to the EPA for certification at 0.2 NOx, and would not submit such an application until January 31, 2012;

d)    Non-approval of the Company's EGR engine technology at 0.2 NOx posed severe risks to the Company's well-being, as later acknowledged by Navistar and the EPA,

and according to CW3, Company executives had explicitly directed Navistar engineers to cease their development of a back-up plan;

e) CW1 and CW2 had reported severe technical problems uncovered during the Cummins EGR engine project to Navistar director-level supervisors and vice presidents as early as the summer of 2008, including to Dr. Helmut Endres, who delivered the findings to Ustian;

f) From 2009 until 2011, according to CW9, Navistar's Engine Engineering section produced quarterly reports and held meetings to provide internal updates on the EGR project;

g) From February 2011 until CW11's departure in August 2012, he participated in a daily "engineering and quality" teleconference, held at 9:00 a.m. every morning, to update senior executives (including senior executives who reported to Ustian and Cederoth) on delays and problems encountered in the EGR project, and written information relaying what happened on these calls was provided to Ustian;

h) During CW13's tenure at Navistar, from July 2008 until April 2013, Navistar circulated to the director level and above periodic summary reports on each of its engine and truck programs, which were prepared and disseminated by Defendant Tech and which reflected the "yellow" status of the EGR project beginning in at least 2011; and

i) During CW13's tenure at Navistar, from July 2008 until April 2013, as confirmed by CW11, Navistar circulated a monthly operations review written by Defendant Tech that included information on sales, warranty costs, and engineering costs and that reflected significant warranty issues in EGR solution engines by mid-2011, and Ustian and upper management had access to these reports because Tech reported directly to Ustian.

**B.**     **Defendants Continued to Mislead Investors After the EPA's 2010 Emissions Requirements Became Effective**

124.     The EPA's 0.2 NOx emissions requirements went into effect with the 2010 model year.  As of the beginning of 2010, Navistar had only certified some of its engines at 0.5 NOx, and none at 0.2 NOx.  The Company had not yet certified its 15-liter EGR engine at 0.5 NOx.  As a result, Navistar was able to sell only its stockpiled Cummins 15-liter engines and its ability to legally sell other sizes of diesel engines that had been certified at 0.5 NOx was due entirely to the Company's banked reserves of emissions credits.

125.     At an Analyst Day presentation on January 19, 2010, Ustian nonetheless reaffirmed that EGR technology was "on track," and touted that "we have the only EGR engine available in [the] marketplace."

126.     On March 9, 2010, the Company issued a press release announcing its financial results for the first quarter of 2010.  The press release stated, in part:

> *The last half of 2010 will provide opportunities for even better margins as we launch our 2010 EGR strategies.*
>
> * * *
>
> "Our EGR message is resonating with the marketplace as evidenced by our continued strong market share levels," said Ustian.  "The breadth, depth and value of our product family is now being enhanced by an EGR solution that is gaining acceptance with the marketplace."
>
> During the 2010 first quarter, Navistar also managed research and development spending while at the same time positioning for tighter 2010 emission rules.  *Navistar said it is prepared for a successful engine launch in the months ahead as it continues on its path to meet the latest emissions requirements through its advanced EGR (exhaust gas recirculation) MaxxForce® engines.  The company has already submitted several MaxxForce engine types to the U.S. Environmental Protection Agency for certification.*

127.     The same day, Navistar filed a Form 10-Q with the SEC for the first quarter of 2010.  The Form 10-Q included Navistar's previously-reported financial results and was signed by Defendant Waldron.  The Form 10-Q also noted the following:

45

We continue to invest in research, development, and tooling equipment to design and produce our engine product lines to meet EPA emission requirements. This includes the further enhancement of our exhaust gas recirculation ("EGR") technology to meet 2010 EPA emission regulations with emissions credits and continue to develop reliable, high-quality, high-performance and fuel-efficient products. In the first quarter of 2010, we made equity and asset investments which included leading EGR technologies that augment our investment in Pure Power Technologies.

128.    Navistar's March 9, 2010 Form 10-Q was accompanied by certifications signed by Ustian and Cederoth, substantially identical to those described in paragraphs 120 and 121.

129.    On the following day, March 10, 2010, the Company conducted a conference call with analysts to discuss its first quarter 2010 financial results. During the call, Ustian stated that the Company was *"ready for emission standards"* and that Navistar's EGR technology was *"already proven,"* even though the Company had not attained a certifiable engine, nor would it:

> *And we're ready for emission standards. Our products are being certified today. Some of them have already passed.* Some of them will go over the next period of time as we launch our vehicles in April and May of this year. We do have some already in the marketplace. If you remember right, we had 100 or so buses that went into the marketplace at 2010 emissions levels. Those are running great. We have had no quality problems with it to speak of. *So we believe that our technology is already proven.* We also have test vehicles out there in the other applications as well, so we're confident in our 2010 emissions launch, and obviously that's very important to our strategy.

130.    On April 5, 2010, however, Navistar filed a brief in litigation against the EPA in which it admitted that its engines could not meet 2010 NOx emissions standards:

> By producing engines "cleaner than those required by the regulations," Navistar earned credits that it banked and will use in 2010 to comply with the 2001 rule while it continues to develop EGR technology. … Navistar went to the cost and trouble of building engines cleaner than required by the regulations because it believed that USEPA would not grant licenses to pollute to manufacturers who could not comply with the 0.20 NOx Standard and who did not have sufficient credits to comply with the 2001 Rule.[9]

---

[9] Final Brief of Petitioner Navistar, Inc., at 30-31, *Navistar v. EPA*, No. 09-113 (D.C. Cir. Apr. 9, 2010).

1777281.1

Navistar attached to its brief a declaration from David Piech, Director, Powertrain/Vehicle

Regulations, Certification & Compliance, in which Mr. Piech states:

> Navistar is still maturing Advanced EGR technology and will certify its engines
> for 2010 to be fully compliant in the test cell and on the highway with the 0.20
> NOx Standard through a combination of Advanced EGR technology and
> "banked" emission credits.

131.    On April 9, 2010, the EPA likewise stated in its own brief in the same litigation,

"Navistar will only be certified as meeting the 2010 NOx requirements by using banked

credits."[10]

132.    On June 9, 2010, prior to the markets' open, the Company issued a press release

announcing its financial results for the second quarter of 2010, including net income of $30

million, or $0.42 diluted earnings per share ("EPS") on revenues of $2.7 billion.   The press

release included the following statements:

> "Our expectations are to be profitable across the business cycle," said Daniel C.
> Ustian, Navistar chairman, president and CEO.   "The plans we have put in place
> for our core businesses are on track through the second quarter.  We are confident
> that the foundation is in place to continue to support our profitability and grow
> our business."
>
> * * *
>
> "We remain confident for the remainder of the year about our ability to deliver
> fiscal 2010 results in the previously reported range," said Ustian. "The orders we
> have received for our 2010-compliant products ensure that the business is well
> positioned for the rest of the year."
>
> *The company said it is prepared for a successful launch of its MaxxForce®
> Advanced EGR (exhaust gas recirculation) engines as it continues on its path to
> meet the latest emissions requirements.*   During the quarter, key regulatory
> certifications were obtained for 2010 MaxxForce® 13 and MaxxForce® DT
> Advanced EGR big bore diesel and mid-range diesel engines.

---

[10]   Final Brief of Respondent EPA, at 29-30, *Navistar v. EPA*, No. 09-113 (D.C. Cir. Apr.
9, 2010).

133.    The same day, the Company conducted a conference call with analysts to discuss

its second quarter 2010 financial results.  During the call, Ustian stated:

> Now this is all triggered by our decision to be able to meet emissions through
> combustion.  We've got a different path than others out there.  So what has
> happened is that the market has looked at this and created what we would call
> myths, which has created for some of our investors uncertainty or maybe some
> worry beads.  *Well, we're at the point now that every one of these worry beads is
> behind us.*

In response to a question from an analyst, Ustian added:

> We also want to be responsible for meeting emissions.  And no matter what we do
> here, the best answer is always going to be through combustion.  *And we have
> engines running – we have vehicles running that meet those standards of 0.2*
> without degrading fuel, by the way.  In fact, you can see us get better in fuel as
> we move forward.  The question has always been, is time.  When will we have
> enough credits, and when will we need to get this application started for 2010
> emissions at 0.2?

134.    Also on June 9, 2010, Navistar filed a Form 10-Q with the SEC for the second

quarter of 2010.  The Form 10-Q included Navistar's previously-reported financial results and

was signed by Defendant Tarapchak.  The Form 10-Q also noted the following:

> We continue to invest in research, development, and tooling equipment to design
> and produce our engine product lines to meet EPA emission requirements.  We
> have chosen advanced Exhaust Gas Recirculation ("EGR") combined with other
> strategies as our solution to meet the 2010 emissions requirements.  We believe
> coupling EGR with other emissions strategies gives our products advantages over
> our competitors' urea-based Selective Catalytic Reduction ("SCR") solution and
> enabled us to maintain flexibility in meeting emission requirements.  We continue
> to evaluate our emission strategies on a platform-by-platform basis to achieve the
> best long-term solution for our customers in each of our vehicle applications.  Our
> continued investment in research and development includes the further
> enhancement of our advanced EGR technology and the ongoing development of
> reliable, high-quality, high-performance and fuel-efficient products.

135.    Navistar's June 9, 2010 Form 10-Q was accompanied by certifications signed by

Ustian and Cederoth, substantially identical to those described in paragraphs 120 and 121.

136. On September 8, 2010, prior to the markets' open, Navistar issued a press release announcing its financial results for the third quarter of 2010, including net income of $137 million, or $1.83 diluted EPS on revenues of $3.2 billion. The press release included the following statements:

"Third-quarter results showed a continuation of the company's ability to be profitable in difficult economic times. Beyond strong military sales, we saw improved performance from our core businesses in truck, engine and particularly service parts," said Daniel C. Ustian, Navistar chairman, president and chief executive officer.

\* \* \*

"All of our businesses continue to perform well," said Ustian. "We are encouraged by the results of the third quarter and expect to deliver full year results toward the upper end of our earnings guidance. In addition, we are experiencing several successful product launches and are actively delivering 2010-compliant products to our customers."

137. Also on September 8, 2010, Navistar filed a Form 10-Q with the SEC for the third quarter of 2010. The Form 10-Q included Navistar's previously-reported financial results and was signed by Defendant Tarapchak. The Form 10-Q also noted the following:

We continue to invest in research, development, and tooling equipment to design and produce our engine product lines to meet EPA emission requirements. We have chosen advanced Exhaust Gas Recirculation ("EGR") combined with other strategies as our solution to meet the 2010 emissions requirements. We believe coupling EGR with other emissions strategies gives our products advantages over our competitors' urea-based Selective Catalytic Reduction ("SCR") solution and enabled us to maintain flexibility in meeting emission requirements. We continue to evaluate our emission strategies on a platform-by-platform basis to achieve the best long-term solution for our customers in each of our vehicle applications. Our continued investment in research and development includes the further enhancement of our advanced EGR technology and the ongoing development of reliable, high-quality, high-performance and fuel-efficient products.

138. Navistar's September 8, 2010 Form 10-Q was accompanied by certifications signed by Ustian and Cederoth, substantially identical to those described above in paragraphs 120 and 121.

139.    On September 27, 2010, Ustian sold 10,000 shares of Navistar common stock at an average price of $45.60 per share, for total proceeds of $456,000.  Approximately one week later, on October 5, 2010, Ustian sold an additional 18,723 shares of Navistar common stock at an average price of $46.15 per share, for total proceeds of $864,009.

140.    Defendants' statements in paragraphs 125-138 above, including that the Company's EGR technology was "on track" and that Navistar had "the only EGR engine available in [the] marketplace"; that the "last half of 2010 will provide opportunities for even better margins as we launch our 2010 EGR strategies"; that Navistar was "prepared for a successful engine launch in the months ahead as it continues on its path to meet the latest emissions requirements through its advanced EGR ... engines"; that the Company "continue[d] to invest in research, development, and tooling equipment to design and produce engine product lines to meet EPA emissions requirements" including "further enhancement of our [EGR] technology to meet 2010 EPA emission regulations"; that the Company was "ready for emissions standards" and that as of March 10, 2010, its products were "being certified today. Some of them have already passed."; that the Company was "prepared for a successful launch of its [EGR] engines as it continues on its path to meet the latest emissions requirements; that as of June 9, 2010, the Company's "worry beads [were] behind [it]"; that as of June 9, 2010, the Company "ha[d] engines running – we have vehicles running that meet those standards of 0.2 [NOx]"; that "[w]e have chosen [EGR] combined with other strategies as our solution to meet the 2010 emissions requirements" and that competitive advantages accrued to that strategy; and that "[a]ll of our businesses continue to perform well" and that the Company was "actively delivering 2010-compliant products to our customers," were false and misleading when made, and/or

omitted material facts, for the following reasons, among others, which Defendants knew of and/or recklessly disregarded:

        a)      The Company's EGR engine technology had not met the EPA's 2010 0.2 NOx emissions requirements and never would, as Defendants later admitted;

        b)      The EPA had not certified any of Navistar's engines at 0.2 NOx, and never would, as Defendants later admitted;

        c)      Navistar had not submitted an application to the EPA for certification at 0.2 NOx, and would not submit such an application until January 31, 2012;

        d)      On August 27, 2010, CW5 authored a report entitled, "Go Fast 0.2 NOx In-Cylinder Solution – Scope," which included, on page 2, a timeline showing that Navistar's emissions credits would be exhausted in either Q1 or Q2 2012, but that the technology for an 0.2 NOx in-cylinder solution could not go into production until at least Q1 2014 for a 13-liter engine, Q3 2014 for an 11-liter engine, and Q1 2015 for a 15-liter engine;

        e)      Non-approval of the Company's EGR engine technology at 0.2 NOx posed severe risks to the Company's well-being, as later acknowledged by Navistar and the EPA, and according to CW3, Company executives had explicitly directed Navistar engineers to cease their development of a back-up plan;

        f)      In a declaration filed in Court on April 5, 2010, David Piech, Director, Powertrain/Vehicle Regulations, Certification & Compliance admitted that Navistar was "still maturing Advanced EGR technology" and in a court filing on April 9, 2010, the EPA stated that "Navistar will only be certified as meeting the 2010 NOx requirements by using banked credits";

        g)      CW1 and CW2 had reported severe technical problems uncovered during the Cummins EGR engine project to Navistar director-level supervisors and vice presidents as

51

early as the summer of 2008, including to Dr. Helmut Endres, who delivered the findings to Ustian;

h)      CW5 reported delayed progress on development of the EGR engine up his reporting chain at least monthly from the time he became Chief Engineer for the project in September or October 2009, including to Iwaszkiewski, who reported to Ustian;

i)      At least by 2010, according to CW6, Navistar held internal monthly (and sometimes bimonthly) presentations where the Engine Group would provide updates on the status of meeting 2010 NOx emissions standards, which were given by Iwaszkiewski and attended by vice presidents, general managers, directors, and chief engineers and project managers;

j)      Also according to CW6, Younessi would attend these meetings and would relay updates to executive management, including to Ustian and Tech, at monthly executive management program review meetings, and, in fact, the 0.2 NOx EGR development program was included on the agenda of these monthly executive management meetings approximately 10 out of 12 months of the year and Iwaskiewicz and/or others would make presentations to executive management on topics related to the 0.2 NOx program;

k)      From 2009 until 2011, according to CW9, Navistar's Engine Engineering section produced quarterly reports and held meetings to provide internal updates on the EGR project;

l)      From February 2011 until CW11's departure in August 2012, he participated in a daily "engineering and quality" teleconference, held at 9:00 a.m. every morning, to update senior executives (including senior executives who reported to Ustian and Cederoth)

52

on delays and problems encountered in the EGR project, and written information relaying what happened on these calls was provided to Ustian;

m)    During CW13's tenure at Navistar, from July 2008 until April 2013, Navistar circulated to the director level and above periodic summary reports on each of its engine and truck programs, which were prepared and disseminated by Defendant Tech and which reflected the "yellow" status of the EGR project beginning in at least 2011; and

n)    During CW13's tenure at Navistar, from July 2008 until April 2013, as confirmed by CW11, Navistar circulated a monthly operations review written by Defendant Tech that included information on sales, warranty costs, and engineering costs and that reflected significant warranty issues in EGR solution engines by mid-2011, and Ustian and upper management had access to these reports because Tech reported directly to Ustian.

## C.    Navistar Misrepresents the Status of Its Application to the EPA and the Progress of its 0.2 NOx Engine Development

141.    In 2012 Navistar became the target of an SEC inquiry into its public disclosures dating from November 1, 2010.  Beginning in November 2010, Navistar representatives repeatedly stated that the Company had a 13-liter EGR engine that would be certifiable by the EPA at 0.2 NOx and it would be submitting the application for certification in a few "months." In fact, the Company did not submit the application until January 31, 2012, *fifteen* months later.

142.    On November 3, 2010, Navistar issued a press release announcing that the Company had finally submitted the 15-liter EGR engine to the EPA for certification at 0.5 NOx and planned to submit the 13-liter for certification at 0.2 NOx in the "next few months":

> Navistar also advised that it has submitted certification to the EPA for its MaxxForce 15 and *plans to submit for EPA certification of its MaxxForce 13 at 0.2g NOx in the next few months*, far ahead of when high volume production of the 0.2g NOx-certified MaxxForce 13 would be required.

143.    On November 3, 2010, Navistar held a press briefing at the Company's Engine Group facility in Huntsville, Alabama.  Ustian and other officers of the Company were later quoted in media articles regarding the Company's readiness to meet the 0.2 NOx standard.

144.    For example, on November 4, 2010, *Fleet Owner* published an article entitled "Navistar Says It Has Engines Meeting 2010 Emissions Standard," which stated in part:

> When Navistar announced it was going to meet the Environmental Protection Agency's 2010 emissions mandate with Advanced EGR technology, many said it couldn't be done.  Some said Navistar could only satisfy the EPA 2010 emissions standard of 0.2 grams of nitrates of oxide (NOx) through the use of emissions credits that allowed its engines to emit 0.5 grams of NOx.

> According to Dan Ustian, president & CEO, Navistar not only can meet the 0.2 NOx level without credits, but customers are warming to its distinct engine solution.

> *"We're 100% there in terms of our ability to do it,"* Dan Ustian, chairman & CEO of Navistar said at a press briefing on Wednesday at the company's Engine Group facility in Huntsville, AL.  "It's really nothing to do with the technology anymore, it's [customer] experience.  They don't have any experience with the engine."

> Ramin Younessi, group vice president-product development & strategy, told *Fleet Owner* that engines meeting the 0.2 limit without credits will be submitted to EPA for certification "within the next few months."

145.    Also on November 4, 2010, *Today's Trucking* published an article entitled "Navistar: NOx-compliant engine achieved," which stated in part:

> Navistar International says it is on the verge of submitting for certification a MaxxForce 13 engine that finally meets the EPA's 0.2g NOx standard, but it will continue selling engines that exceed that EPA limit until its banked emissions credits run out.

> Navistar – the sole heavy-duty engine maker to go with an advanced version of the 2007 EGR system rather than SCR technology – announced it will for the first time submit to EPA 0.2g NOx-compliant engines, "far ahead of when high volume production of the 0.2g NOx-certified MaxxForce 13 would be required."

* * *

54

During the tour, Dan Ustian, chairman & CEO said the new generation, 0.2g NOx-compliant models improve on fuel economy. *They will be submitted to the EPA in the next few months. . . .*

When asked for details before this posting, Navistar spokesman Roy Wiley would only confirm in an email that the "0.2g NOx MaxxForce 13 we mentioned in the release yesterday and plan to submit to the EPA for certification will achieve emissions 'in-cylinder.' Stay tuned."

146.    On November 5, 2010, *Truck News* published an article entitled "Navistar Nearly

Ready to Certify International MaxxForce at 0.2 g NOx," which stated in part:

Navistar International will soon certify its heavy-duty engines at 0.2 g/hp-hr NOx but it will not roll those engines out to industry for as long as possible, until it has exhausted its collection of emissions credits.

During a recent tour of the company's Huntsville, Alabama big bore engine plant, Navistar chairman, president and CEO Dan Ustian told media that the company will certify its engines at 0.2 g NOx so the industry has the peace of mind of knowing it is possible.

*"Because of all the anxiety that is out there, we're going to certify that over the next few months here at 0.2 grams,"* he said, adding the company will then continue selling engines at today's 0.5 g NOx level "as long as we can," so customers will not have to endure another engine change so soon. The 0.2 g NOx engine won't be drastically different from today's, Ustian noted, but will require new algorithms and enhancements to fuel pressure and air management systems.

\* \* \*

"There is this (perception) that when you go to 0.2, you're going to lose fuel economy," Ustian said. "We'll be able to show you that it's better fuel economy (at 0.2 g) just because of improvements in the technology."

147.    On December 22, 2010, the Company issued a press release announcing its

financial results for the fourth quarter and full year 2010. The press release stated, in part:

"The North American truck market has been depressed for three years now and the company has been able to provide good profits while investing in the future growth," said Daniel C. Ustian, Navistar chairman, president and chief executive officer. "The company is well positioned to take advantage of the growing North American market as well as expanding globally."

"Going forward, we anticipate investments in our global operations will deliver profits by fiscal 2011 and provide solid returns to our bottom line in 2012 and

2013," said Ustian. The company has invested more than $55 million in global expansion in 2010.

148. The same day, the Company conducted a conference call with analysts to discuss

its fourth quarter and full year 2010 financial results. During the call, Ustian stated:

Integration is a word that's tough to describe until you see it and we're going to be able show you what integration means. But, I want to point out one thing, and this is kind of our culture. *We're the only ones that meet emissions in the cylinder.* We're only ones that all of our vehicles will have our own engine in it. We're the only ones that have a full integrated product here and we'll show you why that's hard to copy. When you see it, I think, you'll be impressed with how that'll be difficult for others to match what we've got there.

Tech added the following in response to a question from an analyst:

Q – **Analyst:** And then on the 13-liter in terms of certifying that at 0.2, what kind of timeline do you think we're looking at there?

A – **Tech:** *Well it's over the next few months. We'll submit that and it takes a while for them to go through it. But we'll submit that over the next couple of months, I believe.* We'll show you that product, by the way, in Melrose Park on the 25th. We'll show you those modifications. It won't be a great drama to you because you won't be able to see anything, other than *we'll be able to show you the data, that it meets 0.2, and show you how we're able to meet it,* but as far as the customers, he's not going to know the difference, nothing looks any different.

Ustian also had the following exchange with an analyst:

Q – **Analyst:** Sorry about that. My line got dropped. Just a couple of clarifications. Dan, can you talk about the fuel efficiency of your 13-liter 0.2 NOx versus an equivalent SCR 0.2 NOx and if you – and if they're running close comparisons?

A – **Ustian:** Yes, Ann. Yes. We'll show you on the 25th, Ann, but – basically it's this. It gets better. It gets better because there are advanced technologies in the same area that we've worked on before. *The fuel economy of the 0.2 will be better and there will be no change in heat rejection at the same time, so this product will be even better.*

Q – **Analyst:** Will it be better than an equivalent SCR 0.2 NOx?

A – **Ustian:** *Well, our strategy has been we will be equal to any SCR, the best of any SCR product that's out there.* So we're assuming the SCR product gets a

56

*little better, too, so – and that's what we're going to be able to do with getting the 0.2.*

149.     Also on December 22, 2010, Navistar filed a Form 10-K with the SEC for 2010. The Form 10-K included Navistar's previously-reported financial results and was signed by Defendants Ustian, Cederoth, Tarapchak, Clariond, Correnti, Gulyas, Hammes, Harrison, Keyes, Klinger, Osborne, and Williams.  The Form 10-K also noted the following:

**Our Strategy**

Our long-term strategy is focused on three pillars:

I. Great Products

- Growing our product line, including an expanded line of our Class 8 ProStar and LoneStar trucks and Class 4/5 TerraStar trucks manufactured under the International brand, the AC series of small shuttle buses manufactured under the IC brand, and the Vesta RV manufactured under the Monaco brand

- Maintain strong market share in our "traditional classes," including School bus Class 6 and 7 medium, and Class 8 severe service

- Focusing on engine research and development in order to have a competitive advantage using Exhaust Gas Recirculation ("EGR") and other technologies for compliance with 2010 emissions standards

- Introducing our advanced engine technology in new markets

150.     Navistar's December 22, 2010 Form 10-K was accompanied by certifications signed by Ustian and Cederoth, substantially identical to those described in paragraphs 120 and 121.

151.     On January 25, 2011, Navistar issued a press release announcing its earnings guidance for fiscal 2011.  The Company projected substantial gains in fiscal 2011 earnings due in part to the Company's implementation of its "three-pillar growth strategy and improving economic conditions."  The Company further reported it expected net income to be between

1777281.1

$388 million and $466 million, or $5 to $6 diluted EPS, for the fiscal year ending October 31, 2011.  The release stated in part:

> "As evidenced by our guidance, our strategy continues to drive value for our shareholders," said Daniel C. Ustian, Navistar chairman, president and chief executive officer.  "Coming out of the recession, we have developed today's earning guidance around a stronger economy, further expansion of our after-market service parts business and continued benefit from great products, a competitive cost structure and profitable growth.

152.    Also on January 25, 2011, Navistar conducted an Analyst Day conference call at its Melrose Park plant.  During the call, Ustian stated:

> And then the other thing that they've done that's kind of interesting is they've used, after they realize that's in jeopardy here, they try other things, like how could all the companies be going one way and Navistar be going the other way?  It must be Navistar is the problem.  Well, they say I've got European engineers.  Everybody knows European engineers are smarter than the North American engineers.  *Well, the facts are now out, our products are out there and they're delivering actually a little bit better than what we said on fuel economy, durability, the whole thing.*

Allen added:

> Few highlights.  The MaxxForce 7 is doing phenomenal.  We're seeing 9% better fuel economy than the prior model.  The MaxxForce 13, as I've said the fuel economy is at parity or better than anything in the market and *we'll be applying for our 0.2 certification here in the next couple of months.*  The MaxxForce 15 is EPA-certified.  Someone asked me a question about that today.  I assume that was widely known.  MaxxForce 15 is fully certified with the EPA.

153.    On March 9, 2011, prior to the markets' open, Navistar issued a press release announcing its financial results for the first quarter of 2011.  The press release stated, in part:

> "We have significantly raised truck production schedules by up to 40 percent on various models to reflect increasing order activity.  And, overall, we remain confident that we can deliver upon our commitments while still investing in our global business," said Daniel C. Ustian, Navistar chairman, president and chief executive officer.  "We see positive signs across all of our businesses.  We believe industry volumes should be at the higher end of our range, military revenue will approach $2 billion, global volumes are expanding and so far we have contained challenges in commodity costs.  Such that, we believe we can deliver results toward the higher side of our guidance."

154.    The same day, the Company conducted a conference call to discuss its first quarter 2011 financial results.  During the call Ustian stated:

Now let's talk about in-cylinder 0.2.  One of our challenges, perhaps as difficult a challenge as the technology itself, was the marketing side of our solution, which is in-cylinder.  Since we were the only ones out there, there's a lot coming at us with, oh, this can't work.

*And of course, now we're out in the marketplace, and that's over.  That argument's over.  We're out there in the marketplace.  We're exceeding what we had committed to in terms of performance and fuel economy and all of that.  So that's over.*

Well, we want to get in front of the 0.2 now, because we can anticipate – here's the next one coming out that 0.2 can't be done.  *So what we did is we submitted to the EPA certification of 0.2 to take that argument away.*  We don't plan on using this for a while, but we're going to have it out there on the shelf, that says that it can be done, and we can meet the standards and get all the performance features, as well.

So that's what we've done.  When you hear about that, it's not that it's coming into production tomorrow.  *It's just to get it out there and take all of that argument away.*

Ustian also had the following exchanges with analysts:

Q –    …on the 13-liter certification at 0.2, can you talk a little bit about what you did to the end then to get that in compliance at that level?  Was there any after-treatment in there?  Any other tweaks to the engines you can share?

A –    **Ustian:**  Yeah.  It's the same things.  It's in fuel, air controls, cooling.  So it's enhancements in every one of them.

Q –    **Analysts:**  So it's all in-cylinder, there's no after-treatments?

A –    **Ustian:**  No after-treatment. No.

                                        * * *

Q –    **Analyst:**  Okay.  All right, great.  And then just one more little one.  I think, Dan, at the beginning of the call it sounds like you said that the MaxxForce 13 was certified at 0.2, but it looks like you were just saying it was submitted for certification.  Have you actually received certification?

59

A – **Ustian:** No, no. *We just submitted it to the EPA.* It takes a period of time – I don't know – two to three months before we'll hear back from them likely. But we're not in a hurry. *We just want to have it out there so we can take the argument away that it can't be done.*

155. Also on March 9, 2011, Navistar filed a Form 10-Q with the SEC for the first quarter of 2011. The Form 10-Q included Navistar's previously-reported financial results and was signed by Defendant Tarapchak.

156. Navistar's March 9, 2011 Form 10-Q was accompanied by certifications signed by Ustian and Cederoth, substantially identical to those described in paragraphs 120 and 121.

157. On March 29, 2011, Cederoth sold 9,548 shares of Navistar stock at an average price of $67.34 per share, for proceeds of $642,962.32.

158. On April 5, 2011, Navistar issued a press release entitled "Navistar Receives EPA Certification for MaxxForce DT Mid-Range Diesel Engine at 0.39g NOx – With EPA and CARB Certification of MaxxForce 15, Submission of MaxxForce 13 at 0.2g NOx, Company Continues to Make Strides in Its In-Cylinder Emissions Technology Path." The press release stated, in part:

MaxxForce 13 at 0.2g NOx Submitted to EPA

*Navistar also recently submitted its MaxxForce 13 at 0.20g NOx for EPA certification*, once again reiterating its prime technology path in meeting the 0.20g NOx standard through in-cylinder technologies. The company intends to phase-in its engines at progressively lower NOx emissions levels (0.4g NOx, 0.35g NOx, 0.3g NOx, 0.25g NOx, etc.) in the years ahead in an effort to make emissions compliance as seamless as possible to its customers.

"During the past several years, while other OEMs were producing engines at or above the required emissions standard, Navistar produced engines much cleaner than the standard, in turn, generating credits that today provide us with the flexibility needed to develop the most customer-focused emissions technologies in the industry," Younessi added. "Our MaxxForce Advanced EGR in-cylinder emissions technology remains the only solution in compliance with EPA standards at the turn of the key, without the need for aftertreatment and without customers having to find and fill liquid urea for their SCR systems."

60

159.    The same day, Ustian sold 55,469 shares of Navistar stock at an average price of $69.59 per share, for total proceeds of $3,860,087.71.

160.    Defendants' statements in paragraphs 142-158 above, including that as of November 3, 2010, the Company "plan[ned] to submit for EPA certification of its MaxxForce 13 at 0.2g NOx in the next few months"; that the Company was "100% there in terms of [its] ability to do [EGR]"; that engines meeting the 0.2 NOx requirement would be submitted to the EPA "within the next few months"; that "[t]he Company is well positioned to take advantage of the growing North American market as well as expanding globally"; that Defendants were "the only ones that meet emissions in the cylinder"; that Navistar's 0.2 NOx application would be submitted to the EPA "over the next couple of months" and that the Company was prepared to show analysts that its engine "meets 0.2 NOx"; that one of the pillars of the Company's strategy was "[f]ocusing on engine research and development in order to have a competitive advantage using [EGR] and other technologies for compliance with 2010 emissions standards"; that as of January 25, 2011, the Company's EGR "products are out there and they're delivering … better than what we said"; that the Company was "out in the marketplace" with its EGR and had, in fact, "submitted to the EPA certification of 0.2 [NOx]"; and that Navistar had "recently submitted its MaxxForce 13 at 0.20g NOx for EPA certification," were false and misleading when made, and/or omitted material facts, for the following reasons, among others, which Defendants knew of and/or recklessly disregarded:

a)    The Company's EGR engine technology had not met the EPA's 2010 0.2 NOx emissions requirements and never would, as Defendants later admitted;

b)    The EPA had not certified any of Navistar's engines at 0.2 NOx, and never would, as Defendants later admitted;

61

c)　　　Navistar had not submitted an application to the EPA for certification at 0.2 NOx, and would not submit such an application until January 31, 2012;

d)　　　On August 27, 2010, CW5 authored a report entitled, "Go Fast 0.2 NOx In-Cylinder Solution – Scope," which included, on page 2, a timeline showing that Navistar's emissions credits would be exhausted in either Q1 or Q2 2012, but that the technology for an 0.2 NOx in-cylinder solution could not go into production until at least Q1 2014 for a 13-liter engine, Q3 2014 for an 11-liter engine, and Q1 2015 for a 15-liter engine;

e)　　　Non-approval of the Company's EGR engine technology at 0.2 NOx posed severe risks to the Company's well-being, as later acknowledged by Navistar and the EPA, and according to CW3, Company executives had explicitly directed Navistar engineers to cease their development of a back-up plan;

f)　　　In a declaration filed in Court on April 5, 2010, David Piech, Director, Powertrain/Vehicle Regulations, Certification & Compliance admitted that Navistar was "still maturing Advanced EGR technology" and in a court filing on April 9, 2010, the EPA stated that "Navistar will only be certified as meeting the 2010 NOx requirements by using banked credits";

g)　　　CW1 and CW2 had reported severe technical problems uncovered during the Cummins EGR engine project to Navistar director-level supervisors and vice presidents as early as the summer of 2008, including to Dr. Helmut Endres, who delivered the findings to Ustian;

h)　　　CW5 reported delayed progress on development of the EGR engine up his reporting chain at least monthly from the time he became Chief Engineer for the project in September or October 2009, including to Iwaszkiewski, who reported to Ustian;

    i)  At least by 2010, according to CW6, Navistar held internal monthly (and sometimes bimonthly) presentations where the Engine Group would provide updates on the status of meeting 2010 NOx emissions standards, which were given by Iwaszkiewski and attended by vice presidents, general managers, directors, and chief engineers and project managers;

    j)  Also according to CW6, Younessi would attend these meetings and would relay updates to executive management, including to Ustian and Tech, at monthly executive management program review meetings, and, in fact, the 0.2 NOx EGR development program was included on the agenda of these monthly executive management meetings approximately 10 out of 12 months of the year and Iwaskiewicz and/or others would make presentations to executive management on topics related to the 0.2 NOx program;

    k)  According to CW7, either CW7 or Iwaszkiewski met regularly with Ostarello, Mooney, and Younessi, who reported to Ustian, to discuss the troubled EGR program, beginning at least when he became the lead Vehicle Program Chief Engineer for the 0.2 NOx engines in October of 2010;

    l)  From 2009 until 2011, according to CW9, Navistar's Engine Engineering section produced quarterly reports and held meetings to provide internal updates on the EGR project;

    m)  From February 2011 until CW11's departure in August 2012, he participated in a daily "engineering and quality" teleconference, held at 9:00 a.m. every morning, to update senior executives (including senior executives who reported to Ustian and Cederoth) on delays and problems encountered in the EGR project, and written information relaying what happened on these calls was provided to Ustian;

n)　　During CW13's tenure at Navistar, from July 2008 until April 2013, Navistar circulated to the director level and above periodic summary reports on each of its engine and truck programs, which were prepared and disseminated by Defendant Tech and which reflected the "yellow" status of the EGR project beginning in at least 2011; and

o)　　During CW13's tenure at Navistar, from July 2008 until April 2013, as confirmed by CW11, Navistar circulated a monthly operations review written by Defendant Tech that included information on sales, warranty costs, and engineering costs and that reflected significant warranty issues in EGR solution engines by mid-2011, and Ustian and upper management had access to these reports because Tech reported directly to Ustian.

161.　　On June 7, 2011, Navistar issued a press release announcing its second quarter 2011 financial results. The Company reported net income of $80 million, or $1.02 diluted EPS. The press release stated, in part:

> "The second quarter results represent good earnings and strong cash flow from operations while building to deliver to our 2011 and beyond objectives," said Daniel C. Ustian, Navistar chairman, president and chief executive officer. "We continue to see increasing customer acceptance of all our engine and vehicle families, confirming we have the right strategy in place and that we will deliver full year results toward the higher side of our previous guidance.
>
> 　　　　　　　　　　* * *
>
> "In the second quarter, our growth strategy continued to unfold as we introduced a number of products to the market place," said Ustian. "Our core business has seen an increase in volume and our military and service parts continue to deliver strong results. We also delivered solid results while investing in our future and growing globally."

162.　　The same day, the Company conducted a conference call with analysts to discuss its second quarter 2011 financial results. During the call, Ustian stated:

> Henry, one of the things we've had in the past, EGR, and this is all gone. I mean, we haven't heard any signs of any even discussion on it other than the benefits that we get from EGRs, lower weight and not having to deal with urea. *But as far*

*as any discussion on SCR versus EGR, I mean those things are past a long time ago.*

Cederoth also had the following exchange with respect to warranty reserves:

A – **Cederoth:** We're seeing some higher corporate costs related to stock option expenses.

Q – **Analyst:** Okay. And then second question on your warranties. How are you accruing for warranties going forward? And how has that changed versus prior cycles now that you're building your own – much more of your own engines?

A – **Cederoth**: Nothing has changed in the way we accrue for warranties. We always forecast the total life expense of the warranty, and we accrue that when we ship the product. The adjustments that we made in Q2 were related to some older products where costs were coming in higher.

163.     The slide presentation prepared for the call included the following slide:

Q16: What is Navistar doing to meet the 0.20g NOx emissions when its credits are depleted?

A: Navistar remains committed to its strategy of providing solutions that let customers focus on their business, not emissions regulations. Solutions under development are multi-pronged and include our prime path of in-cylinder solutions along with application-specific solutions such as the Amminex metal ammine-based NOx reductant delivery system which Navistar announced in December 2009. *We submitted an application for the 0.20g NOx 13L EGR engine to the EPA.*

164.     Also on June 7, 2011, Navistar filed a Form 10-Q with the SEC for the second quarter of 2011. The Form 10-Q was signed by Defendant Tarapchak. The Form 10-Q included Navistar's previously-reported financial results and also stated in relevant part:

Advanced Exhaust Gas Recirculation ("EGR"), combined with other strategies, is our solution to meet ongoing emissions requirements. Advancements in EGR technology have resulted in reductions in emissions of nitrogen oxides ("NOx") from 1.2 or more grams per brake horsepower-hour through 2009 to 0.5 grams in 2010, to as low as 0.39 grams in 2011, with additional reductions in process. Our engines meet current EPA certification requirements because of emissions credits we earned from 2007 through 2009 via the early adoption of technologies that reduced NOx levels beyond what was then mandated. The rate of usage of these emissions credits is dependent upon a variety of factors, including sales, product

65

mix and improvements in technologies. We continue to invest in our EGR technology, combined with other strategies, to meet current EPA emission requirements in North America and Euro IV emissions requirements in South America, as well as evaluate our emissions strategies on a platform-by-platform basis to achieve the best long-term solution for our customers in each of our vehicle applications. As a result of these strategies, we do not expect the rate of usage of emissions credits to have a material adverse effect on our business and believe that coupling EGR with other emission strategies will provide a significant competitive advantage over our competition's products.

165. Navistar's June 7, 2011 Form 10-Q was accompanied by certifications signed by Ustian and Cederoth, substantially identical to those described in paragraphs 120 and 121.

166. On August 10, 2011, Navistar hosted a conference call for analysts at the Jefferies & Co. Global Industrial and A&D Conference during which Ustian represented the following:

So now let's dissect Class 6 and 7, let's talk about what were the ingredients for us in that strategy. And on the Class 6 and 7 business, remember our strategy included taking a technology path that was different than anyone in the world, certainly in North America, but basically anyone in the world. And that technology path says that, we will answer emissions inside the cylinder without the need for after treatment. It helps our customer and obviously, our cost structure is a lot better from it as well. While at the beginning of this year, we had a couple of major fleets that weren't convinced that we could accomplish that. And so, they didn't buy and our market share was 35% which is where we were prior to the strategy.

*Today, we've been able to show to those fleets that we can deliver with this product.* In fact, better than any other methodology, and our share for the last three months it's been 43%. So you can see in mediums, we're on a clear path to achieve our goals of increasing margins and increasing our presence in the medium truck marketplace.

On Class 8, our strategy was threefold. *Number one, that same technology path of delivering emissions inside the cylinder.*

167. On September 7, 2011, Navistar issued a press release announcing its financial results for the third quarter of 2011. The Company reported net income of $1.4 billion, or $18.24 diluted EPS for the period ended July 31, 2011. The press release stated, in part:

"The industry continued its recovery in the third quarter, and our results reflect this strengthening as well as our continued investments for future growth. We

introduced new products for our growing global presence, invested in our engineering integration and heavy engine strategies, and took additional actions to reduce costs and further increase our manufacturing flexibility," said Daniel C. Ustian, Navistar chairman, president and chief executive officer.

"As a result, we are well positioned to deliver a strong fourth quarter, achieve our adjusted full-year earnings of $5 to $6 per share, and enter 2012 with positive momentum."

\* \* \*

"Our proven ability to deliver consistent earnings, even in the toughest of times, coupled with our future growth prospects gives us the confidence that we can capture the benefits of these deferred tax assets. As a result, Navistar is now in its best equity position in the last ten years," said Ustian. "Given our strong cash position, we are launching a significant buyback of our stock, which we believe is currently undervalued. We are also evaluating additional return on capital options and look forward to announcing them early in 2012."

168. The same day, the Company conducted a conference call with analysts to discuss its financial results for the third quarter of 2011. During the call, Cederoth stated that Navistar's EGR technology was "on par with the best SCR competitors." The call was accompanied by a slide presentation that included the following:

Q16: What is Navistar doing to meet the 0.20g NOx emissions when its credits are depleted?

A: Navistar remains committed to its strategy of providing solutions that let customers focus on their business, not emissions regulations. Our primary path continues to be Advanced EGR. *This technology is proving extremely viable providing fuel economy and performance on par with the best SCR competitors.* Customer acceptance is excellent with over 60,000 vehicles built at 0.5 grams NOx or better. *As we develop 0.20g NOx capability our goal of continuing to improve performance and fuel economy at this emissions level is being realized.*

169. Also on September 7, 2011, Navistar filed a Form 10-Q with the SEC for the third quarter of 2011. The Form 10-Q was signed by Defendant Tarapchak. The Form 10-Q included Navistar's previously-reported financial results and also stated in relevant part:

Advanced Exhaust Gas Recirculation ("EGR"), combined with other strategies, is our solution to meet ongoing emissions requirements. Advancements in EGR technology have resulted in reductions in emissions of nitrogen oxides ("NOx") from 1.2 or more grams per brake horsepower-hour through 2009 to 0.5 grams in

67

2010, to as low as 0.39 grams in 2011, with additional reductions in process. Our engines meet current EPA certification requirements because of emissions credits we earned from 2007 through 2009 via the early adoption of technologies that reduced NOx levels beyond what was then mandated. The rate of usage of these emissions credits is dependent upon a variety of factors, including sales, product mix and improvements in technologies. We continue to invest in our EGR technology, combined with other strategies, to meet current EPA emission requirements in North America and Euro IV emissions requirements in South America, as well as evaluate our emissions strategies on a platform-by-platform basis to achieve the best long-term solution for our customers in each of our vehicle applications. As a result of these strategies, and other legal regulatory courses of action available to us, we do not expect the rate of usage of emissions credits to have a material adverse effect on our business. We believe that coupling EGR with our other emission strategies will provide a significant competitive advantage over our competition's products.

170.    Navistar's September 7, 2011 Form 10-Q was accompanied by certifications signed by Ustian and Cederoth, substantially identical to those described in paragraphs 120 and 121.

171.    Contrary to Ustian's and Cederoth's certifications, Navistar's third quarter 2011 financial statements did not comply with GAAP, for the reasons given in paragraphs 208-219 below.

172.    Even though in the middle of September 2011, Navistar had publicly stated that it did not expect "the rate of usage emissions credits to have a material adverse effect on our business," by October 2011, the Company had privately informed the EPA that its emissions credits would be exhausted imminently.  This development was not disclosed publicly at the time.  In court documents filed later by the EPA:

In October 2011, Navistar orally informed EPA of its imminent emissions credit shortage.  At that time, Navistar had "not provided EPA with any 2012 model year applications for certification for which EPA could certify Navistar produced heavy heavy-duty diesel engines as meeting the 0.20 g/hp-hr standard without credits."  The exact date that those credits would be gone depended on Navistar's rate of sales – a figure that could not be precisely determined at that time.  Given

this uncertainty, and based on Navistar's prior sales, EPA reasonably estimated that Navistar's credits likely would be exhausted sometime in February 2012.[11]

173.    On October 31, 2011, Navistar hosted a conference call for analysts at the Gabelli & Company, Inc. Automotive Aftermarket Symposium, during which Defendant Ustian represented the following:

> *We are the only ones that are able to ... satisfy the emissions regulations inside the cylinder.* And we use the same thing – the same tools that are in engine, diesel engine manufacturing. And that is better combustion, better fuel, and air match with an electronic control system that allows those to provide the cleanest burn.

174.    On December 20, 2011, Navistar issued a press release announcing its fourth quarter and full year 2011 financial results. The Company reported net income of $255 million, or $3.48 diluted EPS for the fourth quarter ended October 31, 2011. Additionally, the Company reported net income for fiscal year 2011 was $1.7 billion, or $22.64 diluted EPS. The release stated in part:

> "We are pleased that we have finished the year strong and delivered solid fourth quarter results across all segments," said Daniel C. Ustian, Navistar chairman, president and chief executive officer. "Not only did we deliver on 2011 commitments, we continued to invest in our strategy and set the foundation for a strong 2012."
>
>                                  * * *
>
> "We expect the industry to continue its steady recovery," said Ustian. "We will continue to leverage our market leading North American businesses, invest in new products and expand further into global markets, while effectively controlling our costs."

175.    The same day, the Company conducted a conference call with analysts to discuss its financial results for the fourth quarter and full year 2011. During the call, Ustian stated the following in response to a question from an analyst:

---

[11]  Respondent's Brief, at 29-30, *Mack Trucks, Inc. v. EPA*, No. 12-1077 (D.C. Cir. Apr. 10, 2012).

Q - **Analyst:** … so just a question on the 13-liter and certification, just progress within that process and any communication between you and the EPA, and when we could potentially see any news on certification at 0.2?

A - **Ustian:** yeah, so here's where we're at on it. *We're going to submit for certification to the EPA on our big bore engine family, mostly the 13-liter first.* This is how it has worked. If you go back into time – remember for those of you that aren't familiar with us, what we did is kind of a building block strategy on emissions, and our emission strategy is inside the cylinder. So what we did is keep the standards that earn credits, use the credits while we get the technologies maturing. We've also said that the first product that would utilize all those credits up would be on our big bore engines and that's kind of where we're at.

But we are prepared now with the advancements in our technology and the strides we have made to mature that 0.2 solution to be able to submit it to the EPA in the very short term. What we're going to do is on – we'll be able to show you all of that how on Analyst Day on February 1, and I think it'll become clearer to you how we're able to do that. But the integration is a big part of it. Obviously technology advancements in fuel, air and controls is what makes that work for us.

176.    Also on December 20, 2011, Navistar filed its Form 10-K with the SEC for 2011,

signed by Defendants Ustian, Cederoth, Tarapchak, Clariond, Correnti, Gulyas, Hammes,

Harrison, Keyes, Klinger, McChrystal, and Williams. The Form 10-K included Navistar's

previously-reported financial results and also noted:

We continue to invest in research, development, and tooling equipment to design and produce our engine product lines to meet EPA and California Air Resources Board ("CARB") emissions requirements. EGR, combined with other strategies, is our solution to meet ongoing emissions requirements. Advancements in EGR technology have resulted in reductions in emissions of nitrogen oxides ("NOx") from 1.2 or more grams per brake horsepower-hour through 2009 to 0.5 grams in 2010, to as low as 0.39 grams in 2011, with additional reductions in process.

* * *

In 2011 and 2010, our engines met EPA and CARB certification requirements because of emissions credits we earned from 2007 through 2009 via the early adoption of technologies that reduced NOx levels beyond what was then mandated. The rate of usage of these emissions credits is dependent upon a variety of factors, including sales, product mix and improvements in technologies. For some categories of engines we make, we expect to use our remaining emissions credits some time in 2012. We plan to submit certification applications to both EPA and CARB in the near future. We believe that our engines meet both

70

agencies' certification requirements.  We are engaged in ongoing discussions with officials from both EPA and CARB regarding potential regulatory solutions that would permit us to continue uninterrupted production of all of our engines.  We cannot predict the outcome of these discussions nor the effect they may have on our business or our financial condition, results of operation or cash flows.

177.    Navistar's December 20, 2011 Form 10-K was accompanied by certifications signed by Ustian and Cederoth, substantially identical to those described in paragraphs 120 and 121.

178.    Contrary to Ustian's and Cederoth's certifications, Navistar's fourth quarter and annual 2011 financial statements did not comply with GAAP, for the reasons given in paragraphs 208-219 below.

179.    On January 23, 2012, *Land Line Magazine* issued an article entitled "Navistar running low on emissions credit but has a plan," which stated in part:

Navistar engines produced for several models of heavy-duty trucks are only certified to meet federal emissions standards until late February.  After that point, the truck builder will have run out of emissions credits unless it unveils a new engine that meets federal NOx standards.

Navistar says it has a plan and will be unveiling a new engine "very soon."

* * *

The emissions credits issue affects Navistar big bore engines of 11, 13 and 15-liters, said Navistar Spokeswoman Karen Denning.

"Navistar remains confident in our EGR strategy and will be submitting a .2 engine for certification very soon," Denning told *Land Line Magazine* Monday.

180.    On January 31, 2012, the EPA promulgated an interim final rule ("IFR") titled "Nonconformance Penalties for On-Highway Heavy Heavy-Duty Diesel Engines," 77 Fed. Reg.

4681. Although the IFR did not refer to Navistar by name, as is clear from the text (and as Navistar conceded in subsequent litigation),[12] the following refers to Navistar and only Navistar.

> EPA is promulgating NCPs for heavy heavy-duty diesel engines because we have concluded that there is a significant likelihood that they will be needed by an engine manufacturer that has not yet met the requirements for technological reasons. One manufacturer is currently using NOx credits to certify all of its heavy heavy-duty diesel engines at nearly the FEL cap level of 0.50 g/hp-hr. Based on its current credit balance and projected sales for this service class, we do not expect this manufacturer to have sufficient credits to cover its entire model year 2012 production. This manufacturer intends to use a different technology to meet the NOx standard **but has not yet submitted an application for the 2012 model year with NOx emissions at or below the 0.20 g/hp-hr standard.** Since it has not yet submitted an application for certification for any model year 2012 heavy heavy-duty [*sic*] diesel engines that would not require emission credits, we believe it is a reasonable possibility that this manufacturer may not be able to comply for technological reasons with respect to the 2010 NOx standards for heavy heavy-duty diesel engines in the 2012 and 2013 model years. This manufacturer notified us late in 2011 that it would not have enough emission credits for its model year 2012 heavy heavy-duty engines.

181. Defendants' statements in paragraphs 161-179 above, including that the debate between SCR and EGR had "past a long time ago"; that the Company had "submitted an application for the 0.20g NOx 13L EGR engine to the EPA"; that "[EGR], combined with other strategies, is our solution to meet ongoing emissions requirements" and that competitive advantages accrued to that strategy; that "we've been able to show … that we can deliver with [EGR technology]"; that the Company's EGR technology was "on par with the best SCR competitors"; that the Company's EGR technology was "proving extremely viable" and that its goal of improving performance and fuel economy at the 0.2 NOx emissions level "is being realized"; that Navistar did not expect "the rate of usage emissions credits to have a material adverse effect on our business"; and that Defendants were "the only ones that are able to … satisfy the emissions regulations inside the cylinder," were false and misleading when made,

---

[12] *See* Navistar, Inc.'s Motion for Leave to Intervene at 3-4, *Mack Trucks, Inc. v. EPA*, No. 12-1077 (D.C. Cir. Feb. 28, 2012).

and/or omitted material facts, for the following reasons, among others, which Defendants knew of and/or recklessly disregarded:

a)     The Company's EGR engine technology had not met the EPA's 2010 0.2 NOx emissions requirements and never would, as Defendants later admitted;

b)     The EPA had not certified any of Navistar's engines at 0.2 NOx, and never would, as Defendants later admitted;

c)     Navistar had not submitted an application to the EPA for certification at 0.2 NOx, and would not submit such an application until January 31, 2012;

d)     On August 27, 2010, CW5 authored a report entitled, "Go Fast 0.2 NOx In-Cylinder Solution – Scope," which included, on page 2, a timeline showing that Navistar's emissions credits would be exhausted in either Q1 or Q2 2012, but that the technology for an 0.2 NOx in-cylinder solution could not go into production until at least Q1 2014 for a 13-liter engine, Q3 2014 for an 11-liter engine, and Q1 2015 for a 15-liter engine;

e)     Non-approval of the Company's EGR engine technology at 0.2 NOx posed severe risks to the Company's well-being, as later acknowledged by Navistar and the EPA, and according to CW3, Company executives had explicitly directed Navistar engineers to cease their development of a back-up plan;

f)     In a declaration filed in Court on April 5, 2010, David Piech, Director, Powertrain/Vehicle Regulations, Certification & Compliance admitted that Navistar was "still maturing Advanced EGR technology" and in a court filing on April 9, 2010, the EPA stated that "Navistar will only be certified as meeting the 2010 NOx requirements by using banked credits";

g)      In October 2011, Navistar had orally informed EPA of its imminent emissions credit shortage, and based on this information, EPA reasonably estimated that Navistar's emissions credits likely would be exhausted sometime in February 2012;

h)      CW1 and CW2 had reported severe technical problems uncovered during the Cummins EGR engine project to Navistar director-level supervisors and vice presidents as early as the summer of 2008, including to Dr. Helmut Endres, who delivered the findings to Ustian;

i)      CW5 reported delayed progress on development of the EGR engine up his reporting chain at least monthly from the time he became Chief Engineer for the project in September or October 2009, including to Iwaszkiewski, who reported to Ustian;

j)      At least by 2010, according to CW6, Navistar held internal monthly (and sometimes bimonthly) presentations where the Engine Group would provide updates on the status of meeting 2010 NOx emissions standards, which were given by Iwaszkiewski and attended by vice presidents, general managers, directors, and chief engineers and project managers;

k)      Also according to CW6, Younessi would attend these meetings and would relay updates to executive management, including to Ustian and Tech, at monthly executive management program review meetings, and, in fact, the 0.2 NOx EGR development program was included on the agenda of these monthly executive management meetings approximately 10 out of 12 months of the year and Iwaskiewicz and/or others would make presentations to executive management on topics related to the 0.2 NOx program;

l)      According to CW7, either CW7 or Iwaszkiewski met regularly with Ostarello, Mooney, and Younessi, who reported to Ustian, to discuss the troubled EGR program,

74

beginning at least when he became the lead Vehicle Program Chief Engineer for the 0.2 NOx engines in October of 2010;

m)     From 2009 until 2011, according to CW9, Navistar's Engine Engineering section produced quarterly reports and held meetings to provide internal updates on the EGR project;

n)     From February 2011 until CW11's departure in August 2012, he participated in a daily "engineering and quality" teleconference, held at 9:00 a.m. every morning, to update senior executives (including senior executives who reported to Ustian and Cederoth) on delays and problems encountered in the EGR project, and written information relaying what happened on these calls was provided to Ustian;

o)     During CW13's tenure at Navistar, from July 2008 until April 2013, Navistar circulated to the director level and above periodic summary reports on each of its engine and truck programs, which were prepared and disseminated by Defendant Tech and which reflected the "yellow" status of the EGR project beginning in at least 2011; and

p)     During CW13's tenure at Navistar, from July 2008 until April 2013, as confirmed by CW11, Navistar circulated a monthly operations review written by Defendant Tech that included information on sales, warranty costs, and engineering costs and that reflected significant warranty issues in EGR solution engines by mid-2011, and Ustian and upper management had access to these reports because Tech reported directly to Ustian.

## D.     Navistar Finally Submits the 13-Liter EGR Engine for Certification at 0.2 NOx

182.     On January 31, 2012, Navistar finally submitted its 13-liter EGR engine to the EPA for certification at 0.2 NOx.  On February 1, 2012, Navistar conducted an Analyst Day at its Lisle, Illinois headquarters.  During the call, Allen stated the following:

So, let's start – remember, what are we trying to accomplish here? First is an integrated powertrain, drive performance, control our destiny, a lot of reasons for that' anticipate the market moving to 13-liters and being out ahead of that; and then the third one, achieve 0.2 emissions and achieve it without external after treatment. *Without a doubt in our mind and I think that of the industry, our solution is the simplest. It's the most customer friendly and we are providing equal or better performance than the SCR systems without any of the cost, without the maintenance or without the hassle of SCR.*

So, on the – *on our 0.2, as Dan said, we submitted that earlier this week.* This is a production engine. This will have no degradation in performance. We've been working back and forth with the EPA now for a number of months on this submission and you know it's a complicated process and it takes time. The EPA will evaluate our submission and we'll work back and forth with them. At the same time we'll take the time to make sure that this engine and this calibration is ready for production.

So what will we do in the meantime? Well we have a clear path that we are going to be able to build this year and certify our engines in all 50 states, that's not under debate from our standpoint. How are we going to do that? Well certainly, we're going to use the credits that we have in our bank and we'll also if required, we'll use other avenues that the EPA has put forward for us. We think that if we do go down that path and the impact of us financially, this year will be minimal from that effect.

*Our goal is to continue to demonstrate that we're a leader in this area. We are the only manufacturer in the world who is going to have a 0.2 gram NOx engine, out of the engine, engine out alone.* We will have lower [ph] N2O (20:32) levels than any SCR engine and as D talked about, we're well prepared to meet the greenhouse gas regulations without any really large significant investments going forward.

Ustian also stated the following in response to a question from an analyst:

Q - **Analyst:** … A couple of other questions on the engine. Can you give a sense of what the differences are between the current engine that's with the EPA at 0.2 versus the one at 0.43 and can you just give us a sense of looking from the outside, why you sort of let it get down to this level where you may be close to running out of credits and – yeah, start with those.

A - **Ustian:** … It's all in the responsiveness of the control unit that – before that. And, as far as waiting so long I mean we have to develop those controls and this is just what it took to get us to that.

*That's always been in our plan. This is not like we're late on what we intended or anything. This has been the plan.* We knew we were going to be tight with this,

but we're confident in the solution. You'll see next, we'll do a 15-liter then we're going to do the MaxxForce DTs, so it's just now going to be a string over a period of time.

\* \* \*

Q - **Analyst:** … What is plan B if the EPA certification isn't done in time, if for whatever reason they send you back? Just if you could give people an idea. Do you pay a fine and continue to work on a solution? Kind of what is plan B is the short term question. I'll start with that.

A - **Ustian:** Yeah, I think if you think about what has transpired over the past month while we're in the process of submitting this, the EPA says we can't have the pressure on us to make sure that that happens exactly like you want it. So they work with us on getting this, I don't want to call it [ph] NTP (1:58:15) credits available to us. And that's what that's all about. So if there's some period of time lapse where the approval process and our credits are at an imbalance, we have the opportunity, so that's plan B. We don't ever plan on using plan B but that is plan B and why it's out there to take away that risk.

183.    On February 14, 2012, Navistar's share price declined after an internet article reported that the EPA had advised Navistar it would be fined for shipping thousands of back-dated engines during its 2010 engine transition. The fines were expected to be as much as $37,500 per violation, or up to $285 million.

184.    In a February 28, 2012 letter to counsel for Daimler Trucks,[13] the EPA stated the following:

Based on confidential business information available to EPA at the time the [IFR] was signed [January 20, 2012], EPA determined that there was *no viable technological path available to Navistar during the interim period that would allow it to produce engines that fully comply with 0.20 g/hp-hr NOx emission standard*, or to use compliant engines made by another manufacturer in its vehicles. This determination was based on EPA's analysis of the performance of Navistar's emission controls, which unlike the rest of the industry do not rely on selective catalytic reduction (SCR). The determination was also based on the amount of time it would take [to] redesign its engines and vehicles for an alternate compliance path that would use SCR to reduce NOx emissions. *These limitations are technological rather than economic in nature, and no amount of money could*

---

[13] The same day, the EPA wrote substantially the same letter to counsel for Mack Trucks and Volvo.

*be spent by Navistar to bring its engines into compliance during the interim period.*

The EPA further stated with regard to Navistar's recently-submitted application:

EPA has indeed received an application for certification from Navistar for a 0.20 g/bhp-hr engine. *However, EPA's initial view is that there are several significant problems with Navistar's application. ... EPA has substantial concerns regarding the ability of Navistar to certify its engine at a 0.20 g/bhp-hr level.* In addition, even if Navistar's engine could be certified, Navistar apparently will not be able to introduce the engine into commerce until June 15, 2012 at the earliest, based on their request for certification.

The EPA elaborated on the risk that non-certification posed for Navistar:

*The consequences of EPA's inability to certify Navistar engines with NCPs could be devastating to Navistar.* In an Analysis of Potential Economic Impacts of Delaying NCPs, ... EPA states that "[a]t a minimum, this would have led to Navistar ceasing nearly all assembly of heavy heavy-duty diesel engines. Navistar may or may not have continued production of heavy heavy-duty engines for export. Since Navistar's current tractor designs would need to be redesigned to accept other manufacturers' SCR-equipped engines, it would likely also have led to Navistar ceasing assembly of heavy heavy-duty vehicles for up to a year." ... The analysis goes on to state that Navistar's global operations employed more than 15,000 workers in 2010 and estimate that its heavy heavy-duty Class 8 tractor sales represent about one-quarter of its revenue. Regarding the effect of Navistar's inability to certify engines, it states:

"While we do not have details of how many of Navistar's employees are currently involved in the assembly of heavy heavy-duty diesel engines and vehicles, if it is proportional to revenue, then it could be one-quarter of Navistar's employees. Halting nearly all assembly of heavy heavy-duty diesel engines and vehicles would have likely resulted in the layoff of these workers and would also have had a cascading impact on Navistar's suppliers, dealers, and other businesses that support the assembly plants. Thus, this scenario would likely have resulted in the layoff of several thousand workers."

Finally, the EPA stated the following with respect to Navistar's exhaustion of its

banked credits:

[T]owards the end of 2011, EPA received information indicating that Navistar's early 2011 engine sales were occurring at a much larger rate than its 2010 engine sales. Upon confirmation by Navistar, EPA determined that Navistar would likely run out of credits in the early part of 2012.

185.    On March 8, 2012, Navistar issued a press release announcing its financial results for the first quarter of 2012.  The Company reported a loss of $153 million, or a loss of $2.19 per diluted share for the first quarter ended January 31, 2012.  The press release stated, in part:

> "We proactively addressed these product issues in a low usage period during the first quarter, which we believe will improve long-term customer satisfaction and reduce warranty costs," said Daniel C. Ustian, Navistar chairman, president and chief executive officer. *"Strategically, we achieved a number of key milestones in the first quarter, including our submission of a 0.2 NOx engine for EPA certification* and the announcement of our development of a full range of natural gas truck offerings."
>
> * * *
>
> "We remain confident in our ability to deliver strong 2012 profit performance and make continued progress toward our long-term growth goals," Ustian said. "We are already seeing accelerated synergies from our recent move into our new integrated product development center beyond the $60 million we originally estimated. We now believe this integration of our people will unlock up to $100 million in savings toward our bottom line in 2012."

186.    The same day, the Company conducted a conference call with analysts to discuss its financial results for the first quarter of 2012.  During the call, Ustian stated as follows in response to a question from an analyst:

> Q –    **Analyst:**  First, thanks for the clarification on the $25 million NCP hit. Dan, could you or A.J. let us know how many months you're assuming the NCP payments continue for that $25 million hit?
>
> A –    **Ustian:**  Yeah.  So, Andy, here's maybe a way to look at it, we've submitted for the 0.2 and that goes through a process and typically that's about three months.  I think, is about the average of that, so when we get the certification, it will still take some time for us to get the production on that.  So what we're doing right now is getting ready to go to production in that and *it will be about June before we can get into production with that particular engine.  So that kind of gives you a framework of where it would be as to the preciseness of it, we can't tell you but our objective is to be in production on that in June.*

Ustian and Allen also had the following exchange with an analyst:

> Q –    **Analyst:**  Can you talk a little bit about the impact of these higher warranties on residual values for your used trucks?  And then secondly, could you talk a little bit about 15 liters to 13 liter.  You've only submitted a 13-liter for

approval to the EPA. Does that mean you're giving up on the 15-liter and we look at your comments the last couple of months and it's gaining share – engine share suggesting that customers are still specifying 15-liter engines out there? Sorry for the lengthy questions but if you could just kind of hook the two of those together, I'd appreciate it.

A – **Ustian**: Sure. Hey, Ann, I'll ask Jack to answer those. Go ahead, Jack.

A – **Allen:** Maybe one at a time. Used trucks, clearly, our ProStar continues to have excellent used truck residual values. The issues that we've described here, we're addressing them with the customers and we're addressing them in the field, and therefore there's really no impact to used trucks or calibration here. We're fixing the calibration on them but we continue to see excellent used truck values.

Regarding the submission, *I guess was your second question, we submitted the 13-liter. We're prepared to submit the 11 and 15, Ann. I'm not quite sure why you would jump to the conclusion that we're abandoning it, but we're prepared to submit the 11 and 15* but it really doesn't make a lot of sense to do that until the EPA addresses the 13-liter and we can work back and forth with them and then we'll follow on with the 11 and 15-liter.

I'm sure you see the trend reports like we do. In 2011, 13 liters crossed the threshold. 15 liters and there's now more 13 liters sold in the marketplace today. And we believe that as one of our major competitors has a more free supply of their own proprietary engines in 2012, you'll continue to see the trend of 13 liters growing in the marketplace.

187.     Also on March 8, 2012, the Company filed a Form 10-Q with the SEC for the first

quarter of 2012. The Form 10-Q was signed by Defendant Tarapchak. The Form 10-Q included

the Company's previously-reported financial results and stated, in part:

We reached a number of key milestones during the quarter that we believe will contribute to our long-term, strategic profitability goals. Advanced Exhaust Gas Recirculation ("EGR"), combined with other strategies, is our solution to meet ongoing emissions requirements. We formally submitted our 0.2g NOx in-cylinder engine certification data for our 13L engine to the United States Environmental Protection Agency ("EPA") on January 31, 2012, and to the California Air Resources Board ("CARB") on February 17, 2012 (collectively, our "0.2g NOx Engine Submission"). These submissions are under review by EPA and CARB and we are engaged in ongoing discussions relating to our engine certification. We announced the launch of a comprehensive natural gas strategy, including integrated natural gas product offerings and a strategic partnership with Clean Energy Fuels Corp. that will provide customers with a sustainable,

80

commercially viable solution for adding natural gas powered trucks to their fleets. Our Pure Power Technologies ("PPT") subsidiary has started production of compacted graphite iron ("CGI") cylinder blocks for our MaxxForce engines. We also initiated certain strategic initiatives, including a letter of intent with Neobus to design and manufacture fully-integrated commercial buses, as well as an agreement with Indiana Phoenix to sell front-discharge concrete mixers through our Continental Mixer subsidiary.

188. Navistar's March 8, 2012 Form 10-Q was accompanied by certifications signed by Ustian and Cederoth, substantially identical to those described in paragraphs 120 and 121.

189. Contrary to Ustian's and Cederoth's certifications, Navistar's first quarter 2012 financial statements did not comply with GAAP, for the reasons given in paragraphs 208-219 below.

190. On April 10, 2012, the EPA filed its respondent's brief with the U.S. Court of Appeals for the D.C. Circuit, in connection with a suit against it by certain competitors of Navistar related to the IFR promulgated on January 31, 2012 (77 Fed. Reg. 4678).[14] The EPA brief stated that Navistar had not submitted a formal application for certification of the 13-liter engine at 0.2 NOx in March 2011, and that as of October 2011, "substantial work" was still required for Navistar to meet the 2010 NOx emissions standard:

> In October 2011, Navistar orally informed EPA that it was likely to consume its current supply of NOx emission credits for its Class 8 diesel engines sometime during the first quarter in 2012. Based on Navistar's confidential business information ("CBI"), EPA considered Navistar's credit balance and projected Class 8 engine sales and concluded that Navistar indeed was likely to deplete its credits early in 2012. … Navistar also had not submitted any applications for certification that showed technology compliant with the 2010 standard.

> * * *

> Given that [when the "revised standard," the IFR, was issued] substantial work was required for Navistar to go from the prior NOx standard to the 2010 standard using its EGR technology, that Navistar had not yet submitted an application for a

---

[14] Respondent's Brief at 11, 43-44, *Mack Trucks, Inc. v. EPA*, No. 12-1077 (D.C. Cir. Apr. 10, 2012).

certificate of conformity for model year 2012 without the use of emissions credits, and that (based on confidential business information) Navistar would be forced out of the Class 8 engine marketplace without NCPs, EPA reasonably determined that Navistar was likely to be a technological laggard.

191. On April 19, 2012, Wells Fargo downgraded Navistar to Market Perform, citing challenges for the Company, including soft truck demand and EPA emissions certification.

192. Defendants' statements in paragraphs 182-189 above, including that the Company's EGR technology was "providing equal or better performance than the SCR systems … without the maintenance or within the hassle of SCR"; that Navistar is "the only manufacturer in the world who is going to have a 0.2 gram NOx engine"; that waiting so long to submit the 0.2NOx application to the EPA has "always been in our plan"; that Navistar had achieved a number of "key milestones in the first quarter, including our submission of a 0.2 NOx engine for EPA certification"; that production of the 0.2 NOx engine would begin in late June; that Navistar would not abandon its EGR solution; and that "[EGR], combined with other strategies, is our solution to meet ongoing emissions requirements," were false and misleading when made, and/or omitted material facts, for the following reasons, among others, which Defendants knew of and/or recklessly disregarded:

a)      The Company's EGR engine technology had not met the EPA's 2010 0.2 NOx emissions requirements and never would, as Defendants later admitted;

b)      On August 27, 2010, CW5 authored a report entitled, "Go Fast 0.2 NOx In-Cylinder Solution – Scope," which included, on page 2, a timeline showing that Navistar's emissions credits would be exhausted in either Q1 or Q2 2012, but that the technology for an 0.2 NOx in-cylinder solution could not go into production until at least Q1 2014 for a 13-liter engine, Q3 2014 for an 11-liter engine, and Q1 2015 for a 15-liter engine;

c)     Non-approval of the Company's EGR engine technology at 0.2 NOx posed severe risks to the Company's well-being, as later acknowledged by Navistar and the EPA, and according to CW3, Company executives had explicitly directed Navistar engineers to cease their development of a back-up plan;

d)     In a declaration filed in Court on April 5, 2010, David Piech, Director, Powertrain/Vehicle Regulations, Certification & Compliance admitted that Navistar was "still maturing Advanced EGR technology" and in a court filing on April 9, 2010, the EPA stated that "Navistar will only be certified as meeting the 2010 NOx requirements by using banked credits";

e)     In October 2011, Navistar had orally informed EPA of its imminent emissions credit shortage, and based on this information, EPA reasonably estimated that Navistar's emissions credits likely would be exhausted sometime in February 2012;

f)     As of January 20, 2012, the EPA had determined that there was "no viable technological path available to Navistar … that would allow it to produce engines that fully comply with [the] 0.20 g/hp-hr NOx emission standard" and "[t]hese limitations are technological rather than economic in nature, and no amount of money could be spent by Navistar to bring its engines into compliance";

g)     The EPA had "substantial concerns regarding the ability of Navistar to certify its engine at a 0.20 g/bhp-hr level";

h)     CW1 and CW2 had reported severe technical problems uncovered during the Cummins EGR engine project to Navistar director-level supervisors and vice presidents as early as the summer of 2008, including to Dr. Helmut Endres, who delivered the findings to Ustian;

1777281.1

i)        CW5 reported delayed progress on development of the EGR engine up his reporting chain at least monthly from the time he became Chief Engineer for the project in September or October 2009, including to Iwaszkiewski, who reported to Ustian;

j)        At least by 2010, according to CW6, Navistar held internal monthly (and sometimes bimonthly) presentations where the Engine Group would provide updates on the status of meeting 2010 NOx emissions standards, which were given by Iwaszkiewski and attended by vice presidents, general managers, directors, and chief engineers and project managers;

k)        Also according to CW6, Younessi would attend these meetings and would relay updates to executive management, including to Ustian and Tech, at monthly executive management program review meetings, and, in fact, the 0.2 NOx EGR development program was included on the agenda of these monthly executive management meetings approximately 10 out of 12 months of the year and Iwaskiewicz and/or others would make presentations to executive management on topics related to the 0.2 NOx program;

l)        According to CW7, either CW7 or Iwaszkiewski met regularly with Ostarello, Mooney, and Younessi, who reported to Ustian, to discuss the troubled EGR program, beginning at least when he became the lead Vehicle Program Chief Engineer for the 0.2 NOx engines in October of 2010;

m)        From 2009 until 2011, according to CW9, Navistar's Engine Engineering section produced quarterly reports and held meetings to provide internal updates on the EGR project;

n)        From February 2011 until CW11's departure in August 2012, he participated in a daily "engineering and quality" teleconference, held at 9:00 a.m. every morning,

84

to update senior executives (including senior executives who reported to Ustian and Cederoth) on delays and problems encountered in the EGR project, and written information relaying what happened on these calls was provided to Ustian;

o)     During CW13's tenure at Navistar, from July 2008 until April 2013, Navistar circulated to the director level and above periodic summary reports on each of its engine and truck programs, which were prepared and disseminated by Defendant Tech and which reflected the "yellow" status of the EGR project beginning in at least 2011;

p)     During CW13's tenure at Navistar, from July 2008 until April 2013, as confirmed by CW11, Navistar circulated a monthly operations review written by Defendant Tech that included information on sales, warranty costs, and engineering costs and that reflected significant warranty issues in EGR solution engines by mid-2011, and Ustian and upper management had access to these reports because Tech reported directly to Ustian; and

q)     According to CW13, Navistar held meetings beginning in April 2012 to determine whether Navistar would continue the EGR solution strategy or switch to a new strategy.

## E.    The Truth Begins to Emerge

193.    On June 7, 2012, prior to the markets' open, Navistar shocked investors by issuing a press release announcing its financial results for the second quarter of 2012. The Company reported a loss of $172 million, or a loss of $2.50 per diluted share for the second quarter ended April 30, 2012. The press release stated, in part:

> **"Certainly, our first half performance was unacceptable. It included a warranty reserve to repair early 2010 and 2011 vehicles," said Daniel C. Ustian, Navistar chairman, president and chief executive officer.** "We were also affected by speculation surrounding our engine certification for our Class 8 engine, which is why we are working tirelessly with the U.S. EPA to get resolution."
>
>                                    * * *

**"Going forward, we've identified a path for delivering strong profits in the second half of 2012,"** Ustian said. "Historically, the second half is stronger across our businesses, and we expect to build on this with improved market share in North America, stronger global performance and further cost reductions across all operations. Additionally, we're making management and operational structure changes to align our organization in a more effective manner to drive these results."

* * *

"I am confident that our new management structure will lead to greater planning and execution around our integration strategy, further enabling us to deliver enterprise-wide profitability, leverage assets more effectively, streamline decision making and bring renewed energy to our team," Ustian said.

194.    The same day, the Company conducted a conference call with analysts to discuss its financial results for the second quarter of 2012.  During the call Ustian stated the following in response to a question from an analyst:

Q –    **Analyst:**  I'm not sure where to start.  I guess the question is we'll start with the EPA engine certification.  You said in your Q that you resubmitted that I think in May.  Do we have any idea, I guess, what's the difference between what you submitted in February and what you submitted in May?  And what are your views on when and if this thing gets approved, and how much of that is kind of built in to your second half forecast which is just a massive sequential improvement?

A –    **Ustian:**  Yea, for sure, Steve.  I think let's define what we did there.  In working with the EPA, they asked us – there were some spots that they wanted us to modify.  And so we did that.  And we've been running tests on that to make sure that they meet all the requirements, not just of the EPA but our own requirements on performance, et cetera.  And so we resubmitted that back to them and we're in the process now of working with them on getting that certified.  So, that is where that stands.  Of course, it's hard for us since it's somewhat out of our control to tell you exactly the timing of any of that.  So, I hope you can appreciate that.  But that's the process that we're in right now.

195.    Also on June 7, 2012, Navistar filed a Form 10-Q with the SEC for the second quarter of 2012.  The Form 10-Q included Navistar's previously-reported financial results and stated in part:

In order to meet the current on-highway heavy-duty diesel ("HDD") emission standards, HDD engines must be certified by the EPA for compliance with the 0.20g oxides of nitrogen ("NOx") standard, which also includes standards for on-board diagnostics. Advanced Exhaust Gas Recirculation ("EGR"), combined with other strategies, is our solution to meet the 0.20g NOx standard. Our approach with EGR has dramatically reduced our NOx emissions compared to the previous NOx standard and we believe it is an environmentally friendly approach compared to the liquid-based urea Selective Catalytic Reduction ("SCR") systems used by our competitors. However, we have not yet been able to obtain 0.20g certification for any of our HDD engines. Currently, we are able to sell our trucks which incorporate HDD engines and sell our engines by using emission credits or paying non-conformance penalties ("NCPs").

196.    In response to this news, Navistar's stock price declined by $4.04 per share, or 14.35 percent, on the greatest one-day trading volume during the Class Period.

197.    On June 13, 2012, analyst Gimmie Credit published a report entitled "Unraveling," in which they state, "Navistar's problems are not just hard to solve – it also seems to us like management has deliberately downplayed the seriousness of its situation and the increasing risk that solutions are not imminent." The report further stated that, with respect to the EPA's interim penalties, "We also think Navistar should have disclosed such a shockingly close call, especially one still unresolved, yet none of this appears in its press releases, SEC filings, or investor presentations."

198.    On June 21, 2012, Navistar received an information inquiry from the Chicago Office of the Enforcement Division of the SEC seeking documents for periods dating back to November 1, 2010 relating to certain accounting and disclosure issues. This fact was not disclosed to investors until the end of the Class Period.

199.    On July 6, 2012, Navistar stunned investors by disclosing in a press release that it was abandoning its EGR engine technology in favor of SCR (the technology used by its rivals, that it had previously rejected) in order to meet 2010 EPA emissions standards. The release stated in part:

Navistar International Corporation today announced that it will introduce its next generation clean engine solution – In-Cylinder Technology Plus (ICT+) – to meet 2010 U.S. Environmental Protection Agency (EPA) emissions regulations and position the ompany to meet greenhouse gas (GHG) rules in advance of 2014 nd 2017 requirements. The ICT+ technology combines Navistar's advanced in-cylinder engine expertise with urea-based aftertreatment and is expected to be available beginning early 2013.

* * *

By incorporating an already proven and certified aftertreatment system, the company looks forward to seamlessly offering production-ready vehicles early next year. Furthermore, this approach is expected to provide a clear path to quickly achieving 2017 GHG standards.

200.    On this news, Navistar's stock price declined by $4.37 per share, or 15.18 percent, on elevated trading volume.

201.    On July 16, 2012, Navistar received a subpoena from the SEC in connection with the SEC's investigation of the accounting and disclosure issues mentioned above. This fact was not disclosed to investors until the end of the Class Period.

202.    On August 2, 2012, Navistar issued a startling press release titled "Navistar Announces Actions Designed to Enhance Competitive Position, Drive Profitable Growth and Increase Shareholder Value," announcing that it was withdrawing its full-year fiscal 2012 guidance until the release of its third fiscal quarter 2012 results in September. At the same time, the Company disclosed that it had received a formal letter of inquiry from the SEC involving an investigation into various accounting and disclosure issues. In a Form 8-K filed the same day, the Company disclosed that on June 21, 2012, it had "received an informal inquiry from the Chicago Office of the Enforcement Division of the SEC seeking a number of categories of documents for the period of November 1, 2010 through the present relating to various accounting and disclosure issues," and that the Company had received a subpoena related to the same on July 16, 2012.

203.    In reaction to this news, the price of Navistar's stock declined by $3.33 per share, or 13.44 percent, on above-average trading volume.

204.    The true facts, which were known by Defendants but concealed from the investing public during the Class Period, were as follows:

(a)    Navistar had not achieved – and would never achieve – the EPA's 0.2 NOx emissions requirements through its EGR technology;

(b)    Navistar did not have engines ready to meet the 2010 EPA standards;

(c)    Navistar's public statements contained incomplete and misleading disclosures, including with respect to the status of the development of its EGR technology and the Company's warranty and recall expenses, among other things; and

(d)    based on the above, Defendants lacked a reasonable basis for their positive statements about the Company and its revenue outlook.

205.    On August 30, 2012, Navistar filed a Form 8-K with the SEC that, among other things, disclosed that Defendant Ustian had, effective August 26, 2012, "resigned from his roles as Chairman, President, Chief Executive Officer and member of the Board of Directors … and all other offices, directorships and other positions with any subsidiaries or affiliates of the Company."

206.    On August 20, 2012, *Forbes* published an article entitled, "Death By Hubris?  The Catastrophic Decision That Could Bankrupt a Great American Manufacturer."  Its author gives a telling perspective of glaringly obvious red flags within Navistar that put Defendants on notice, as early as 2008, that the Company would not achieve 2010 EPA emissions requirements:

> As the [EGR] project developed and 2007 turned into 2008 and 2009 it became increasingly obvious – to everyone but the CEO, says one former manager who was close to Ustian – that Navistar had done worse than pick the diesel version of Betamax when the rest of the world was going to VHS.  It simply couldn't get its

engines to work as hoped. "Dan is telling his technical people, 'You've got to deliver,' and they're saying, 'We don't know how, but we'll try,'" says the former executive. "There was a lot of tension in the technical community, from the scientists on up to the managers, about whether we should be agreeing to something we don't know how to do. Dan didn't want to hear any of it. 'You're going to get it done.' He's a positive thinker. He doesn't like negative thinking."

The article also provided insight into Ustian's management style:

As 2010 approached, [] Ustian's vision clashed with reality. Errors of ambition can be corrected, of course. But Ustian, those familiar with his decision-making say, compounded his mistake with a healthy dose of stubbornness and hubris that eliminated real dissent. The CEO kept tight counsel, literally. His office was small, as was an adjoining conference room, limiting meetings to four or five people ("he didn't like having people who he considered extraneous in his meetings," says the former executive), and since the engine development was done in a facility 45 minutes away, the actual engineers too infrequently had a seat at the table. Senior deputies publicly echoed his endorsement of EGR, but those who broached problems with the 2010 goals did so at their peril. "Dan made it abundantly clear that … anyone who disagreed with him was 'being negative' to the point people figured it would be a career killer to point out problems in achieving it," says the executive.

207. On September 28, 2012, *Land Line Magazine* reported, in an article titled "Navistar 'going forward' despite tough years, board power struggle," that Jim Hebe, Navistar's Senior Vice President, at a September 26, 2012 Company event, said "We have got the right emissions strategy, finally." Hebe went on to say that *"[t]he public will see a more upfront approach from Navistar. … 'We're through with the B.S. … We've had enough of it the past three years.'"*

**VIOLATIONS OF GENERALLY ACCEPTED ACCOUNTING PRINCIPLES**

208. The SEC requires that publicly-traded companies, such as Navistar, present financial statements in accordance with generally accepted accounting principles ("GAAP"). 17 C.F.R. § 210.4-01(a)(1). SEC Regulation S-X states that financial statements filed with the SEC that are not prepared and presented in accordance with GAAP *"…will be presumed to be misleading or inaccurate*, despite footnote of other disclosures...". 17 C.F.R. § 210.4-01(a)(1).

Violations of GAAP, therefore, equate to violations of SEC Regulations (for publicly-traded companies).

209.    GAAP are those principles recognized by the accounting profession and the SEC as the uniform rules, conventions, and procedures necessary to define accepted accounting practices at a particular time, against which financial presentations should be measured.  AU § 411, *The Meaning of* Present Fairly in Conformity with Generally Accepted Accounting Principles *in the Independent Auditor's Report* ("AU 411"), ¶ 2.  GAAP are the official accounting standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"), and at the time the Financial Accounting Standards Board ("FASB").  On July 1, 2009, the Financial Accounting Standards Board ("FASB") enacted the Accounting Standards Codification ("ASC") as the single source of authoritative GAAP effective for interim and annual periods ending after September 15, 2009.

210.    Financial statements (including disclosures) are a central feature of financial reporting and are a principal means of communicating accounting information to parties external to an entity, such as investors.  FASB Statement of Financial Accounting Concepts ("FASCON") No. 1, *Objectives of Financial Reporting by Business Enterprises* ("FASCON 1"), ¶ 6; FASCON No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises* ("FASCON 5"), ¶ 5.  The presentation of financial statements in conformity with GAAP includes adequate disclosure of material matters.  AU § 431, *Adequacy of Disclosure in Financial Statements* ("AU 431"), ¶ 2.  Financial statements are intended to be read in conjunction with the notes to the financial statements ("footnotes").  Footnote disclosures are an integral part of financial statements that are prepared in conformity with GAAP.  FASCON 5 states, in relevant part:

Although financial statements have essentially the same objectives as financial reporting, some useful information is better provided by financial statements and some is better provided, or can only be provided, by notes to financial statements or by supplementary information or other means of financial reporting:

a.      Information disclosed in notes or parenthetically on the face of financial statements, such as significant accounting policies or alternative measures for assets or liabilities, amplifies or explains information recognized in the financial statements.  That sort of information is essential to understanding the information recognized in financial statements and has long been viewed as an integral part of financial statements prepared in accordance with generally accepted accounting principles.

b.      Supplementary information, such as disclosures of the effects of changing prices, and other means of financial reporting, such as management discussion and analysis, add information to that in the financial statements or notes, including information that may be relevant but that does not meet all recognition criteria.

(FASCON 5, ¶ 7) (footnotes omitted).

211.    The responsibility for preparing financial statements (including the footnotes to the financial statements) in conformity with GAAP rests with Navistar's management, as set forth in Section 110.03 of the AICPA Auditing Standards (Responsibilities and Functions of the Independent Auditor):

The financial statements are management's responsibility… Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, authorize, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management… Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

 (footnote omitted).

212.    ASC 450-20-50, an important provision of GAAP, sets forth Navistar's disclosure obligations with respect to accounting for loss contingencies, including obligations related to

92

product warranties[15] as well as other costs associated with discarding the failed EGR technology. In particular, ASC 450-20-50-2 requires disclosure, in certain circumstances, "of an indication that it is at least reasonably possible that a change in an entity's estimate of its probable liability could occur in the near term." Such a disclosure is necessary if two conditions are met:

> (a) It is at least reasonably possible that the estimate of the effect on the financial statements of a condition, situation, or set of circumstances that existed at the date of the financial statements will change in the near term due to one or more future confirming events; and

> (b) The effect of the change would be material to the financial statements.

ASC 275-10-50-8.

213. ASC450-20-50-3 emphasizes that this disclosure obligation applies even if a charge to revenue is not actually taken on Navistar's financial statements, *i.e.*, disclosure of the *contingency* must be made regardless. ASC 450-20-50-4 requires that the disclosure include both (a) the nature of the contingency; and (b) an estimate of the possible loss or range of loss or a statement that such an estimate cannot be made.

214. In mid-2011 and extending through 2012, Lead Plaintiff's confidential witnesses have indicated that Navistar's warranty costs rose dramatically. According to CW16, the warranty issues were due to an increase in failures of components of the engine, including, according to CW18, the EGR valve. This increase in engine failures was linked to an increase in exhaust gas flowing through the engines, which was a consequence of Navistar's attempt to use EGR to comply with 2010 EPA emissions requirements. The increase in exhaust caused a buildup of soot. According to CW16, John Miller, Vice President of Finance, Parts & Engines,

---

[15] *See* ASC 450-20-05-3 ("loss contingency" includes obligations related to product warranties).

told CW16 that he had conversations with Cederoth about the potential impact of these problems on warranty reserves. CW13 also noted that the EGR engine warranty problems were reflected in monthly operations reviews produced by Defendant Tech, Ustian's direct report.

215. CW17 added that EGR engines began to experience more failure rates, and thus warranty costs, as mileage use increased. According to CW17, these warranty costs began to increase in mid-2011, were larger than what Navistar had reserved for (a development that was discussed at monthly finance meetings), and grew exponentially each quarter. CW18 confirmed that the warranty problems arose in mid-2011 and added that although the EGR valve was eventually fixed, warranty problems persisted when CW18 transferred to the Engine Group in September 2012, both because of failure rates in the cooling mechanism in the EGR engines and because, as CW13 noted, the valve was not fixed until late 2011 and Navistar had manufactured and sold many EGR engines before this fix, which were in operation well into 2012.

216. Accordingly, EGR engine failure rates had a significant potential impact on Navistar's warranty costs in mid-2011 into 2012, and it was thus "at least reasonably possible" that Defendants' estimate of their effect on Navistar's financial statements would change and that the impact on the Company's financial statements would be material. GAAP therefore required disclosure both of this contingency and, if possible, an estimate of the potential range of loss Navistar might incur as a result.

217. Likewise, Navistar stood to incur significant losses as a result of its failed EGR technology. The EPA itself was able to quantify these losses:

> *The consequences of EPA's inability to certify Navistar engines with NCPs could be devastating to Navistar.* In an Analysis of Potential Economic Impacts of Delaying NCPs, … EPA states that "[a]t a minimum, this would have led to Navistar ceasing nearly all assembly of heavy heavy-duty diesel engines. Navistar may or may not have continued production of heavy heavy-duty engines for export. Since Navistar's current tractor designs would need to be redesigned

94

to accept other manufacturers' SCR-equipped engines, it would likely also have led to Navistar ceasing assembly of heavy heavy-duty vehicles for up to a year." … The analysis goes on to state that Navistar's global operations employed more than 15,000 workers in 2010 and estimate that its heavy heavy-duty Class 8 tractor sales represent about one-quarter of its revenue. Regarding the effect of Navistar's inability to certify engines, it states:

"While we do not have details of how many of Navistar's employees are currently involved in the assembly of heavy heavy-duty diesel engines and vehicles, if it is proportional to revenue, then it could be one-quarter of Navistar's employees. Halting nearly all assembly of heavy heavy-duty diesel engines and vehicles would have likely resulted in the layoff of these workers and would also have had a cascading impact on Navistar's suppliers, dealers, and other businesses that support the assembly plants. Thus, this scenario would likely have resulted in the layoff of several thousand workers."

Letter from U.S. EPA to Julie Domike and Alec Zacaroli, Counsel for Mack Trucks, Inc. and Volvo Grp. N. Am., LLC (Feb. 28, 2012).

218. Accordingly, it was "at least reasonably possible" that Defendants' estimate both of Navistar's revenue and expenses generally, and of the impact of non-certification of the EGR technology on Navistar's revenue and expenses, would change and that the impact on the Company's financial statements would be material. GAAP therefore required disclosure both of this contingency and, if possible, an estimate of the potential range of loss Navistar might incur as a result.

219. Because Navistar never made these disclosures as required, the Company's financial statements for the periods ending July 31, 2011, October 31, 2011, and January 31, 2012 were false and misleading for this additional reason.

**LOSS CAUSATION/ ECONOMIC LOSS**

220. During the Class Period, as detailed herein, Defendants made false and misleading statements that artificially inflated the price of Navistar securities, and operated as fraud or deceit on Class Period purchasers of Navistar securities by misrepresenting the state and prospects of the Company's research and development efforts, the extent of the recall- and warranty-related costs

and expenses to which the Company was subject, and the effect of these elements on the Company's profitability. Later, as Defendants' prior misrepresentations and fraudulent conduct began to be disclosed and became apparent to the market, the prices of Navistar securities fell precipitously as the prior artificial inflation came out of the prices. As a result of their purchases of Navistar securities during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

221. The statutory safe harbor applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pled in this Complaint.

222. Either the statements complained of herein were not forward-looking statements, but rather were historical statements or statements of purportedly current facts and conditions at the time the statements were made, or to the extent there were any forward-looking statements, Navistar's verbal "safe harbor" warnings accompanying its oral forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

223. Further, the statutory safe harbor does not apply to statements included in financial statements that purportedly were made in accordance with GAAP, such as Navistar's Forms 10-K and 10-Q issued throughout the Class Period.

224. To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

225. To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, Defendants are liable for those false or misleading statements because, at the time each such statement was made, the speaker knew the forward-looking

statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Navistar who knew that the forward-looking statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:

## FRAUD ON THE MARKET

226. Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Lead Plaintiff and other members of the Class purchased Navistar securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

227. At all relevant times, the markets for Navistar securities were efficient for the following reasons, among others:

(a) as a regulated issuer, Navistar filed periodic public reports with the SEC;

(b)     Navistar regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and

(c)     Navistar securities were actively traded in efficient markets, including the NYSE, where the Company's common stock trades under the symbol "NAV."

228.    Lead Plaintiff is also entitled to the presumption of reliance to the extent that Defendants' statements failed to disclose material facts.

## CLASS ACTION ALLEGATIONS

229.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") on behalf of the Class.  Excluded from the Class are Defendants, directors, and officers of Navistar, and their families and affiliates.

230.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of October 10, 2013, Navistar had 80,423,213 shares of common stock outstanding, owned by thousands of investors.

231.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)     whether Defendants violated the Exchange Act;

(b)     whether Defendants omitted and/or misrepresented material facts;

(c)     whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     whether the prices of Navistar securities were artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

232.    Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

233.    Lead Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Lead Plaintiff has no interests that conflict with those of the Class.

234.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

<u>**COUNT I**</u>

**For Violation of Section 10(b) of the Exchange Act**
**<u>And Rule 10b-5 Against All Defendants</u>**

235.    Lead Plaintiff incorporates paragraphs 1 through 234 by reference.

236.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew to be misleading or were reckless in their disregard of their misleading nature, in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

99

237.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Navistar common stock during the Class Period.

238.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially-inflated prices for Navistar common stock.  Lead Plaintiff and the Class would not have purchased Navistar common stock at the prices they paid, or at all, had they been aware that the market prices were artificially and falsely inflated by Defendants' misleading statements.

239.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Navistar common stock during the Class Period.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

240.    Lead Plaintiff incorporates paragraphs 1 through 239 by reference.

241.    The Individual Defendants acted as controlling persons of Navistar within the meaning of Section 20(a) of the Exchange Act.   By virtue of their positions and their power to control public statements about Navistar, the Individual Defendants had the power and ability to

1777281.1

control the actions of Navistar and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Rule 23;

B.     Awarding Lead Plaintiff and the members of the Class damages and interest;

C.     Awarding Lead Plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

Dated: October 10, 2013                          Respectfully submitted,

                                       **COHEN MILSTEIN SELLERS**
                                       **& TOLL PLLC**

                                       /s/ Carol V. Gilden
                                       Carol V. Gilden
                                       190 South LaSalle St., Suite 1705
                                       Chicago, IL 60603
                                       Tel.: (312) 357-0370
                                       Fax: (312) 357-0369
                                       cgilden@cohenmilstein.com
                                       Illinois Bar No. 06185530

                                       Steven J. Toll
                                       Daniel S. Sommers
                                       S. Douglas Bunch
                                       Genevieve O. Fontan
                                       1100 New York Avenue N.W.
                                       West Tower, Suite 500
                                       Washington, DC 20005
                                       Tel.: (202) 408-4600
                                       Fax: (202) 408-4699

                                       *Lead Counsel for the Class*

1777281.1

**CERTIFICATION**

James P. Condon, Deputy Chief Legal Officer for the Central States, Southeast and Southwest Areas Pension Fund ("Central States"), declares, as to the claims asserted under the federal securities laws, that:

1.  I am authorized to make this certification on behalf of Central States.

2.  I have reviewed a complaint filed in this matter and Central States wishes to serve as a lead plaintiff.

3.  Central States did not purchase the securities that are the subject of this action at the direction of its counsel or to participate in this action.

4.  Central States is willing to serve as a lead plaintiff and class representative on behalf of the Class, including providing testimony at deposition and trial if necessary.

5.  Central States' transactions in the securities of Navistar International Corporation that are the subject of this action are set forth in Schedule A, attached hereto.

6.  During the three years prior to the date of this Certification, Central States sought to serve as a representative party for a class under the federal securities laws in the following cases:

    *In re Toyota Corp. Sec. Litig.*, No. 10-cv-0922 (C.D. Cal.)
    *City of Westland Police and Fire Ret. Sys. v. Metlife Inc.*, No. 12-cv-00256 (S.D.N.Y.)
    *Nicolow v. Hewlett-Packard Co.*, No. 12-cv-05980 (N.D. Cal.)

7.  Central States will not accept any payment for serving as a class representative on behalf of the class beyond its *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this
20th day of May 2013.

_James P. Condon_
James P. Condon
Deputy Chief Legal Officer
Central States, Southeast and Southwest Areas
Pension Fund

1738568.1
1738663.1 1

Schedule A

| Trade Date | Transaction Type | Quantity | Share Price ($) |
|---|---|---|---|
| 1/12/2011 | BUY | 8,500.00 | 62.55 |
| 1/12/2011 | BUY | 39,100.00 | 62.73 |
| 1/13/2011 | BUY | 2,800.00 | 63.51 |
| 1/13/2011 | BUY | 6,000.00 | 63.21 |
| 1/13/2011 | BUY | 7,900.00 | 62.51 |
| 1/13/2011 | BUY | 11,000.00 | 63.22 |
| 1/13/2011 | BUY | 14,100.00 | 63.21 |
| 1/14/2011 | BUY | 13,000.00 | 63.14 |
| 1/18/2011 | BUY | 3,500.00 | 62.93 |
| 1/18/2011 | BUY | 5,500.00 | 62.91 |
| 1/18/2011 | BUY | 10,800.00 | 62.96 |
| 1/21/2011 | BUY | 8,100.00 | 59.63 |
| 1/21/2011 | BUY | 11,100.00 | 59.33 |
| 1/24/2011 | BUY | 2,700.00 | 59.56 |
| 1/26/2011 | BUY | 6,500.00 | 64.37 |
| 1/27/2011 | BUY | 10,400.00 | 65.11 |
| 2/28/2011 | BUY | 13,200.00 | 61.86 |
| 3/10/2011 | BUY | 7,600.00 | 62.50 |
| 3/10/2011 | BUY | 12,100.00 | 61.74 |
| 3/14/2011 | BUY | 1,600.00 | 62.98 |
| 4/11/2011 | SELL | 8,500.00 | 67.41 |
| 5/4/2011 | BUY | 9,400.00 | 69.44 |
| 5/25/2011 | BUY | 2,000.00 | 64.66 |
| 5/25/2011 | BUY | 2,400.00 | 64.83 |
| 6/7/2011 | BUY | 8,900.00 | 58.96 |
| 6/7/2011 | BUY | 12,600.00 | 58.94 |
| 6/24/2011 | BUY | 10,200.00 | 53.73 |
| 10/3/2011 | SELL | 3,600.00 | 54.32 |
| 7/12/2011 | SELL | 6,400.00 | 55.03 |
| 9/9/2011 | SELL | 12,500.00 | 36.87 |
| 9/9/2011 | SELL | 5,350.00 | 36.87 |
| 9/9/2011 | SELL | 5,200.00 | 36.85 |
| 9/12/2011 | SELL | 21,100.00 | 36.15 |
| 9/13/2011 | SELL | 12,400.00 | 36.93 |
| 9/13/2011 | SELL | 2,900.00 | 37.04 |
| 9/13/2011 | SELL | 1,650.00 | 36.99 |
| 9/30/2011 | BUY | 17,200.00 | 32.14 |
| 10/3/2011 | BUY | 8,800.00 | 31.93 |
| 10/4/2011 | BUY | 3,800.00 | 30.16 |
| 10/5/2011 | BUY | 9,400.00 | 32.97 |
| 10/6/2011 | BUY | 6,600.00 | 32.76 |
| 10/7/2011 | BUY | 6,600.00 | 33.50 |
| 10/11/2011 | BUY | 1,500.00 | 37.22 |
| 10/11/2011 | BUY | 2,000.00 | 37.27 |
| 10/11/2011 | BUY | 4,600.00 | 37.10 |
| 10/11/2011 | BUY | 5,100.00 | 37.48 |

**Schedule A**

| Trade Date | Transaction Type | Quantity | Share Price ($) |
|---|---|---|---|
| 10/12/2011 | BUY | 600.00 | 38.37 |
| 10/12/2011 | BUY | 600.00 | 39.00 |
| 10/12/2011 | BUY | 1,900.00 | 38.68 |
| 10/12/2011 | BUY | 2,700.00 | 39.03 |
| 10/12/2011 | BUY | 4,600.00 | 38.85 |
| 10/13/2011 | BUY | 2,100.00 | 38.69 |
| 10/14/2011 | BUY | 500.00 | 43.71 |
| 10/14/2011 | BUY | 500.00 | 43.26 |
| 10/14/2011 | SELL | 10,100.00 | 41.62 |
| 10/14/2011 | SELL | 4,200.00 | 41.62 |
| 10/14/2011 | SELL | 2,300.00 | 42.67 |
| 10/19/2011 | BUY | 4,000.00 | 40.70 |
| 10/27/2011 | BUY | 500.00 | 43.78 |
| 10/31/2011 | SELL | 3,400.00 | 42.76 |
| 11/15/2011 | SELL | 13,500.00 | 40.63 |
| 11/15/2011 | SELL | 4,200.00 | 40.70 |
| 11/16/2011 | SELL | 7,100.00 | 40.09 |
| 11/16/2011 | SELL | 5,300.00 | 40.03 |
| 11/17/2011 | SELL | 8,400.00 | 38.57 |
| 11/17/2011 | SELL | 1,500.00 | 38.96 |
| 11/18/2011 | SELL | 12,700.00 | 37.70 |
| 11/18/2011 | SELL | 5,720.00 | 37.55 |
| 11/21/2011 | SELL | 8,400.00 | 35.92 |
| 11/21/2011 | SELL | 7,200.00 | 35.93 |
| 11/21/2011 | SELL | 6,700.00 | 35.81 |
| 11/21/2011 | SELL | 1,700.00 | 36.25 |
| 11/21/2011 | SELL | 900.00 | 35.95 |
| 11/23/2011 | SELL | 2,800.00 | 34.18 |
| 11/23/2011 | SELL | 1,600.00 | 34.51 |
| 11/25/2011 | SELL | 700.00 | 33.98 |
| 11/30/2011 | SELL | 17,850.00 | 37.14 |
| 11/30/2011 | SELL | 10,250.00 | 37.13 |
| 12/5/2011 | SELL | 13,000.00 | 39.60 |
| 12/5/2011 | SELL | 4,300.00 | 39.41 |
| 12/6/2011 | SELL | 16,100.00 | 39.03 |
| 12/6/2011 | SELL | 9,300.00 | 39.05 |
| 12/6/2011 | SELL | 5,980.00 | 38.93 |
| 12/7/2011 | SELL | 3,100.00 | 38.91 |
| 12/7/2011 | SELL | 1,500.00 | 38.89 |
| 12/7/2011 | SELL | 1,200.00 | 38.91 |
| 12/8/2011 | SELL | 1,600.00 | 38.85 |