**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CONSTRUCTION WORKERS PENSION FUND – LAKE COUNTY AND VICINITY, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 13 C 2111 |
| NAVISTAR INTERNATIONAL CORPORATION, et al., | ) ) ) ) | Judge Sara L. Ellis |
| Defendants. | ) | |

## OPINION AND ORDER

Believing that Navistar International Corporation ("Navistar") and certain of its officers and directors perpetrated a fraud on the market by making false and misleading statements with regard to Navistar's engine design and development efforts to meet new Environmental Protection Agency ("EPA") emission requirements, which caused Navistar's stock price to be artificially inflated, Lead Plaintiff Central States Southeast and Southwest Areas Pension Fund ("Central States") brought this putative securities class action on behalf of themselves and all others who purchased Navistar securities from March 10, 2010 through August 1, 2012 (the "Class Period"). Central States alleges that through their false and misleading statements, Defendants Navistar, Daniel C. Ustian, Andrew J. Cederoth, and Jack Allen violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("SEA"), codified at 15 U.S.C. § 78j(b) and t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.[1] The Court previously dismissed Central States' Consolidated Amended Complaint ("CAC"), finding that Central States had improperly

---

[1] Central States voluntarily dismissed Defendant Eric Tech from this matter on November 7, 2014. Doc.136.

engaged in puzzle pleading by quoting Defendants' statements at length and alleging that all of the quoted statements were false or misleading.  The Court dismissed Central States' CAC without prejudice and granted Central States leave to file a second amended complaint ("SAC") to cure the deficiencies noted. Now before the Court is Defendants' motion to dismiss the Second Amended Complaint ("SAC").  Because Central States adequately pleaded § 10(b) and Rule 10b–5 claims regarding two of Ustian's statements, Defendants' motion to dismiss [132] is granted in part and denied in part.

### BACKGROUND[2]

## I.     The Parties

The Court appointed Central States to serve as Lead Plaintiff in this case on July 30, 2013.  Central States is a "multiemployer, collectively–bargained pension fund…which administers benefits for hundreds of thousands of participants, dependents and retirees."  Doc. 128 ¶ 26.  The last day on which Central States purchased Navistar stock during the Class Period was October 27, 2011.

Navistar produces commercial and military trucks, buses, diesel engines, recreational vehicles, and chassis, and provides parts and service for trucks and trailers.  Its stock is listed on the New York Stock Exchange.  Navistar's North American truck and engine market is a core segment of its business.  In 2009, $8.6 billion of Navistar's $11.5 billion net sales derived from its North American truck and engines market.  Of that $8.6 billion in sales, over 50% was attributable to Navistar's heavy duty vehicles, which use 11, 13, and 15–liter diesel engines.

During the Class Period, Ustian served as Navistar's President, Chief Executive Officer, and Chairman of the Board of Directors.  Cederoth held the title of Executive Vice President and

---

[2] The facts in the background section are taken from the SAC and are presumed true for the purpose of resolving Defendants' motion to dismiss.  *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007).

Chief Financial Officer, as well as other minor temporary titles. Allen was also an Executive Vice President, as well as Chief Operating Officer.

## II.      Factual Allegations

Various EPA regulations apply to Navistar's truck and engine business. In 2001, pursuant to the Clean Air Act, the EPA issued a rule that required a 95% reduction in nitrogen oxide ("NOx") emissions from heavy-duty diesel engines. Specifically, the EPA limited NOx emissions to a rate of no more than 0.2 g/bhp-hr ("0.2 NOx") by 2010 for new engines. To obtain EPA certification, a manufacturer had to demonstrate compliance with the 0.2 NOx standard. Recognizing that manufacturers might require additional time to develop their emissions control technology, the EPA initially allowed certification to be obtained through a 0.3–0.5 NOx engine and banked emission credits. For a period of time, the EPA also allowed manufacturers to achieve certification through the payment of nonconformance penalties ("NCPs").

In response to the new EPA standard, the heavy-duty truck industry, with the exception of Navistar, invested in selective catalytic reduction ("SCR") technology, which uses an after-treatment device to reduce emissions.[3] These manufacturers met the 0.2 NOx standard on time. Navistar decided to pursue a different technology—exhaust gas recirculation ("EGR"), an in-cylinder solution that does not require after-treatment. However, as early as 2008, Navistar engineers were experiencing issues in the development of EGR technology which called into question whether it was capable of achieving 0.2 NOx in a commercially viable engine. These issues continued throughout the Class Period and were repeatedly brought to the attention of senior-level management, including Ustian and Cederoth. Nevertheless, Navistar ordered the engineers to continue pursuing the EGR technology. And while Navistar initially had engineers

_____
[3] Navistar uses SCR engines in its diesel engines for the European market.

developing SCR technology as a backup plan, by February or March of 2009 Navistar halted this work.

Because the EGR technology was still being developed, Navistar's initial strategy to comply with EPA's regulation involved using engines certified at 0.5 NOx in combination with banked emission credits. In late 2009 and into early 2010, Navistar launched trucks with 0.5 NOx EGR engines. It did so despite the fact that these engines failed road tests prior to launch. Nevertheless, Navistar proceeded to production because it would have been unable to sell trucks otherwise. After the launch, Navistar began receiving complaints from customers regarding the performance of the 0.5 NOx engine. As a result, Navistar halted sales for a period before restarting sales of these engines.

Because Navistar's North American heavy duty truck sales comprised such a large portion of its overall business, investors and analysts were particularly focused on Navistar's development of EGR technology and its progress toward obtaining certification at 0.2 NOx. Despite all of the issues Navistar encountered on the road to accomplishing that task, Defendants repeatedly made public statements touting Navistar's progress in developing its EGR technology and achieving a 0.2 NOx–compliant engine. These statements caused Navistar's stock price to be artificially inflated.

**2010 Statements**

On March 10, 2010, Ustian participated in a conference call with analysts to discuss Navistar's first quarter 2010 financial results. During the call, Ustian assured analysts that Navistar was ready to meet the 2010 emission standards:

> And we're ready for emission standards. Our products are being certified today. Some of them have already passed…We do have some already in the marketplace. If you remember right, we had 100 or so buses that went into the marketplace at 2010 emissions

4

> levels. Those are running great. We have had no quality problems
> with it to speak of. So we believe that our technology is already
> proven.

Doc. 128 ¶ 127. Yet several weeks later, Navistar confirmed through a brief filed in connection

with litigation against the EPA that it was "still maturing Advanced EGR technology" and would

be able to meet 2010 emission standards only "through a combination of Advanced EGR

technology and 'banked' emissions credits." *Id.* ¶ 128. In other words, as of April 2010,

Navistar had certified only 0.5 NOx engines and was utilizing its emission credits to meet the 0.2

NOx standard.

On June 9, 2010, Navistar conducted a conference call with analysts to discuss its second

quarter 2010 financial results. During this call, Ustian attempted to dispel rumors calling into

question Navistar's ability to satisfy emission requirements with EGR technology that had

concerned investors, or created "worry beads" for investors. Ustian told analysts "we're at the

point now that every one of these worry beads is behind us." *Id.* ¶ 130. Later, during the same

call, Ustian told the analysts that Navistar had "engines running–we have vehicles running that

meet those standards of 0.2." *Id.*

Then, on August 27, 2010, Navistar's Chief Engineer for heavy-duty engines authored a

report called "Go Fast 0.2 NOx In–Cylinder Solution – Scope." *Id.* ¶ 52. This report predicted

that the 0.2 NOx EGR engine would not go into production until the first quarter of 2014 for the

13–liter engine, the third quarter of 2014 for the 11–liter engine, and the first quarter of 2015 for

the 15–liter engine. Outside consultants hired by Ustian had initially set a launch date for the 0.2

NOx EGR engine of January 2012. Navistar engineers told their supervisors that this was not

realistic given the issues they were encountering, and bumped the launch date to 2014. With the

new timeline, Navistar projected that there would be a 1.75 year gap between when Navistar exhausted its emission credits and when it would have a certified 0.2 NOx engine.

A few months later, Navistar held a press briefing at one of their facilities in Alabama. *Fleet Owner* magazine published an article the following day, November 4, 2010, which discussed the ongoing question of whether Navistar would be able to meet the 2010 emission standards without the use of emission credits. The article quoted Ustian's statement from the press briefing–"[w]e're 100% there in terms of our ability to do it," *i.e.*, achieve 0.2 NOx emissions with the EGR technology. *Id.* ¶ 133. The article also quoted a Navistar VP who said that he expected that Navistar would submit 0.2 NOx engines to the EPA for certification "within the next few months." *Id.* On the same day, *Today's Trucking* published a similar article stating that Navistar was on the verge of submitting a 13–liter engine that met 0.2 NOx for certification. A Navistar representative was quoted as saying that the "0.2g NOx MaxxForce 13 we mentioned in the release yesterday and plan to submit to the EPA for certification will achieve emissions 'in-cylinder.' Stay tuned." *Id.* ¶ 134.

On December 22, 2010, Navistar held a call with analysts to discuss fourth quarter and full year 2010 financial results. During the call, Ustian told the analysts that Navistar was the only company that "meet[s] emissions in the cylinder." *Id.* ¶ 135. When an analyst asked Ustian when the 13–liter engine would be certified at 0.2 NOx, Ustian stated that he believed that Navistar would submit the engine to the EPA within the next couple of months. But Ustian told the analysts that they could expect to see the 0.2 NOx 13-liter engine at a trade show on the 25th and that Navistar would "be able to show [them] the data, that it meets 0.2, and show [them] how [Navistar is] able to meet it."[4] *Id.*

---

[4] The Parties previously disputed who made this statement. Central States' SAC and opposition memorandum assert that Tech made the statement while Defendants assert that Ustian made the

### 2011 Statements

In mid-2011, Navistar began experiencing warranty issues with its 0.5 NOx EGR engines. Normally, newly–developed engines experience warranty issues; however, the cost of these warranty issues exceeded Navistar's reserves. The issues stemmed from short development periods that eliminated the necessary time to appropriately test and validate the engine programs prior to launch. As the engines incurred more mileage, the warranty issues began to appear. In late 2011, Navistar was able to re–engineer an EGR valve, which was believed to be the primary source of the warranty issues. Despite these issues, Navistar continued to move forward with the development of the 0.2 NOx EGR engines. Navistar did so ignoring data that seemed to indicate that the engines would not be commercially viable in terms of performance and durability at that emissions level. Specifically, during testing, the engines revealed issues with fuel economy and acceleration, and would sometimes simply break down. Ustian received all of this information.

On September 7, 2011, Navistar conducted a conference call with analysts to discuss its third quarter financial results. During the call, Ustian stated that Navistar's EGR technology was "on par with the best SCR competitors." *Id.* ¶ 138. A slide presentation, discussing Navistar's continued strategy of utilizing EGR technology to achieve emissions standards, accompanied the call. One slide posed the question of what Navistar was doing to meet the 0.2 NOx emissions once its credits were exhausted and provided the following response:

> [EGR] technology is proving extremely viable providing fuel
> economy and performance on par with the best SCR

---

statement. However, as noted in footnote 1 *supra*, Central States voluntarily dismissed Tech from this action on November 7, 2014 after filing its opposition memorandum. It is thus unclear to the Court whether Central States concedes that this statement was made by Ustian, or whether Central States has abandoned its claim as to this statement. Because the Court ultimately finds that the statement is a forward–looking statement protected by the safe–harbor provision of the PSLRA, the Court proceeds on the basis that the statement is attributable to Ustian.

> competitors…As [Navistar] develop[s] 0.20g of NOx capability
> [Navistar's] goal of continuing to improve performance and fuel
> economy at this emissions level is being realized.

*Id*. Navistar's Form 10-Q, filed around the same time, stated that Navistar did not expect for its

"rate of usage of emissions credits to have a material adverse effect on [its] business." *Id*. ¶ 139.

Yet as of October 2011, Navistar was unable to submit an engine and truck for certification at

0.2 NOx. This meant that Navistar would not be able to start production on the engines before

March 2012. And while it was impossible to provide an exact date when Navistar would exhaust

its emission credits, as it depended on Navistar's rate of sales, Navistar predicted that it would

likely be sometime in February of 2012. Navistar did not notify the public or its investors of this

information.

### Navistar Disclosures

Ultimately, Navistar did not achieve the 0.2 NOx emissions requirements through EGR

technology and never was certified as meeting that requirement independent of banked emissions

credits. As it became clear to the market that Navistar was unlikely to do so, its stock price

began to drop. On February 14, 2012, Navistar's share price declined after an internet article

reported that the EPA would fine Navistar for shipping back-dated engines during its 2010

engine transition. The anticipated value of the fines was $285 million. Then, in February 28,

2012 letters to counsel for Daimler Trucks, Mack Trucks, and Volvo, the EPA indicated its

initial concerns that Navistar would be unable to certify its engine at 0.2 NOx and that even if it

could be certified, Navistar would not be able to introduce it until June 15, 2012. The EPA also

opined on the possible economic impact its declining to certify Navistar's engines could have on

Navistar's business.

On June 7, 2012, before the markets opened, Navistar reported a $172 million loss for its second fiscal quarter ending April 30, 2012, due in part to increased warranty expenses for repairs to 2010 and 2011 vehicles. On the same day, Navistar filed a Form 10-Q that stated that Navistar had yet to obtain certification at 0.2 NOx and would continue to meet 2010 emissions standards through its use of 0.5 NOx engines and emissions credits or paying non-conformance penalties. This news caused Navistar's stock price to drop by $4.04 per share (14.35%) that day. Then, on July 6, 2012, Navistar announced that it was abandoning EGR technology in favor of the SCR strategy the rest of the heavy–duty truck industry had already adopted. Navistar's stock price dropped by $4.37 per share (15.18%) that day. Finally, on August 2, 2012, Navistar issued a press release announcing that it was withdrawing its full year fiscal 2012 guidance until releasing its third quarter 2012 results in September. Navistar also disclosed an SEC formal letter of inquiry into accounting and disclosure matters dating back to November 2010.[5] Navistar's stock price fell $3.33 per share (13.44%) that day. On August 30, 2012, Navistar disclosed that Ustian had resigned from Navistar effective August 26, 2012. These continual drops in stock price caused injury to Central States and the Class members.

### Ustian's Stock Sales

During 2010 and 2011, Ustian sold a total of 84,192 shares of Navistar stock for a profit of $5,180,102. Specifically, on September 27, 2010, Ustian sold 10,000 shares of Navistar common stock for total proceeds of $456,000. Approximately one week later, on October 5, Ustian sold an additional 18,723 shares of Navistar common stock for a total value of $864,009. On April 5, 2011, Ustian sold 55,469 shares of Navistar stock at an average price of $69.59 a share, for a value of $3,860,087.71.

---

[5] Navistar received this letter on June 21, 2012, yet did not disclose its receipt until August 2, 2012. Navistar also received a subpoena from the SEC on July 16, 2012, which again was not disclosed until August 2, 2012.

### Cederoth's Stock Sales

On March 29, 2011, Cederoth sold 9,548 shares of Navistar stock at an average price of $67.34 a share, for a value of $642,962.32.

### LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank*, 649 F.3d at 615 (citation omitted). Rule 9(b) applies to "all averments of fraud, not claims of fraud." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). "A claim that 'sounds in fraud'— in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements." *Id.*

On top of the burden imposed by Rules 12(b)(6) and 9(b), Congress further heightened the pleading standards for securities fraud claims when it enacted the Private Securities Litigation Reform Act ("PSLRA") to curb pleading abuses in private securities fraud suits. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* ("*Tellabs II*"), 551 U.S. 308, 313–14, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007). In a 10b–5 action for securities fraud, a plaintiff must allege and ultimately prove:

> (1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation"; (5) economic loss; and (6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss.

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005) (emphasis omitted) (citations omitted). In order to adequately allege that defendants misrepresented or omitted material facts, the PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). In pleading scienter, the PSLRA requires that plaintiffs, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). For an inference to be "strong," it must be "cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs II*, 551 U.S. at 324.

## ANALYSIS

Central States' SAC alleges two causes of action. Count I alleges that Defendants violated § 10(b) and Rule 10b-5 by making material misstatements about Navistar's progress in

11

developing EGR technology to meet the EPA's new emission requirements. Section 10(b) of the SEA prohibits the "use or employ, in connection with the purchase or sale of any security…[of] any manipulative or deceptive device in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). SEC Rule 10b-5, which implements § 10(b), forbids the making of "any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Count II of Central States' SAC seeks to hold Defendants Ustian, Cederoth, and Allen individually liable under SEA § 20(a) as controlling persons in Navistar.

In pleading these causes of action, Central States puts forth over 200 paragraphs of allegations that are intended to paint the picture of a company run by executives who knowingly forced its employees to pursue a technology that defied the laws of physics, all the while lying to the public about the company's progress in achieving that technology for their own financial gain. The problem with Central States' SAC, however, is that it confuses quantity with quality. It makes broad sweeping allegations that, upon close examination, fail to offer contemporaneous detailed facts supporting the assertions made. For example, the SAC contains a section devoted to pleading the alleged misstatements. But as with Central States' CAC, multiple misstatements are collectively alleged to be false or misleading without specifically identifying what was false or misleading about each individual statement. In addition, this section puts forth the same vague and frequently irrelevant allegations in support of each alleged misstatement, forcing the Court to hunt through the novel–length complaint to determine whether there are any factual allegations that might support Central States' claims. This failure to comply with the strictures of the PSLRA is further highlighted by Central States' opposition memorandum, which often

offers a different argument from that contained in the SAC as to whether a statement was false or misleading, and then relies on allegations other than those pleaded in support of the alleged misstatement. Ultimately, upon reading the SAC, the Court is left with the distinct impression that Central States seeks to hold Defendants liable for aggressively pursuing a technology that did not end up being successful. But "there is no 'fraud by hindsight.'" *Higginbotham v. Baxter Int'l, Inc.,* 495 F.3d 753, 759–60 (7th Cir. 2007) (quoting *Tellabs II*, 551 U.S. at 320).

Noting many of these deficiencies, Defendants move to dismiss Central States' SAC on several grounds. First, Defendants assert that Central States lacks standing to pursue claims based on statements made after Central States' last Navistar stock purchase. Second, Defendants move to dismiss Central States' claims as to certain statements on the basis that they are forward–looking statements protected by the safe harbor provision of the PSLRA. Third, Defendants argue that Central States' SAC fails to adequately plead falsity. Fourth, Defendants contend that Central States has failed to adequately plead scienter. And finally, Defendants argue that Central States' SAC must be dismissed for failure to adequately plead loss causation and control person liability. The Court addresses each argument in turn.

## I. Central States' Standing to Raise Claims Based on Post-Purchase Statements

Central States bases several of its § 10(b) claims on statements made by Defendants after October 27, 2011, the date on which Central States last purchased Navistar stock.[6] Defendants move to dismiss these claims arguing that such "post–purchase" statements are not actionable under § 10(b). *Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411, 1420 (7th Cir. 1992) ("post-purchase statements cannot form the basis of Rule 10b-5 liability, because the statements could not have affected the price at which plaintiff actually purchased."). Central States concedes that

---

[6] These statements are: Ustian's October 30, 2011 statement; Allen's February 1, 2012 statement; and Navistar's financial statements certified by Cederoth and Ustian for the year ending on October 31, 2011 and quarter ending January 31, 2012.

it does not have Article III standing to assert claims based on post–purchase statements because it was not itself injured by such statements. Central States asserts, however, that it has class standing under Federal Rule of Civil Procedure 23 to bring these claims on behalf of similarly–situated plaintiffs who purchased Navistar stock after October 27, 2011. In so arguing, Central States relies on various Supreme Court and Seventh Circuit non–securities class action cases that purportedly distinguish Article III standing from Rule 23 class standing. *See Gratz v. Bollinger,* 539 U.S. 244, 123 S. Ct. 2411, 156 L. Ed. 2d 257 (2003); *Arreola v. Godinez,* 546 F.3d 788 (7th Cir. 2008); *Payton v. County of Kane,* 308 F.3d 673 (7th Cir. 2002). Central States contends that subsequent to these class standing opinions, courts within this District have rejected the Seventh Circuit's holding in *Roots* and asks this Court to do the same. *See Danis v. USN Commc'ns Inc.*, 189 F.R.D. 391, 398–99 (N.D. Ill. 1999).

But contrary to Central States' unsupported and chronologically illogical assertion, courts within this District have not repeatedly rejected the Seventh Circuit's holding in *Roots*. Indeed, when presented with the identical argument Central States raises here, courts within this District have distinguished the holding in *Danis* and followed the Seventh Circuit's holding in *Roots*. *See Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 706–07 (N.D. Ill. 2005) (distinguishing *Danis* and finding that under *Roots,* plaintiff lacks standing to bring claims for post-purchase statements); *see also In re Career Educ. Corp. Sec. Litig.*, No. 03 C 8884, 2006 WL 999988, at *2–3 (N.D. Ill. Mar. 28, 2006) (same) (collecting cases). This Court, likewise, finds that *Danis* is distinguishable. First, the court in *Danis* was analyzing standing on a motion for class certification, not on a motion to dismiss. *Danis*, 189 F. R. D. at 394. The question decided in *Danis* was whether the named plaintiffs' claims were typical of the plaintiff class, not whether the named plaintiffs had standing to advance the claims presented. *Danis*, 189 F. R. D. at 395.

Second, each of the two named plaintiffs in *Danis* had standing for one of the two class periods alleged in the complaint. The court therefore found that although each named plaintiff did not have standing for every claim alleged, between the two named plaintiffs, they had standing for all claims and were thus proper representatives of the class. *Id*. at 398. In this case, there is not a named plaintiff that has standing for the statements made after October 27, 2011. The other cases relied upon by Central States are inapposite.

The Court thus finds that *Roots* is still good law and binding in this case. In *Roots*, the Seventh Circuit was presented with the identical argument Central States advances here – that even though the named plaintiff may not have Article III standing with regard to statements made after its last stock purchase, it nevertheless has standing as a representative of those within the class who made purchases after the allegedly false or misleading statements. The Seventh Circuit expressly rejected this contention stating,

> [h]aving no claim of its own based on the post-purchase statements, Roots would not be a proper representative of a class of persons who bought Lands' End stock after the defendants' allegedly fraudulent post-July 25, 1989 statements. Roots therefore cannot defeat dismissal by purporting to represent the interests of post-July 25, 1989 purchasers.

*Roots*, 965 F.2d at 1420 n.6 (internal citations omitted). For the same reasons, the Court finds that Central States lacks standing to state a § 10(b) claim for any statements made after October 27, 2011 and those claims are dismissed. *Id.* Because Central States' claims against Defendant Allen are based solely on statements made after October 27, 2011, Defendant Allen is dismissed from this action.

## II.     Information from Confidential Witnesses

Central States' SAC is based almost entirely on information obtained from confidential witnesses ("CWs") who are former or current employees of Navistar. Defendants' motion to

dismiss repeatedly attacks the SAC based on this fact arguing that the Court must steeply discount information obtained from such sources. The Court generally finds, however, that Central States has adequately described their CWs "to support the probability that a person in the position occupied by the source would possess the information alleged." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.* ("*Tellabs I*"), 437 F.3d 588, 596 (7th Cir. 2006), *vacated and remanded on other grounds*, *Tellabs II,* 551 U.S. 308. For each CW, Central States "provide[s] the job title, duration of employment at [Navistar], and a description of employee responsibilities." *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, No. 11 C 8332, 2013 WL 566805, at *17 (N.D. Ill. Feb. 13, 2013). That being said, the Court notes certain gaps in the information provided that make it impossible for the Court to determine whether the CW relied upon for certain allegations would have had the information he or she is alleged to have had. "Thus, the Court will consider the allegations attributed to confidential witnesses and discount them as appropriate in determining whether [Central States] ha[s] alleged each false statement with particularity." *Id.*

### III. Safe Harbor Provision of the PSLRA

Defendants move to dismiss Central States' claims as to two alleged misstatements arguing that they are forward–looking statements protected by the safe harbor provision of the PSLRA, 15 U.S.C. § 78u–5. Forward–looking statements are those which discuss "the plans and objectives of management for future operations, including plans and objectives relating to the products or services of the issuer" and "the assumptions underlying or relating" to those statements. 15 U.S.C. §§ 78u–5(i)(1)(B), (D). The safe harbor provision protects such statements if (1) the statement is identified as forward–looking and "accompanied by meaningful cautionary language identifying factors that could cause actual results to materially differ from

those in the forward–looking statement," or (2) if the plaintiff fails to demonstrate that the statement was made with actual knowledge that it was false or misleading. *Brasher v. Broadwind Energy, Inc.*, No. 11 CV 991, 2012 WL 1357699, at *18 (N.D. Ill. Apr. 19, 2012); 15 U.S.C. § 78u–5(c)(1). To avoid dismissal under the second prong of the safe harbor provision, plaintiffs must plead "with particularity facts giving rise to a strong inference that the defendant had actual knowledge of the falsity of the statements." *Selbst v. McDonald's Corp.*, No. 04 C 2422, 2005 WL 2319936, at *19 (N.D. Ill. Sept. 21, 2005). Mere recklessness is not enough. *Brasher*, 2012 WL 1357699, at *18.

### A.     Navistar's November 4, 2010 Statement

Central States alleges that Navistar's statement in *Today's Trucking*[7]-the "0.2g NOx Maxxforce 13 we mentioned in the release yesterday and plan to submit to the EPA for certification will achieve emissions 'in-cylinder'" – was misleading because it omitted information regarding when Navistar would achieve 0.2 NOx.[8] Defendants argue that this

---

[7] Most of the alleged misstatements are from news articles and analyst calls. Central States' SAC contains only selected excerpts from those articles and analyst calls. In support of their motion to dismiss, Defendants attach as exhibits the articles and more complete transcripts of the analyst calls. Central States has not moved to strike these exhibits. Because the documents appended to Defendants' motion are referenced in the SAC and central to Central States' claims, the Court may consider them in ruling on the motion to dismiss without converting the motion into one for summary judgment. *Hecker v. Deere & Co.*, 556 F.3d 575, 582–83 (7th Cir. 2009).

[8] Central States' SAC alleges that this statement was false and misleading for two reasons: (1) because Defendants knew that "it could not achieve commercially viable EGR technology at 0.2 NOx," and (2) that even if it could, "it would not do so until at least 2014, well after EPA emission credits" would have expired. Doc. 128 ¶ 175. Basing its argument on this second reason alone, Central States' opposition memorandum argues only that the statement was misleading. Central States has thus waived its argument that Navistar's statement was false. *See Copeling v. Ill. State Toll Highway Auth.*, No. 12 C 10316, 2014 WL 540443, at *2 (N.D. Ill. Feb. 11, 2014) (citing *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011)) (forfeiture occurs "where a litigant effectively abandons the litigation by not responding to alleged deficiencies in a motion to dismiss"). Even had Central States not waived this argument, the Court would still have found that Central States had not adequately alleged that Navistar's statement was false because the SAC does not contain any contemporaneous allegations supporting the reasonable belief that as of November 4, 2010, Navistar knew that it could not achieve commercially viable 0.2 NOx. *See Zerger v. Midway Games, Inc.*, 07 C 3797, 2009 WL 3380653, at *7 (N.D. Ill. Oct. 19, 2009) (dismissing plaintiffs'

statement is protected by both prongs of the safe harbor provision because it was accompanied by meaningful cautionary language and because Central States has failed to adequately plead actual knowledge of the misleading nature of the statement.

Central States contends that Navistar's statement falls outside of the safe harbor's protection because a failure to disclose material information – when the technology would be available – cannot be forward looking. In so arguing, Central States relies on *Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960, 974 (N.D. Ill. 2006). But the court in *Takara* held that the absence of a statement in its entirety cannot be forward–looking. *Id.* It did not hold that a statement that omits material information cannot be forward–looking. This is an important distinction. To interpret the statute as Central States suggests would require the Court to ignore its plain language which explicitly protects statements that are alleged to be false or misleading as a result of an "omission of a material fact." 15 U.S.C. § 78u–5(c)(1). Indeed, the Supreme Court has recognized the safe harbor's application to statements that are alleged to have been misleading as the result of an omission of material fact. *See Matrixx Initiatives, Inc. v. Siracusano*, --- U.S. ---, 131 S. Ct. 1309, 1323 n.14, 179 L. Ed. 2d 398 (2011) ("Under the PSLRA, if the alleged misstatement *or omission* is a 'forward–looking statement,' the required level of scienter is actual knowledge." (emphasis added)). The Court therefore rejects Central States' argument that Navistar's statement was not forward–looking because it omitted material facts and instead finds that the statement was forward–looking under 15 U.S.C. § 78u–5(i)(1)(B). In saying that the engine "will" achieve emissions "in–cylinder," Navistar was discussing its future goal of having an engine that emits 0.2 NOx in–cylinder, i.e., using EGR technology. *See*

claims for failure to sufficiently "allege any facts contemporaneous to the statements"). To the contrary, Central States' SAC repeatedly cites to the August 27, 2010 "Go Fast" report which predicted that Navistar would achieve commercially viable 0.2 NOx EGR engines. Central States has not alleged that this prediction changed between August 27 and November 4, 2010.

http://www.oxforddictionaries.com/us/definition/american_english/will (defining "will" as "expressing the future tense"). Notably missing from Central States' recitation of the statement is Navistar's directive to "[s]tay tuned"; reinforcing that this was Navistar's plan for the future, rather than its present capability. Doc. 128 ¶ 134 ("0.2g NOx MaxxForce 13 we mentioned in the release yesterday and plan to submit to the EPA for certification will achieve emissions 'in-cylinder.' Stay tuned.").

Having found that Navistar's statement was forward–looking, the Court is left to determine whether Central States adequately alleged that the statement was made with actual knowledge that it was misleading. The Court finds that it has not. Central States argues that Navistar's statement was misleading because it omitted information regarding when Navistar would achieve a commercially viable 0.2 NOx EGR engine, specifically, that it was predicted that Navistar would not do so until at least 2014, after its emission credits were expected to expire. There are several problems with this argument. First, it ignores the fact that the article did provide an estimate of when Navistar would have commercially viable 0.2 NOx EGR engines. *See Selbst,* 2005 WL 2319936, at *9 ("In assessing forward–looking statements, the court must examine them 'collectively in the context in which they were made.'" (quoting *Lindelow v. Hill,* No. 00 C 3727, 2001 WL 830956, at *3 (N.D. Ill. July 20, 2001))). The article quoted Ustian as saying that the 0.2 NOx–compliant engines would not "begin coming off assembly lines for another two years." Doc. 133, Ex. 8. As such, the article provided the exact information Central States alleges was omitted. [9]

---

[9] While not clearly articulated, Central States' SAC and opposition memorandum also seem to argue that Navistar's statement was misleading because it neglected to highlight that there would be a gap between when its emission credits ran out and when it would have a 2010 emission–compliant engine in production. Ignoring the fact that this argument is not alleged with the requisite particularity required by the PSLRA, it is also inaccurate. The article said that the 2010 emission–compliant engines would likely not go into production until November of 2012. Given that the emission credits were expected to expire

Central States' argument also ignores the fact that Navistar's statement was an answer to a question. Central States does not allege, nor is it clear from the article, what that question was. *See* Doc. 133, Ex. 8 ("When asked for details before this posting, Navistar spokesman Roy Wiley would only confirm in an email…"). For this reason alone, Central States fails to sufficiently plead that the statement was knowingly misleading since without the context of the question asked, it is impossible for the Court to draw a strong inference that Navistar's limited response was knowingly misleading. *See In re Northfield Labs., Inc.*, 527 F. Supp. 2d 769, 787 (N.D. Ill. 2007) (court's determination of whether answer to question was false or misleading hinged on question posed). As Defendants further point out, Navistar's statement related only to the type of technology it intended to use to meet emission standards. In providing this information, Navistar was not required to provide all information, however tangentially related to the type of technology it planned to use, such as when the engines would be commercially available. *See Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 WL 4360648, at *10 (N.D. Ill. Sept. 23, 2008) ("Merely mentioning a topic…does not require the company to disclose every tangentially related fact that might interest investors." (quoting *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 903 (N.D. Ill. 2001))).

Finally, this claim demonstrates the inherent difficulties in relying on a third–party's article to allege a misleading statement. Specifically, it is difficult to adequately allege that

---

in the first or second quarter of 2012, there would still be a gap during which Navistar would not have any emission credits and would also not have an emission–compliant engine. In addition, this argument relies solely on the "Go Fast" report, authored approximately two months prior to Navistar's statement, which predicted that the 0.2 NOx engines would not be ready for production until at least Q1 2014. The existence of this report alone does not give rise to a strong inference that Navistar had actual knowledge that its statement was misleading. Central States' SAC only alleges that the report was authored on August 27. It does not allege to whom this report was given or when. Given the short window of time between when the report was authored and when Navistar made the subject statement, it is possible that the report had not yet been disseminated and that high–level managers were not yet aware of the projected production date.

Defendants knew that their statements would be misleading when they are not the ones in control of the information that is released or the context in which their statements are placed. *See In re Career Educ. Corp. Sec. Litig.*, 2006 WL 999988, at *6 (finding inherent problems in relying on news reports to meet pleading requirements of PSLRA such as reporter bias and selective editing of information); *see also Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.* ("*Garden City II*"), No. 09 CV 5641, 2012 WL 1068761, at *9 n.3 (N.D. Ill. Mar. 29, 2012) ("Securities issuers are not liable for statements or forecasts disseminated by securities analysts  or third parties unless they have sufficiently entangled [themselves] with the analysts' forecasts [so as] to render those predictions attributable to [the issuers.]"  (alternation in original)  (quoting *Teamsters Afiliates Pension Plan v. Walgreen Cor.*, 2010 WL 3894149, at *3 (N.D. Ill. Sept. 29, 2010))).  For these reasons, Central States fails to plead the knowledge required to make Navistar's November 4, 2010 forward–looking statement actionable, and Central States' claim as to this statement is dismissed.[10]

### B.    Ustian's December 22, 2010 Statement

On December 22, 2010, Navistar conducted a conference call with analysts during which Ustian fielded questions about the timeline for certifying the 13–liter engine at 0.2 NOx.  Ustian answered that it would take several months, but said that at an event occurring on the 25th, "we'll be able to show you the data, that it meets 0.2, and show you how we're able to meet it." Doc. 128 ¶ 135.  Again, Central States asserts that this statement was false and misleading because Ustian knew that Navistar could not achieve commercially viable EGR technology at 0.2 NOx, and that even if it could, it would not do so until 2014, after Navistar's EPA credits were expected to expire.  Defendants move to dismiss Central States' claim as to this statement on the

---

[10] Because the Court finds that Navistar's November 4, 2010 statement is nonactionable under the second prong of the safe–harbor provision, it does not address whether the statement is also nonactionable under the first prong.

grounds that it is a non–actionable forward–looking statement protected by the PSLRA's safe–harbor provision. Central States argues that Ustian's statement was not forward–looking because it was possible to determine the truth or falsity of the portion of the statement, that it "meets 0.2," at the time the statement was made. The Court disagrees.

As the Seventh Circuit has pointed out, the fact that a challenged statement is phrased in the present tense does not necessarily mean that the statement is one of present conditions rather than a prediction of future events. *Makor Issues & Rights v. Tellabs Inc.* ("*Tellabs III*"), 513 F.3d 702, 705 (7th Cir. 2008) (fact that challenged statements "are in the present tense is not decisive on the question whether the statements include predictions"); *see also Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 848 (N.D. Ill. 2009). Ustian was clearly speaking about showing analysts an engine at a future event in Melrose Park.[11] It was here, at this future event, that Ustian predicted that Navistar would be able to show analysts that the engine met 0.2 NOx. As such, even though Ustian used the present tense of the word "meet," the Court nevertheless finds that the portion of Ustian's statement – "that it meets 0.2" – reflected his prediction of future events. It was thus impossible to determine the truth or falsity of Ustian's statement – whether Navistar would be able to show analysts that the engine met 0.2 NOx on the 25th – at the time it was made, which by definition makes it a forward–looking statement. *Selbst v. McDonald's Corp.,* 432 F. Supp. 2d 777, 783 (N.D. Ill. 2006) ("A 'forward–looking' statement is one whose truth or falsity cannot be determined until after the statement has been made."). Central States does not argue that any other portion of Ustian's statement was not forward–looking. The Court therefore finds that Ustian's entire statement was forward–looking.

---

[11] Ustian references an event occurring on "the 25th." Neither the SAC nor the transcript of the call makes clear to which month the 25th corresponds. Regardless, the Parties agree that Ustian was speaking about a future event.

The Court is thus left again to determine whether Central States has pleaded sufficient facts creating a strong inference that Ustian's statement was made with actual knowledge that it was misleading, and finds that it has not.[12] Central States concedes that at the time of Ustian's statement, Navistar had engines meeting 0.2 NOx in dyno cells and in trucks. Central States argues that Ustian's statement was misleading nonetheless because it omitted the fact that these engines were meeting 0.2 NOx *only* in dyno cells, which do not represent real world conditions, and in trucks that broke down. By omitting these facts, Central States argues that a reasonable investor could have understood Ustian to be saying that Navistar had achieved commercially viable 0.2 NOx engines. Again, the Court disagrees.

First, the Court must take Ustian's statement at face value. *Fulton County Emps.' Ret. Sys. v. MGIC Inv. Corp.*, No. 08-C-0458, 2010 WL 601364, at *12 (E.D. Wis. Feb. 18, 2010), *aff'd* 675 F.3d 1047 (7th Cir. 2012); *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 404 (S.D.N.Y. 2006) (rejecting plaintiffs' interpretation of a statement as "not reasonable considering the entire context of the statement and the other statements included in the [complaint]"). Ustian simply did not say that Navistar had commercially viable 0.2 NOx engines. In addition, taking Ustian's statement in the context in which it was made, the Court does not find that a reasonable investor could have understood Ustian to be saying that Navistar had commercially viable 0.2 NOx engines ready for production. When asked about the timeline for certifying the 13–liter engine at 0.2 NOx, Ustian responded that Navistar was not yet ready to submit the engines to EPA for certification. Indeed, Ustian said that Navistar would likely not be

---

[12] Once again, Central States' SAC alleges that Ustian's statement was both false and misleading. Central States concedes in its opposition memorandum, however, that Ustian's statement was technically true because Navistar had achieved 0.2 NOx in dyno cells and engines. Doc. 134 at 18. The Court thus limits its review to whether Central States has sufficiently alleged that the statement was made with actual knowledge that it was misleading.

ready to submit the engines for certification for several more months. Central States thus fails to "create a strong inference that [Ustian] made the forecast[] with actual knowledge that the statement [was] false or misleading at the time made." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 735 F. Supp. 2d 856, 909 (N.D. Ill. 2010) (quoting *Emp'rs. Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1134 (9th Cir. 2004)) (internal quotation marks omitted); *see also Garden City II*, 2012 WL 1068761, at *5. Ustian's December 22, 2010 statement is therefore entitled to the protection of the safe–harbor provision of the PSLRA, and the Court dismisses Central States' claim as to this statement.

### III.    Alleged False or Misleading Statements

Because the PSLRA requires plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1), it is not sufficient to merely claim that a statement was false or misleading. Instead, Plaintiffs must state with particularity the facts – known to the speaker at the time – that render the statement false or misleading. *Garden City II*, 2012 WL 1068761, at *4 ("Plaintiffs must explain, with particularity, the factual basis for their assertion that the statement was untrue."); *In re Harley–Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 1000 (E.D. Wis. 2009) (dismissing complaint because it lacked "fact-based connections between a speaker, a statement, and specific, contradictory information presumably known to that speaker at the time the statement was made"). Even statements that are literally true can still be actionable under § 10(b) as misleading if they are susceptible to another interpretation by a reasonable investor. *Plumbers & Pipefitters Local Union No. 630 Pension-Annutiy Trust Fund v. AllScripts–Mysis Healthcare Solutions, Inc.*, 778 F. Supp. 2d 858, 878 (N.D. Ill. 2011) (citing *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 2009)). In making this determination, courts are to

consider the context in which the statement was made. *Id.* (finding that context is the key to determining whether statement is misleading). When alleging that Defendants omitted something, "'plaintiffs must point to a specific statement that is made misleading by [an] omission,' and offer 'specific, contradictory information' known to [Defendants] sufficient to establish that [Defendants] made any misleading statements." *Garden City II*, 2012 WL 1068761, at *5 (first alteration in original) (citations omitted). Put another way, in evaluating whether Plaintiffs have adequately pleaded falsity, the Court must determine "whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Tellabs I*, 437 F.3d at 596 (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000)).

### A.    Ustian's Statements

#### 1.    Ustian's March 10, 2010 Statements

Navistar hosted an earnings call with analysts on March 10, 2010. During this call, Ustian made two statements that Central States alleges were false and misleading. First, Ustian told analysts that Navistar was "ready for emission standards." Doc. 128 ¶ 172. Second, Ustian told analysts "[w]e have had no quality problems with it to speak of. So we believe that our technology is already proven." *Id.* Central States alleges that these statements were false and misleading because Navistar was experiencing quality problems with their EGR engines, therefore the technology was not proven.

With regard to Ustian's first statement – we're ready for emission standards" – Central States' SAC does not specifically allege what was false or misleading about this statement, instead focusing solely on why Ustian's second statement was false or misleading. Central States therefore fails to sufficiently state a claim as to this statement. *Garden City II*, 2012 WL

1068761, at *4.  In the interests of completeness, however, the Court will examine the arguments

raised in the Parties' briefs as to this statement.  Central States concedes in its opposition

memorandum that Ustian's statement was technically true because Navistar was meeting

emission standards through the use of 0.5 NOx engines and emission credits.  Doc. 134 at 12

("[T]he Company was ready for the 0.5 NOx emission standard.").  But Central States maintains

that Ustian's statement was misleading because it omitted the fact that Navistar was able to meet

emission standards *only* by using 0.5 NOx engines and emission credits, and "was

technologically incapable of achieving [0.2 NOx] in a commercially viable manner."  *Id*.  As a

result of these omissions, Central States argues that Navistar's statement was susceptible to

another interpretation – that Navistar was ready to meet the 2010 emission standards with 0.2

NOx engines.

The Court does not find, however, that a reasonable investor could have construed

Ustian's statement in the way Central States proposes.  *See Allscripts*, 778 F. Supp. 2d at 878

(finding that defendant's statement was not misleading because "in its actual context a

reasonable investor would not arrive at the conclusion Plaintiff proposes").  Taken in context, it

is clear that Ustian was referring to meeting emission standards by using 0.5 NOx engines and

emission credits.  Immediately following Ustian's "we're ready for emission standards"

statement, Ustian went on to say "[o]ur products are being certified today.  Some of them have

already passed…We do have some already in the marketplace."  Doc. 128 ¶ 127.  Central States'

SAC makes clear that in early 2010, Navistar was certified as meeting 2010 emission standards

only through a combination of 0.5 NOx engines and emission credits.  *See* Doc. 128 ¶ 87 ("2010

EPA-compliant engines (0.5 NOx) were sold in low volumes during the first half of 2010.").

Nowhere in Central States' SAC are there allegations that as of March 10, 2010, Navistar had

certified 0.2 NOx engines, or 0.2 NOx engines were in the marketplace. Nor are there allegations that Defendants represented this to be the case. Moreover, the slide presentation shown concurrently with the call included a slide titled "Summary – 2010 Emission Strategy Status." Doc. 133, Ex. 29 at 13. This slide stated that "[a]ll engines will be between 0.4 and 0.5 NOx." *Id.*

Additionally, Ustian's statement was not misleading for the alternative reasons offered by Defendants. First, the SAC lacks factual allegations demonstrating that Ustian knew as of March 10, 2010 that Navistar was not technologically capable of achieving commercially viable 0.2 NOx engines. *See Garden City II,* 2012 WL 1068761, at *5 (when alleging that a statement is misleading due to an omission of material fact, the plaintiff must "offer specific, contradictory information known to [Defendants]" (citations omitted ) (internal quotation marks omitted)). To the contrary, as previously discussed, Navistar's chief engineer believed that given sufficient time, commercially viable 0.2 NOx EGR engines were possible. Doc. 128 ¶¶ 52, 174(h). Second, Ustian was not required to point out that Navistar did not yet have certified 0.2 NOx engines. *See Harley-Davidson,* 660 F. Supp. 2d at 984 ("[M]erely mentioning a matter 'does not require the company to disclose every tangentially related fact that might interest investors, only those that are sufficiently important.'" (quoting *Anderson*, 140 F. Supp. 2d at 903). Ustian was reporting on the status of Navistar engines that were certified at 0.5 and 0.4 NOx. This did not obligate Ustian to also discuss Navistar's progress in developing 0.2 NOx certified engines. Ustian's statement was neither false nor misleading, and Central States has failed to adequately allege otherwise.

Turning to Ustian's second statement, the Court finds that despite the Parties treating it as one statement, it is in fact two statements: (1) "We have had no quality problems with it to speak

of," and (2) "[s]o we believe that our technology is already proven." Doc. 128 ¶ 127. The Court will thus analyze them separately. Turning to the first statement, the Court agrees with Defendants that Ustian was commenting only on the lack of quality problems with the 0.5 NOx engines in the 100 buses Navistar sold. Doc. 128 ¶ 127 ("If you remember right, we had 100 or so buses that went into the marketplace at 2010 emissions levels. Those are running great. We have had no quality problems with it to speak of."). Central States argues that even if Ustian's comment pertained only to the 0.5 NOx engines in the 100 buses, Central States has still sufficiently alleged that the comment was false or misleading because it has alleged that there were quality problems with all 0.5 NOx engines.

But none of the allegations pleaded in support of this claim discuss quality problems with the 0.5 NOx engines. *See* Doc. 128 ¶¶ 172(a) – (f). Presumably recognizing this failure, Central States' opposition memorandum directs the Court's attention to allegations made in unrelated portions of the SAC that purportedly demonstrate the falsity of Ustian's statement. In doing so, Central States concedes that it has not complied with the pleading requirements of the PSLRA. *See Garden City II*, 2012 WL 1068761, at *4 ("Plaintiffs must explain, with particularity, the factual basis for their assertion that the statement was untrue."). For the sake of completeness, the Court will address these arguments.

First, Central States relies on the allegations attributed to CWs 14 and 20 to support its assertion that Ustian's statement was false when made. But the SAC does not describe the positions CWs 14 and 20 held in March of 2010 such that the Court can determine that they would have had access to the information they allege. Even had the SAC provided this information, and the Court determined that their allegations were reliable, they would still not support the reasonable belief that Ustian's statement was false or misleading when made. This is

so because the allegations attributed to CWs 14 and 20 make absolutely no mention of quality problems with the 100 buses, which was the subject of Ustian's comment. Central States' reliance on SAC ¶¶ 94–96 is similarly unavailing as those paragraphs discuss warranty issues that arose in mid–2011, over a year after Ustian's statement, and also do not mention the 100 buses. Doc. 128 ¶¶ 94–96.

The closest Central States comes to adequately alleging that Ustian's statement was false or misleading when made is the allegations in ¶ 110, which states:

> when Navistar launched trucks with engines meeting 0.5 NOx in late 2009 and early 2010, everyone including upper management saw that the majority of the engines were failing due to increased soot circulating through the engine. CW21 flew to Florida around this time to deliver five heavy duty trucks to customers, and three of the five failed immediately.

Doc. 128 ¶ 110. Yet, this allegation also fails to adequately establish that Ustian's statement was false or misleading when made because it does not specifically identify when Ustian knew of the engine failures, this allegation refers to trucks, not buses, and most importantly, this allegation says that "the *majority* of engines were failing," which means that some of the engines were not failing. *Id.* (emphasis added). Perhaps these non–failing engines were in the 100 buses. For these reasons, Central States has failed to adequately plead that this statement was false or misleading when made.

As previously stated, the Court finds that Ustian's statement, "[s]o we believe our technology is already proven," is a separate and distinct statement from Ustian's statement "[w]e have had no quality problems with it to speak of." The latter statement relates to the 100 buses Navistar sold in the marketplace, while the former statement relates to Navistar's EGR technology generally. In joining these two statements together, Defendants did not provide a

basis for dismissal of Ustian's statement that Navistar's technology was proven. Central States' claim as to this statement will thus proceed.

### 2. Ustian's June 9, 2010 Statement

Ustian participated in an analyst call on June 9, 2010 to discuss Navistar's second quarter 2010 financial results. During the call, Ustian made two statements that Central States alleges were false and misleading: (1) "we're at the point now that every one of the worry beads is behind us," and (2) "we have engines running – we have vehicles running that meet those standards of 0.2." Doc. 128 ¶ 173. Central States alleges that these statements were false and misleading when made because Navistar did not have vehicles running that met 0.2 NOx, nor was it true that all of the worry beads were behind it.

Ustian's first statement regarding the worry beads is the type of "vacuous management speak" and vague corporate optimism that courts have consistently held to be nonactionable under § 10b. *AllScripts*, 778 F. Supp. 2d at 872 (finding statements that defendant was "'confident in its ability to deliver solid results,' and was 'in position to capitalize' on a significant market opportunity" to "amount to nothing more than vacuous management speak"). Courts reject claims based on these types of statements because they "are so general and devoid of any substantive content that they fail to communicate anything that would alter the total mix of information available to investors and the market." *Id*. Ustian's statement is exactly this type of statement. It is mere hyperbole, so lacking in specificity that no reasonable investor could have relied upon it, and it cannot, as a matter of law, have altered the total mix of information available to the market. "Scrutiny of vaguely optimistic statements for immateriality as a matter of law is 'especially robust' in cases involving a fraud-on-the-market theory of liability, such as this one, because the hypothetical 'reasonable investor,' by reference to whom materiality is

gauged, is 'the market' itself." *Alizadeh v. Tellabs, Inc.,* No. 13 C 537, 2015 WL 557249, at *8

(N.D. Ill. Feb. 9, 2015) (quoting *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152,

1164 (N.D. Ill. 2004)) (citations omitted). Were the Court to accept Central States' argument

and attempt to ascertain the statement's veracity, it would be required to answer the existential

question of what worry beads are, to what myths or rumors the beads related, and whether, in

fact, Navistar's concerns were in the past. Lacking any objective metric by which such a

determination can be made, the statement must be dismissed as immaterial.

Even had the Court not found Ustian's worry bead statement immaterial, the statement

would still be dismissed because Central States fails to adequately plead that it was false or

misleading when made. As with the other alleged misstatements, Central States put forth several

subparagraphs of allegations meant to demonstrate the false and misleading nature of Ustian's

statement. Once again, the Court finds that the allegations fail to do so. Rather, the

subparagraphs offer vague allegations that between 2008 and 2011, Navistar experienced time

delays, cost overruns, and technical issues during the development of its EGR technology. Doc.

128 ¶¶ 173(a) – (g). None of the paragraphs allege facts that support the reasonable belief that

Ustian's statement was false or misleading when made. *See Zerger*, 2009 WL 3380653, at *7

(dismissing plaintiffs' claims for failure to sufficiently "allege any facts contemporaneous to the

statements"); *see also Harley–Davidson*, 660 F. Supp. 2d at 1000 (dismissing complaint because

it lacked "fact–based connections between a speaker, a statement, and specific contradictory

information presumably known to that speaker at the time the statement was made"). To the

contrary, ¶ 173(h) alleges that in April 2010, the EPA certified Navistar engines as meeting the

2010 emission requirements through the use of banked emission credits. This allegation supports

the notion that Navistar had assuaged concerns that it would not be able to certify engines meeting the 2010 emission standards.

Central States' sole argument in opposition is that "it was widely known that the EGR solution was unworkable." But as with Ustian's March 10, 2010 statement, Central States has failed to adequately allege that as of June 9, 2010, it was widely known that the EGR solution was unworkable. Quite the opposite, Central States' SAC alleges that there were those within Navistar, including its chief engineer, who believed at least through August of 2010 that the technology would be successful. *See* Doc. 128 ¶ 52.

Turning to the second statement, the Court finds that Ustian's statement – "we have engines running – we have vehicles running that meet those standards of 0.2"– is not adequately alleged to have been false when made. Central States concedes in its opposition memorandum that Navistar had 0.2 NOx engines running in dyno cells and trucks. The engines in those trucks may not have run indefinitely and may not have been commercially viable, as Central States asserts, but Ustian did not say that Navistar had commercially viable 0.2 NOx engines. Ustian simply said that Navistar had engines and vehicles running that met the 0.2 NOx standard. This statement was true and Central States' SAC does not contain any allegations creating a reasonable belief that it was not.

Central States argues in the alternative that Ustian's statement was misleading because it omitted the fact that the engines were running only in dyno cells. But as discussed above, the Court finds that the engines were also running in vehicles. Again, Central States has not alleged anything to contradict this conclusion. Central States also argues that Ustian's statement was misleading because it was susceptible to another interpretation. Central States fails, however, to

identify the alternative interpretation. Taken in context, the Court finds that Ustian's statement meant what it said; nothing more, nothing less.

Ustian made this statement in response to an analyst who asked "how the testing of [EGR] was going." Doc. 133, Ex. 4. The question posed – how the testing of the technology was going – reflects an understanding that the technology was still in the testing stage of development. In addition, Ustian made clear later in the call that the 0.2 NOx engines were not yet in production, and "at best case, we are very successful, we will need another two plus years before we launch [the 0.2 NOx EGR engines]." *Id*. For these reasons, the Court finds that Ustian's statement was neither false nor misleading when made, and Central States' claim as to Ustian's June 9, 2010 statements is dismissed.

### 3. Ustian's November 4, 2010 Statement

On November 4, 2010, *Fleet Owner* magazine ran an article discussing Navistar's EGR technology. Ustian was quoted as saying "[w]e're 100% there in terms of our ability to do it," i.e., meet 0.2 NOx with EGR technology. Doc. 128 ¶¶ 133, 174. Once again, Central States' SAC argues that this statement was false and misleading because Navistar was not capable of achieving commercially viable 0.2 NOx. Central States' opposition memorandum, however, abandons its argument that the statement was false and argues only that the statement was misleading. *Copeling*, 2014 WL 540443, at *2 (citing *Alioto*, 651 F.3d at 721) (forfeiture occurs "where a litigant effectively abandons the litigation by not responding to alleged deficiencies in a motion to dismiss"). The Court agrees that the statement was not false and moves on to determine whether it was misleading.

Once again, Central States argues that Ustian's statement was misleading because it implied that Navistar had commercially viable 0.2 NOx engines when it did not. But again,

Ustian did not say that Navistar had commercially viable 0.2 NOx engines.  Rather, Ustian said that he believed that Navistar had the *ability* to produce commercially viable 0.2 NOx engines. As previously discussed, Central States' own allegations confirm that as of August 27, 2010, there were those within Navistar, including Navistar's chief engineer, who believed that Navistar did have the ability to manufacture a commercially viable 0.2 NOx engine using EGR technology.  Doc. 128 ¶ 174(h).  Central States' SAC does not allege anything that suggests that this belief changed between August 27 and November 4, 2010.

In addition, taken in context, no reasonable investor could have understood Ustian to be saying that Navistar had commercially viable 0.2 NOx engines.  As Defendants point out, the article quoted Ustian as saying "[w]e're probably not going to get .2 for a couple of years."  Doc. 133, Ex. 30.  Central States argues that Ustian misleadingly framed the delay in releasing the 0.2 NOx engines as one of customer experience, rather than inadequate technology.  But Ustian's comments, even if framed as "customer experience," still indicated that the technology was not there yet.  For example, in discussing "customer experience," Ustian said that delaying production of these engines would allow Navistar to diminish issues that customers could experience with performance, "as Navistar slowly steps down to the 0.2 level."  *Id.*  This statement makes two things clear: (1) that Navistar did not yet have 0.2 NOx engines ready for production, and (2) that the engines had performance issues.  Whether framed as "customer experience" or something else, this statement demonstrates that Navistar did not have commercially viable 0.2 NOx technology yet.  For these reasons, Central States has failed to adequately plead that Ustian's November 4, 2010 statement was false or misleading and Central States' claim as to this statement is dismissed.  *See AllScripts*, 778 F. Supp. 2d at 878 (finding

that defendant's statement was not misleading because "in its actual context a reasonable investor would not arrive at the conclusion Plaintiff proposes").

<b>4.      Ustian's December 22, 2010 Statement</b>

Central States alleges that Ustian's statement during a December 22, 2010 analyst call – "we're the only ones that meet emissions in the cylinder" – was false and misleading because Defendants knew that Navistar could not achieve commercially viable 0.2 NOx, and even if it could, it would not do so until after expiration of its EPA emission credits. Interestingly, Defendants do not argue that this statement was true because Navistar had an engine that met 0.2 NOx without emission credits. Rather, Defendants argue that this statement was true because Navistar was the only company meeting 2010 emission standards with EGR, or "in–cylinder," technology, albeit through the use of 0.5 NOx engines and emission credits. Doc. 133 at 25. Central States thus switches tack in its opposition memorandum and argues that even though technically true, Ustian's statement was misleading because, taken in context, a reasonable investor could have understood him to be saying that Navistar had engines that met the 0.2 NOx emission standard without emission credits. The Court agrees.

First, the plain language of the statement states that Navistar is the only company that "meet[s] emissions *in the cylinder.*" Doc. 128 ¶ 176 (emphasis added). A reasonable investor could certainly have understood this to mean that Navistar had an engine that was able to meet the 2010 emission standard without the use of emission credits. Defendants do not cite to, nor can the Court locate, any portion of the call that contains qualifying language that would alert a reasonable investor to the fact that Ustian meant only that its engines met emission standards through the use of 0.5 NOx engines and emission credits. Instead, Defendants point to Navistar's 10–K form filed the same day which discussed how Navistar was selling EPA–

certified engines that met 2010 emission requirements through the use of emission credits throughout 2010. Defendants rely on this statement to support their argument that Ustian's statement was not misleading because it was known that throughout 2010, Navistar was meeting emission standards through 0.5 NOx engines and emission credits. The problem with Defendants' argument is that while the analyst call may have been intended to cover only 2010's products and financial results, the portion of the call during which this statement was made was discussing the upcoming trade show on the 25th and the 2011 products that Navistar would have there. *See* Doc. 135, Ex. A at 8. It was in this context that Ustian said "[w]e're the only ones that meet emissions in the cylinder." Ustian then went on to say "[w]e're the only ones that all of our vehicles will have our own engine in it. We're the only ones that have a full integrated product here." *Id.* Ustian then told the analysts that Navistar expected to be able to show them a 13–liter engine that met 0.2 NOx at the tradeshow on the 25th.[13] Doc. 128 ¶ 135. Given this context, a reasonable investor could have understood Ustian to be saying that Navistar had an engine that met the 0.2 NOx emission standard without the use of emission credits. Additionally, Defendants do not argue that Navistar had a 0.2 NOx–compliant engine at that time. For these reasons, the Court finds that Central States has adequately pleaded that this statement was misleading when made and Defendants' motion to dismiss this statement is denied.

---

[13] The allegations relied on by the Court to find that Central States has adequately pleaded that Ustian's statement was misleading are not included in the section of Central States' SAC intended to specifically identify why Ustian's statement was false or misleading, as is required by the PSLRA. *See* Doc. 128 ¶ 176(a) – (i). However, because there are facts in the SAC that support Central States' claim, the Court finds that the interests of judicial economy and efficiency are best served by reading the SAC as a whole, rather than dismissing this claim for technically failing to strictly comply with the PSLRA. Were it to do so, the Court would dismiss the claim without prejudice as the SAC does contain facts that support the claim, thus imposing more time and expense on the Parties by requiring Central States to file a third amended complaint, which would likely be followed by another motion to dismiss, all to remedy a technicality. Proceeding this way does not thwart the purposes of the heightened pleading requirements of the PSLRA, namely curbing "nuisance filings, targeting [] deep–pocket defendants, vexatious discovery requests and manipulation by class action lawyers." *Tellabs II,* 551 U.S. at 320.

## B.    Navistar Statements

During a conference call with analysts on September 7, 2011, Navistar made two statements that Central States claims were false and misleading: (1) that "[Advanced EGR] is proving extremely viable providing fuel economy and performance on par with the best SCR competitors," and (2) "[a]s we develop 0.20g NOx capability, our goal of continuing to improve performance and fuel economy at this emissions level is being realized."  Doc. 128 ¶ 177. Central States alleges that these statements were false and misleading because EGR technology was not proving to be viable, nor was performance and fuel economy at the 0.2 NOx emissions level being realized.

With regard to Navistar's first statement, Central States fails to put forth any factual allegations that contradict Navistar's statement that its EGR technology was proving viable in that it was providing fuel economy and performance on par with its SCR competitors.  Central States does not dispute that Navistar's statement was made with regard to the 0.5 NOx engines, as opposed to the 0.2 NOx engines.  Central States argues that the statement was nevertheless misleading because the 0.5 NOx engines were experiencing significant performance and warranty issues.  That may be true and for purposes of this motion, the Court accepts that this allegation is true.  But Central States' argument ignores the fact that Navistar's statement was comparative.  Without a point of comparison to any Navistar competitor using SCR technology, Central States fails to plead with the requisite specificity that Navistar's statement was misleading. Perhaps Navistar's SCR competitors also experienced significant performance and warranty issues.  Given that these companies were designing new technology or augmenting existing technology to achieve lower emissions, it is certainly within the realm of possibility that all engine companies experienced hiccups in the development process.  Ultimately, nowhere in

Central States' nearly 100–page complaint are allegations supporting its contention that Navistar's statement putting its technology on par with its competitors was misleading when made.

Central States' bare allegation that "[m]anufacturers using SCR were able to meet the 2010 EPA standard on time" does not save its claim. Doc. 128 ¶ 7. First, this allegation does not indicate the type of emission strategy (0.5 NOx with emission credits or 0.2 NOx) Navistar's competitors utilized to meet the 2010 emission standards. Second, Central States does not clarify what "on time" means. Finally, and most importantly, this allegation is silent regarding the level of performance experienced by Navistar competitors, as well as the presence, or lack, of warranty issues. Central States' claim as to this statement thus fails.

Turning to Navistar's second statement – "[a]s we develop 0.20g NOx capability, our goal of continuing to improve performance and fuel economy at this emissions level is being realized" – the Court agrees with Defendants that Central States failed to adequately plead falsity. No allegation put forth in support of this claim directly contradict Navistar's statement. Paragraphs 177(a) – (e) and (h) – (j) contain vague non–contemporaneous allegations that the development of EGR technology was experiencing difficulties, was taking longer than anticipated, and was incurring cost overruns. *See* Doc. 128 ¶ 177(a) (CW1 and CW2 reported technical problems as early as the summer of 2008); *id.* ¶ 177(h) (CW7 met with people who reported to Ustian to discuss the "troubled EGR program" beginning in October of 2010). Paragraph 177(k) discusses the warranty issues with the 0.5 NOx engines, which became apparent by mid–2011. Doc. 128 ¶ 177(k) (according to CWs 11 and 13, Navistar circulated monthly reports that by mid–2011 reflected significant warranty issues with the 0.5 NOx EGR engines). But Navistar's statement was made as to the 0.2 NOx engines, not the 0.5 NOx

engines.  Nothing  in these paragraphs bears on the performance or fuel economy of the developing 0.2 NOx EGR technology.  *See Harley–Davidson,* 660 F. Supp. 2d at 1000 (dismissing complaint because it lacked "fact–based connections between a speaker, a statement, and specific, contradictory information presumably known to that speaker at the time the statement was made").

Central States' opposition memorandum further highlights the shortcomings of its claim as to this statement.  Once again Central States argues that it has sufficiently pleaded falsity as to this statement because it has alleged facts demonstrating that Navistar did not have "commercially viable" 0.2 NOx technology as of September 2011.  As with other alleged misstatements, this argument mischaracterizes Navistar's statement.  Navistar did not say that it had commercially viable 0.2 NOx engines.  Navistar said that it was in the process of developing 0.2 NOx capability.  As such, Central States' allegation that Navistar did not have commercially viable 0.2 NOx technology as of September 2011 is irrelevant.  Central States goes on to argue that the "Go Fast" report contradicts Navistar's statement, but fails to explain how.  Regardless, as previously discussed, the Court finds that this report supports Navistar's statement as it was based on the premise that Navistar would achieve commercially viable 0.2 NOx engines with EGR technology.  Central States' final argument is that on January 20, 2012, the EPA determined that Navistar would not be able to meet the 0.2 NOx emissions standards with EGR technology.  Given that this determination was made over four months after Navistar's statement, it does not support a reasonable belief that the statement was false when made.  In short, Central States falls short of pleading with the requisite particularity why Navistar's statement was false or misleading when made.  *See Garden City II*, 2012 WL 1068761, at *4.

The Court thus dismisses Central States' claim based on Navistar's September 7, 2011 statements.

## IV.    GAAP Violations

Central States asserts that Navistar's Form 10–Q for the period ending July 31, 2011, certified by Ustian and Cederoth, was false and misleading because it did not comply with Generally Accepted Accounting Principles ("GAAP").[14]  17 C.F.R. § 210.4–01(a)(1) (financial statements that are not GAAP–compliant "will be presumed to be misleading or inaccurate"). Under GAAP, companies are required to accrue loss contingencies on their balance sheets if it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated.  Accounting Standards Codification ("ASC") 450–20–50–2.  In addition, companies are required to disclose the possibility of a change in a company's estimate of its probable liability if two conditions are met:

> (1) It is at least reasonably possible that the estimate of the effect on the financial statements of a condition, situation, or set of circumstances that existed at the date of the financial statements will change in the near term due to one or more future confirming events; and
> (2) the effect of the change would be material to the financial statements.

ASC 275–10–50–8.  Central States does not dispute that Navistar properly accrued a loss contingency for the warranty issues that were arising with the 0.5 NOx engines as required by GAAP.  Nevertheless, Central States alleges that Navistar's Form 10–Q was false and misleading because it failed to disclose the reasonable possibility that the estimate of the loss amount could change and that any such change would be material.  ASC 275–10–50–8.  But as Defendants point out, Central States fails to identify a future confirming event that could have

---

[14] Central States also asserts that Navistar's SEC filings for the period ending October 31, 2011 and January 31, 2012 were false and misleading.  For the reasons discussed in Section I *supra*, Central States does not have standing as to these statements.

affected the estimate of the loss amount.  Central States' opposition memorandum does not attempt to contradict Defendants' argument and instead generally argues that engine failures and the uptick in warranty expenses, which began in mid–2011 and continued through 2012, created the reasonable possibility that Navistar's liability estimate could have changed in the near term. But ASC 275–10–50–8 requires more to create a disclosure obligation.  Namely, it requires "one or more future confirming events."  *See S.E.C. v. Spiegel, Inc.*, No. 03 C 1685, 2003 WL 22176223, at *69–71 (N.D. Ill. Sept. 15, 2003) (identifying specific "trigger" events that had the potential to change the company's liabilities).  Central States' failure to identify such an event is fatal to its claim.

Because Central States has failed to adequately allege a false or misleading statement attributable to Navistar or Cederoth, they are dismissed from this action.

## V. Scienter

In addition to alleging that Defendants made false or misleading material statements, Central States must also allege facts establishing Defendants' scienter— "a mental state embracing intent to deceive, manipulate, or defraud."  *Tellabs II*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976)).  A court may find that even though a plaintiff has adequately alleged that the defendant's statements were false or misleading, the complaint must be dismissed if the plaintiff has not adequately alleged scienter.  *See Tellabs I*, 437 F.3d at 600.  To satisfy the PSLRA's pleading standard with regard to scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2). The Supreme Court has clarified that for an inference to be "strong" it must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs II*,

551 U.S. at 324. "For present-tense statements, the scienter required is actual knowledge or a reckless disregard of a substantial risk that the statement is false." *Desai*, 654 F. Supp. 2d at 859 (citing *Tellabs III*, 513 F.3d at 704–05).

Central States' SAC pleads various allegations intended to demonstrate a strong inference of scienter: (1) Defendants' participation in meetings and receipt of reports discussing issues in the development of the EGR technology, (2) Defendants' communications with the EPA, and (3) Defendants' stock sales and severance packages. Central States argues that through these allegations, they have sufficiently alleged that Defendants knowingly or recklessly misrepresented Navistar's progress in developing commercially viable 0.2 NOx EGR engines. Defendants argue that Central States has not pleaded a strong inference of scienter and that the non–fraudulent inference, namely, that Defendants genuinely believed Navistar would be successful in achieving commercially viable 0.2 NOx EGR engines, is more compelling. Viewing the SAC as a whole, the Court will address each argument in turn. *Tellabs II*, 551 U.S. at 326 (in determining whether plaintiff has adequately pleaded a strong inference of scienter, allegations are not to be scrutinized in isolation, but assessed holistically).

Initially, the Court rejects Central States' argument that it has sufficiently pleaded motive through its allegations that Defendants Ustian and Cederoth sold Navistar stock during the Class Period, and that Ustian received a hefty severance package when he left Navistar in 2012. First, Central States' SAC merely alleges the dates on which Defendants sold stock and the amount of stock sold. Central States' SAC does not contain any allegations connecting these sales or the severance package to a motive to artificially inflate Navistar's stock price. For this reason alone Central States has not sufficiently pleaded motive through Defendants' stock sales and severance package. *Cf. City of Sterling Heights*, 2013 WL 566805, at *25 ("Plaintiffs allege that

Defendants were motivated to artificially inflate Hospira's stock price during the Class Period in order to line their own pockets with the proceeds of insider stock sales."). The Seventh Circuit has expressly held that a "complaint that merely sets forth the aggregate amount of shares sold during the class period and the value of those shares" without providing any context demonstrating that those sales were unusual or suspicious is insufficient to demonstrate a strong inference of scienter. *Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008); *Higginbotham*, 495 F.3d at 759; *see also Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.* ("*Garden City I*"), No. 09 CV 5641, 2011 WL 1303387, at *30 (N.D. Ill. Mar. 30, 2011). This is so because executives sell stock all the time. In order for stock sales to be indicative of fraudulent intent, the sales must be unusual or suspicious. *Pugh*, 521 F.3d at 695. Central States' failure to allege the sales as unusual or suspicious defeats a finding of scienter based on Ustian and Cederoth's stock sales or severance package. Because stock sales are not the only means by which a plaintiff can establish a strong inference of scienter, however, the Court will consider Central States' other bases.

Central States' allegations regarding communications with the EPA and information shared with Ustian during meetings and reports are more compelling. The SAC contains numerous allegations that create a strong inference that Ustian's March 10, 2010 statement – "so we believe that our technology is already proven" – if indeed false or misleading, was made with knowledge that it was false or misleading. For example, Ustian attended a meeting in the spring of 2010 during which the engineers relayed the problems they were encountering in achieving 0.2 NOx with the EGR technology. In response, Ustian told the engineers to "go work on it – make it go away." Doc. 128 ¶ 49. Even though Navistar had gotten the EPA to certify its 0.5 NOx engines by 2010, Navistar was experiencing issues getting the emissions level down to 0.2

NOx with the EGR technology. These issues were discussed at monthly meetings beginning at least by 2010. Doc. 128 ¶¶ 63–64. While allegations that executives attended meetings or received reports discussing an issue do not independently support a strong inference of scienter, where these meetings and reports discuss an issue that is "critical to a business's core operations," the Court can assume knowledge. *Garden City II*, 2012 WL 1068761, at *12 (citing *Tellabs III,* 513 F.3d at 709; *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003)). In addition, Navistar's Director of Powertrain/Vehicle Regulations, Certification & Compliance stated that as of April 5, 2010, Navistar was "still maturing advanced EGR technology." Doc. 128 ¶ 128. It is axiomatic that something which is still being developed cannot yet be proven. Viewing these allegations in the light most favorable to Central States, the Court finds that Central States has adequately alleged that if false or misleading, Ustian made his statement with knowledge or reckless disregard as to its falsity. Moreover, the Court does not find Defendants' nonfraudulent inference as cogent and compelling. The Court agrees with Defendants that Ustian's substantial efforts and investment into the EGR technology is more likely than not the result of his belief that the technology would prove successful. But believing that a technology will be successful and representing that it already is successful, when it is evident that it is not, are two different things.

Turning to Ustian's December 22, 2010 statement – "we're the only ones that meet emissions in cylinder" – the Court again finds that Central States has adequately alleged that, if false or misleading, Ustian made this statement with knowledge or reckless disregard of its falsity. Simply put, Navistar did not have a 0.2 NOx engine ready to be certified as of December 22, 2010, and Ustian was aware of this as evidenced by his own statements. Doc. 128 ¶ 135 (Ustian's statement that Navistar would not be ready to submit the 0.2 NOx engine to EPA for

several more months); *see Garden City I*, 2011 WL 1303387, at *28 (finding that the analysis in determining whether a statement was false or misleading overlaps with the scienter analysis). Again, Defendants' proffered inference is not as compelling or cogent because even if Ustian believed that Navistar would ultimately achieve a 0.2 NOx EGR engine, that has no bearing on whether he knew this statement was true or false when made. For these reasons, Central States has adequately alleged a strong inference of scienter as to Ustian's two remaining statements.

## VI.    Loss Causation

The Court also finds that Central States has adequately pleaded loss causation. Central States has pleaded that "[D]efendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception." *Ray v. Citigroup Global Mkts., Inc.*, 482 F.3d 991, 995 (7th Cir. 2007). The Court agrees with Defendants that Navistar's June 7, 2012 and August 2, 2012 press releases do not reveal a truth previously hidden by the remaining alleged misstatements. Navistar's July 6, 2012 press release, on the other hand, does. In this press release, Navistar disclosed that it was abandoning its pursuit to certify a 0.2 NOx engine utilizing EGR technology in favor of an engine that utilized SCR technology. Contrary to Defendants' assertions, this press release certainly "touch[es] on the [SAC's] subject matter." *Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*, No. 10 C 7031, 2012 WL 1030474, at *15 (N.D. Ill. Mar. 27, 2012). Namely, this press release reveals that EGR technology was not "already proven," as Ustian allegedly represented on March 10, 2010. To the extent Defendants made false or misleading statements touting the progress or achievement of 0.2 NOx through EGR technology, this press release reveals that Navistar was not successful in achieving commercially viable 0.2 NOx EGR engines and was switching its emission control strategy as a result.

**VII.    Control Person Liability**

In Count II, Central States seeks to hold Ustian, Cederoth, and Allen liable under § 20(a) of the SEA as "controlling persons" of Navistar.  Because the Court has dismissed all claims against Navistar, Count II is dismissed as moot.

**VII.    Dismissal with Prejudice**

Finally, the Court must determine whether to dismiss the relevant claims with prejudice or whether to grant Plaintiffs leave to file a third amended complaint.  When determining whether to dismiss with prejudice in the securities context, "each case must be evaluated on its own merit, in light of its own procedural history."  *Fannon v. Guidant Corp.*, 583 F.3d 995, 1002 (7th Cir. 2009).  When "plaintiffs had, as a practical matter, a number of opportunities to craft a complaint that complied with the standards of the PSLRA" and continue to fail, the Court is "entitled to bring this litigation to a close with a dismissal with prejudice."  *Id.*; *see also Pugh*, 521 F.3d at 583 (affirming a dismissal with prejudice of a second amended complaint); *Garden City II*, 2012 WL 1068761, at *14 n.7 (discussing *Fannon* and ultimately dismissing the case with prejudice after a previous dismissal without prejudice).  Now before the Court is the third iteration of the complaint.  The Court already dismissed the CAC without prejudice.  In light of the facts alleged in the SAC as well as this case's procedural history, the Court finds that further leave to amend would be futile and thus dismisses the relevant claims with prejudice.

## CONCLUSION

For the above stated reasons, Defendants' motion to dismiss [132] is granted in part and denied in part.  Central States' § 10(b)  and Rule 10b–5 claims based on Ustian's March 10, 2010 statement, "[s]o we believe that our technology is already proven," and December 22, 2010 statement, "we're the only ones that meet emissions in the cylinder," remain.  Central States'

claims based on statements for which the Court determined Central States lacks standing are dismissed without prejudice.  All other claims are dismissed with prejudice.  Ustian is given until August 7, 2015 to answer the SAC.


Dated: July 10, 2015

_____
SARA L. ELLIS
United States District Judge