# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CONSTRUCTION WORKERS PENSION TRUST FUND – LAKE COUNTY AND VICINITY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>NAVISTAR INTERNATIONAL CORPORATION, DANIEL C. USTIAN, ANDREW J. CEDEROTH, and JACK ALLEN,<br><br>Defendants. | Civ. No. 1:13-cv-2111<br><br>CLASS ACTION |

**DECLARATION OF CAROL V. GILDEN IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF THE PROPOSED SETTLEMENT AND APPROVAL OF THE PLAN OF ALLOCATION, AND LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

I, Carol V. Gilden, a partner of the law firm of Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein"), submit this declaration in support of Lead Plaintiff's motion for final approval of the proposed Settlement and approval of the Plan of Allocation, as well as Lead Counsel's motion for approval of an award of attorneys' fees and reimbursement of litigation expenses, including the expenses of Lead Plaintiff pursuant to 15 U.S.C. § 78u-4(a)(4).[1] I have supervised and actively participated in the prosecution of this Action. The statements in this declaration are made based on my personal knowledge and information provided to me by others at my Firm who worked under my supervision unless otherwise indicated.

## I. PRELIMINARY STATEMENT

1. My law firm is the Court-appointed Lead Counsel in this Action and counsel for Lead Plaintiff Central States, Southeast and Southwest Areas Pension Fund ("Central States" or "Lead Plaintiff").

2. This Declaration does not seek to detail each and every event that occurred since the Action was commenced. Rather, the Declaration provides the Court with highlights of the litigation and the events leading to the Settlement and the basis on which Lead Plaintiff and Lead Counsel recommend its approval.

3. Lead Plaintiff brought this Action against Defendants Navistar International Corporation ("Navistar" or the "Company"), Daniel C. Ustian, Andrew J. Cederoth and Jack Allen (the "Individual Defendants" and, together with the Company, "Defendants").

4. In entering the Settlement, Lead Plaintiff and Lead Counsel were well-informed about the strengths and weaknesses of the Action. As detailed below, prior to entering the proposed Settlement, Lead Counsel: (1) conducted an extensive investigation of all potential

---

[1] Unless otherwise noted, capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement, dated May 4, 2016 (Dkt. 161) (the "Settlement" or "Stipulation").

claims that could be asserted against Navistar and its executives and others, including extensive legal reseach; (2) analyzed numerous documents filed by Navistar with the SEC as well as transcripts of quarterly investor calls and various other public documents; (3) conducted substantial research, both directly and in conjunction with an outside investigator retained by Lead Counsel, to identify over 50 potential witnesses likely to have information relevant to the Class' claims; (4) conducted interviews with more than 30 percipient fact witnesses in various states within the U.S., and including in-person interviews that required travel; (5) filed two amended complaints based on the results of that investigation; (6) opposed Defendants' various motions to dismiss through the submission of extensive briefing, resulting in the Court's July 10, 2015 order (Dkt. No. 146) (the "Motion to Dismiss Order") that sustained, in part, Lead Plaintiff's claims against Defendant Daniel C. Ustian; (7) retained and consulted with an accounting expert on accounting issues, as well as a damages expert to obtain assistance in understanding issues related to loss causation, materiality, and damages; (8) participated in a fulsome mediation process conducted by Mr. Melnick,[2] that included presentation of the Settling Parties'[3] respective positions and loss causation and damages analyses based on complex economic regression models, and which process was preceded by the exchange of detailed written mediation briefs and other information on damages by the Settling Parties; (9) engaged in negotiations with counsel for Navistar on the scope, search terms, custodians and confidentiality restrictions on documents to be produced by Navistar as part of confirmatory discovery, which negotiations required Mr. Melnick's active assistance to resolve; (10) conducted broad confirmatory discovery by reviewing and analyzing, vis-à-vis Lead Plaintiff's allegations,

---

[2] *See* http://www.jamsadr.com/melnick/ (biography of Jed D. Melnick, Esq.).

[3] As indicated in the Stipulation at ¶ 1(ii), Norfolk County Retirement System has been added as an additional plaintiff, for purposes of this Settlement, to cure any potential defect in standing.

Defendants' substantial production of documents on a rolling basis from December 2015 to January 2016; (11) designed, in consultation with a damages expert, a Plan of Allocation based on the criteria set forth in the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and an analysis of economic data particular to Navistar securities; and (12) negotiated and drafted appropriate documentation of the Settlement, including the Stipulation and the Notices to be issued to potential Class Members.

5.     Based upon our experience, the extensive confirmatory discovery we conducted, our evaluation of the facts and the applicable law, and our recognition of the risk and expense of continued litigation, Lead Plaintiff and Lead Counsel submit that the Settlement is fair, reasonable and adequate. In our view, the Settlement represents an excellent result, and is in the best interests of the Class, particularly because it provides a meaningful recovery to the Class now, and avoids the possibility of years of protracted litigation, including appeals, and the risk of ultimately recovering either less than the Settlement amount after years of delay or nothing at all.

6.     From the outset of this Action, Lead Plaintiff supervised Lead Counsel. Lead Plaintiff reviewed pleadings and all material filings, and remained informed throughout the Action, including by participating in telephonic and email communications regarding case strategy and developments. Lead Plaintiff was also involved in the mediation, sent a representative to the mediation and continued to consult with Lead Counsel throughout their efforts to mediate and negotiate the Settlement, and ultimately reviewed and approved the proposed Settlement. *See* Declaration of James P. Condon, Deputy Chief Legal Officer for Central States, Southeast and Southwest Areas Pension Fund ("Condon Decl.") in Support of (A) Lead Plaintiff's Motion for Final Approval of Settlement; and (B) Lead Counsel's Motion

for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses, ¶¶ 6-7, attached hereto as Ex. 1.

7.    The Settlement requires Defendants to cause to be paid $9,100,000 in cash (the "Settlement Amount"). By June 8, 2016, Defendants had caused the Settlement Amount to be deposited into an escrow account for the benefit of the Class in accordance with the terms of the Stipulation. The Settlement Fund has been invested in accordance with the terms of the Stipulation. The Settlement benefits the Class by conferring a guaranteed, immediate and substantial benefit of $9,100,000 and avoids the risks and expenses of continued litigation, including the risk of recovering less than the Settlement Amount after substantial delay, or of no recovery at all.

8.    In addition to seeking final approval of the Settlement, Lead Plaintiff seeks approval of the proposed Plan of Allocation. Lead Counsel engaged Michael Hartzmark, Ph.D. of Hartzmark Economics Litigation Practice LLC to assist Lead Counsel in preparing the proposed Plan of Allocation. Dr. Hartzmark is an economist who has served as an expert in numerous other securities class actions and also has experience as a litigation consultant, an academic, and a CEO of a public company. *See* Resume of Michael Hartzmark, Ph.D., attached hereto as Ex. 2. Under the proposed Plan of Allocation, the Settlement Amount (plus interest accrued and after deduction of Court-approved expenses and attorneys' fees) will be distributed on a *pro rata* basis to members of the Class who timely submit valid Proof of Claim Forms based on their Recognized Loss amount as calculated pursuant to the Plan of Allocation.

9.    Lead Counsel requests an award of attorneys' fees and reimbursement of litigation expenses. Specifically, Lead Counsel is applying for a fee award of 22% of the Settlement Fund plus interest, for reimbursement of Lead Counsel's litigation expenses in the

amount of $150,764.40, and for reimbursement of Lead Plaintiff's costs and expenses pursuant to 15 U.S.C. § 78u-4(a)(4) in the amount of $8,715.50.

10. Lead Counsel submits that the fee and expense application is fair and reasonable. As explained in the accompanying brief in support of Lead Counsel's request for attorneys' fees and reimbursement of litigation expenses, the requested fee of 22% of the Settlement Fund, plus interest, is consistent with fees awarded in other securities class actions. In addition, the reasonableness is further confirmed because an analysis of the lodestar in this Action would result in Lead Counsel receiving a multiplier of slightly less than 1, specifically 0.98.

## II. HISTORY OF THE ACTION

11. This Action was commenced on March 19, 2013 (Dkt. No. 1) as action No. 13-cv-02111, when plaintiff Construction Workers Pension Trust Fund – Lake County and Vicinity filed a complaint naming Navistar, and two of its officers, former Chief Executive Officer Daniel C. Ustian and then-current Chief Financial Officer Andrew J. Cederoth, in the U.S. District Court for the Northern District of Illinois (the "Court"), on behalf of a putative class consisting of purchasers of the Company's common stock between November 3, 2010 and August 1, 2012, inclusive, and asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5.[4] Two other complaints followed asserting similar allegations. *See Norfolk County Retirement System v.*

---

[4] As described below, Lead Counsel conducted an extensive investigation, and alleged an expanded Class Period. In its Consolidated Amended Complaint (Dkt. No. 66) (the "CAC"), Lead Plaintiff alleged a proposed Class Period of March 2, 2010 through July 29, 2013, inclusive; and, next, in the SAC, Lead Plaintiff alleged a proposed Class Period of March 10, 2010 through August 1, 2012, inclusive.

*Navistar International Corp.*, No. 13-cv-02639 (N.D. Ill. Apr. 9, 2013); *Jane C. Purnell FBO Purnell Family Trust v. Navistar International Corp.*, No. 13-cv-02691 (N.D. Ill. Apr. 10, 2013).

12.     On May 20, 2013, Central States filed a motion and supporting papers with the Court for appointment as lead plaintiff pursuant to the Exchange Act, as amended by the PSLRA, 15 U.S.C. § 78u-4(a)(3). Dkt. Nos. 25, 28, 30, 32.

13.     On July 30, 2013, the Court appointed Central States as Lead Plaintiff, and approved its selection of Cohen Milstein as Lead Counsel in the Action. Dkt. No. 55.

14.     In connection with filing its CAC, Lead Counsel conducted a comprehensive investigation in order to develop the claims set forth in this Action and to evaluate the possible defenses thereto. Because Lead Plaintiff was not able to utilize the discovery tools provided by the Federal Rules of Civil Procedure due to the standard discovery stay imposed by the PSLRA, Lead Counsel conducted its investigation using other investigative techniques. Moreover, we were not assisted in our pre-filing investigation by the results or reports of any investigation of Navistar by governmental agencies such as the SEC.

15.     Lead Counsel's investigation included, *inter alia*, the following:

(a)     reviewing and analyzing numerous documents filed by Navistar with the SEC before, during, and after the Class Period, including, but not limited to, submissions on Forms 8-K, 10-Q, and 10-K;

(b)     reviewing and analyzing, in consultation with an accounting expert, Navistar's accounting as set forth in the above filings with the SEC to gather information relevant to the claims set forth in the Action;

(c)     conducting an in-depth investigation of the nature of the mechanical and scientific details of Navistar's EGR technology as well as Navistar's pursuit of 0.2 NOx EGR technology versus competitor companies' timing and pursuit of alternative technologies to meet the 2010 EPA Guidelines;

(d)     identifying potential confidential witnesses, and conducting interviews with more than 30 individuals, some of which required travel, from a list that Lead Counsel researched and compiled through their own investigation and that included former employees of Navistar;

(e)     reviewing and analyzing public statements made and distributed by Navistar, including, but not limited to, statements in conference calls, announcements, and wire and press releases, as well as analyst reports, articles and other third-party publications; and

(f)     analyzing information obtainable on the Internet and through public court records, such as prior civil litigation against the EPA by commercial interests in the trucking industry and related court filings describing facts concerning Navistar's 0.2 NOx EGR technology and other pending litigation, and reviewing news articles about Navistar for additional information on related events.

16.     Lead Counsel expended substantial time and effort synthesizing the information obtained through its investigation, including from witnesses, as well as aligning first-hand accounts obtained from witnesses with information disclosed in the Company's SEC filings, statements and press releases, so that Lead Plaintiff could allege the facts set forth in its complaints with particularity.

17.     On October 10, 2013, Central States filed a CAC alleging claims against Defendants as well as various members of Navistar's board of directors (the "Navistar Director Defendants") and other executives, based on Lead Counsel's investigation of the Class' claims as well as information provided by 18 confidential witnesses. Dkt. No. 66. Lead Counsel's investigation of the Class' claims led to a proposed expanded Class Period of June 9, 2009 through August 1, 2012, inclusive. The CAC alleged that for more than three years, Defendants made false and misleading statements and concealed material information relating to, among other things, the Company's engine design and development efforts and associated warranty and recall expenses.

18.     On December 17, 2013, Defendants and additional Navistar executives named in the CAC as well as the Navistar Director Defendants filed three separate motions to dismiss with supporting memoranda and exhibits. Dkt. Nos. 99-104.

19.     Lead Plaintiff filed oppositions to the motions to dismiss on January 31, 2014. Dkt. Nos. 108-110. In addition, Lead Plaintiff filed a motion to strike, which the parties subsequently briefed. Dkt. Nos. 108-110.

20.     Defendants and additional Navistar executives named in the CAC as well as the Navistar Director Defendants filed replies in further support of their motions to dismiss on March 3, 2014. Dkt. Nos. 117-119.

21.     On July 22, 2014, the Court issued an opinion on the motions to dismiss. Dkt. No. 127. In the July 22, 2014 opinion, the Court dismissed the complaint and granted leave to re-plead in conformity with the Court's opinion and order.

22.     On August 22, 2014, Lead Plaintiff filed the SAC, setting forth a narrower set of allegations based on Lead Plaintiff's continued fact investigation, and including information provided by 21 confidential witnesses. Dkt. No. 128. The SAC alleged claims against Navistar and Individual Defendants Daniel C. Ustian, Andrew J. Cederoth and Jack Allen as well as Eric Tech, Navistar's Senior Vice President, Strategy and Planning and President, Global and Specialty Businesses, and was based on a Class Period of March 10, 2010 through August 1, 2012, inclusive.

23.     On September 23, 2014, Defendants filed a motion to dismiss with supporting documentation. Dkt. Nos. 132-133.

24.     On October 23, 2014, Lead Plaintiff filed an opposition to the motion to dismiss. Dkt. Nos. 134-135. On November 7, 2014, Lead Plaintiff voluntarily dismissed its claims alleged against defendant Eric Tech. Dkt. No. 136.

25. On July 10, 2015, this Court issued an opinion on Defendants' motion to dismiss. The Court sustained Lead Plaintiff's allegations against defendant Ustian with regard to two allegedly false and misleading statements made during the Class Period. Dkt. No. 146.

## III. THE SETTLEMENT

26. On October 1, 2015, Lead Plaintiff, Lead Counsel, Defendants, Navistar's insurers, and Defendants' Counsel participated in a mediation under the auspices of Mr. Melnick of JAMS. Declaration of Jed. D. Melnick, Esq. in Support of Lead Plaintiff's Motion for Final Approval of the Proposed Settlement ("Melnick Decl."), ¶¶ 6-7, attached hereto as Ex. 3. Pursuant to Mr. Melnick's instructions, the Parties submitted detailed confidential mediation statements in advance of the mediation session. The Settling Parties also submitted to Mr. Melnick and shared with each other their respective detailed responses to a series of questions regarding estimated damages, including the means of calculating per-share inflation, a description of the trading model used, and other considerations that could influence damages. In addition to these submissions, Lead Plaintiff prepared additional materials and damages analyses in anticipation of mediation. On the day of mediation, the Settling Parties presented their arguments to Mr. Melnick and each other, and provided detailed arguments to Mr. Melnick outlining what their respective damages analyses would bear out at trial, based on thorough and complex economic regression models by the Settling Parties' respective damages experts. Though the Settling Parties made progress on the day of mediation, they continued to negotiate the strengths of Lead Plaintiff's claims and Defendants' defenses, through Mr. Melnick. After several weeks of continued negotiations between the Settling Parties conducted through Mr. Melnick, Mr. Melnick ultimately issued a mediator's proposal of $9,100,000. As a result of these arms' length negotiations during the mediation and subsequent to the mediation, the

Settling Parties agreed to accept a potential settlement of the Action, subject to the completion of confirmatory discovery by the Lead Plaintiff.

27.     As part of the confirmatory discovery process, Lead Counsel engaged in vigorous and protracted negotiations with counsel for Defendants regarding the scope, search terms, custodians and confidentiality restrictions on documents to be produced by Navistar. Mr. Melnick subsequently became involved in the negotiations and assisted the Parties in reaching agreement on the scope of the discovery. Defendants proceeded to make a substantial production of documents on a rolling basis from November 2015 through January 2016. Lead Counsel then reviewed and conducted an in-depth and comprehensive analysis of these documents in light of Lead Plaintiff's claims. After concluding this process, Lead Plaintiff and Lead Counsel subsequently agreed to proceed with the Settlement, and Lead Counsel proceeded to negotiate the terms and provisions of the Stipulation and its exhibits. This process culminated with the Parties' execution of the Stipulation on May 4, 2016. Dkt. No. 161.

28.     The Settlement provides the Class an immediate and substantial benefit and eliminates the significant risks of continued litigation under circumstances where a favorable outcome could not be assured, given the uncertainties inherent in continued litigation that would necessarily include substantial negotiations of fact discovery, and what could be expected to be highly contentious class certification briefing, summary judgment briefing and pre-trial motion practice, not to mention the uncertainties of trial itself. Lead Counsel believes that the Settlement is fair, reasonable, and an excellent result for Class Members considering the risk of an adverse judgment and recovering nothing or less after substantial delay.

### A.     Reasons for the Settlement

29.     Lead Plaintiff and Lead Counsel endorse the Settlement. Lead Plaintiff is a sophisticated institutional investor who has actively overseen and/or participated in the

prosecution of this Action. Lead Counsel is a national law firm that specializes in complex securities litigation and is highly experienced in this type of litigation. Based on their experience and close knowledge of the facts developed over three years of litigation, Lead Counsel and Lead Plaintiff determined that the Settlement was in the best interests of the Class.

30.     As described herein, at the time of settlement, Lead Plaintiff faced many risks in continuing the litigation. Perhaps the most significant of these risks was that, even if Lead Plaintiff survived unscathed the arduous path through discovery, class certification, summary judgment, trial, and appeals—which altogether may have taken years—recovery was hardly assured.

31.     Defendants could and would have interposed several defenses to liability and damages, such as falsity, scienter, loss causation, price impact, and materiality, at summary judgment or at trial, that would have made the case more complex, and that, if successful, could have barred any recovery whatsoever. Also, Defendants could, and likely would, have sought to disqualify Lead Plaintiff's economic experts.

32.     The Settlement eliminates the above risks and guarantees the Class a cash recovery now. Lead Counsel firmly believes that settling the Action at this juncture and for the amount negotiated was and is in the best interests of the Class.

### 1.     The Likely Complexity, Length and Expense of Continued Litigation Supports Approval of the Settlement

33.     Based upon our experience, the comprehensive investigation, substantial confirmatory discovery conducted, our evaluation of the facts and the applicable law, and our recognition of the risk and expense of continued litigation, we submit that the Settlement is fair, reasonable and adequate. In view of all these considerations, Lead Counsel believe the Settlement represents an excellent result, and is in the best interests of the Class, particularly

because it provides a meaningful recovery to the Class now, and avoids substantial delay and the possibility of recovering nothing due to the risks, expense, and duration of continued litigation.

34.     Moreover, the procedural risks that remained were numerous. There remained several stages of litigation—class certification, summary judgment, pre-trial motions, and trial—at which the Court might issue interim rulings in favor of Defendants on the issues of scienter or loss causation. Indeed, as described more fully in the accompanying Memorandum of Law in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation (the "Settlement Memorandum") filed herewith, the Court's Motion to Dismiss Order reduced Lead Plaintiff's claims to only two statements, which posed additional risks in continued litigation of the Action.

35.     In addition, the Settling Parties retained consulting experts to calculate the estimated damages in this Action and arrived at starkly different amounts. The "battle of the experts" at summary judgment and at trial would have incurred a substantial amount of time and expense.

**2.      The Strength of Lead Plaintiff's Case Compared to the Amount of Defendants' Settlement Offer Supports Approval of the Settlement**

36.     Here, Lead Plaintiff and Lead Counsel had conducted a substantial and thorough investigation of the Class' claims as alleged and set forth in the CAC and SAC. Despite Lead Plaintiff's (*see generally* Condon Decl.) and Lead Counsel's belief in the strength of the Class' claims in this Action, as well as the numerous false and misleading statements that Lead Plaintiff alleged in the SAC, the Court granted Defendants' motion to dismiss on all allegations except for those relating to two false and misleading statements. This ruling by the Court, and others in the Motion to Dismiss Order, dismissed all of Lead Plaintiff's claims against every defendant except for defendant Ustian. That Defendants and Lead Plaintiff reached a Settlement at all—when

Defendants argued throughout the case and in mediation that the Class' damages were zero, and the Court had dismissed a substantial portion of Lead Plaintiff's claims—is an excellent result.

### 3.     The Lack of Opposition to the Settlement Supports Approval

37.     As set forth in more detail in the Declaration of Alexander Villanova Regarding (A) Mailing of Notice and Proof of Claim Form and (B) Report on Requests for Exclusion Received ("Villanova Decl."), attached hereto as Ex. 4, 141,826 Notices have been disseminated to potential Class Members and their nominees. *Id.*, ¶ 11 & Ex. A (copy of the Notice). In addition, the Summary Notice was published in the *Investor's Business Daily* and disseminated on *PR Newswire* on June 20, 2016. *Id.*, ¶ 12. Both the Notice and Summary Notice were published on a dedicated settlement website, www.NavistarSecuritiesSettlement.com. The Notice was mailed to approximately 141,826 potential Class members, informing them that Lead Counsel would apply for fees not to exceed 22% of the recovery, plus reimbursement of out-of-pocket expenses not to exceed $175,000. *See* Villanova Decl., ¶ 11. In return, Epiq has received a total of 15,940 Proof of Claim Forms from potential Class Members. *Id*, ¶ 11. The Notice sets forth the Settlement Amount, a short summary of the reasons for the Settlement, as well as Lead Counsel's anticipated fee request and request for reimbursement of Lead Counsel's and Lead Plaintiff's costs and expenses. The deadline to object to the Settlement or any of its elements is October 7, 2016. To date, no Class Member has objected. *Id*., ¶ 18. Moreover, only 10 purported Class Members have requested exclusion.

38.     In addition to the lack of objections, Lead Plaintiff, also a Class Member, supports the fairness of the Settlement. Lead Plaintiff took an active role in supervising this litigation, as envisioned by the PSLRA, and Lead Plaintiff strongly endorses the Settlement. *See* Condon Decl., at ¶¶ 6-7.

39.     Pursuant to the Settlement, Defendants' Counsel also served upon the appropriate state official of each state and the Attorney General of the United States notice of the Action in compliance with the requirements of the Class Action Fairness Act, 28 U.S.C. § 1711, *et seq.* (the "CAFA Notice"), by May 23, 2016, within the statutory limit of ten days from Lead Plaintiff's filing of its request for preliminary approval of the Settlement. Lead Counsel received confirmation from Defendants that the CAFA Notice had been served on the appropriate officials on May 20, 2016 in accordance with the statutory and Settlement requirements. No objection from any of these officials has been received in response to the CAFA Notice, which further indicates the reasonableness and adequacy of the Settlement.

### 4.     The Opinion of Competent Counsel Supports Approval

40.     The expertise and experience of counsel are other important factors in setting a fair fee. As demonstrated by Lead Counsel's firm resume, attached hereto as Exhibit 5, the attorneys at Cohen Milstein are experienced and skilled class action securities litigators and have a successful track record in securities cases throughout the country.

41.     Lead Counsel in this Action believe that the Settlement achieved is an excellent result, particularly in light of the challenges faced in litigating the Action, described below.

42.     ***Overcoming the Court's Motion to Dismiss Order.*** Despite Cohen Milstein's firm belief in the strength of the Class' claims, described more fully in the Settlement Memorandum, the Court reduced Lead Plaintiff's claims of numerous alleged false and misleading statements to two. In its Motion to Dismiss Order, the Court held that only two alleged false and misleading statements were potentially actionable and that the rest—as a matter of law—were not actionable. Thus Lead Plaintiff was facing the very real possibility that, were the Action to survive all the way to trial, Lead Counsel would present its case to a jury based on only two statements by a single defendant. Notably, were Lead Plaintiff to pursue

reconsideration of the Court's Motion to Dismiss Order, Lead Plaintiff inevitably faced a high burden to prevail on such a motion and success was uncertain.

43. **_Damages._** Defendants disputed that the Lead Plaintiff would be able to prove loss causation as a matter of law and argued there were news reports revealing the truth before the July 6th disclosure alleged by Lead Plaintiff to be corrective, and that in reaction to those news reports, Navistar's stock price rose. In addition, Defendants have argued that there are no damages in this Action because Lead Plaintiff cannot demonstrate that the stock price was inflated. Indeed, Lead Plaintiff's and Defendants' dispute regarding both loss causation and damages would have resulted in a lengthy and costly "battle of the experts" in summary judgment and pre-trial motions, and particularly at trial itself. Although Lead Plaintiff had retained a highly qualified consultant, Dr. Hartzmark, to perform its loss causation and damages analyses, the reaction of a jury to expert testimony is highly unpredictable and always poses a risk.

44. Moreover, Lead Counsel's most generous maximum provable damages estimate in the Action, after offsetting for Class Members' gains from selling shares at inflated prices during the Class Period, was approximately $133 million, using an "institutional trader" model that examines actual market data to calculate damages individually for each institutional investor who filed quarterly reports of holdings of shares with the SEC on Form 13-F during the Class Period. A second estimate of damages—contingent on various factual or legal findings the Court may have ultimately made in interim or summary judgment rulings on loss causation—was approximately $82 million. Although, on reconsideration, the Court could conceivably have reversed its prior holding and brought additional corrective disclosure dates (and thus additional damages) back into the case, the likelihood of this occurring was exceedingly low, and even if it

were to occur, the additional damages would be discounted for several reasons, including that a jury might conclude that confounding information entered the market on those dates (*i.e.*, the Company's stock price declined on those dates for reasons unrelated to the alleged fraud, and thus that must be disaggregated for purposes of calculating damages). After discounting such damages (again, even were such damages recoverable), they would add minimal value to the case.

### 5. The Stage of the Proceedings and the Amount of Discovery Completed Supports Approval of the Settlement

45.     The Settlement followed intensive arm's-length settlement negotiations and is the product of over three years of hard-fought litigation, including an intensive fact investigation that Lead Plaintiff and Lead Counsel continued to conduct for approximately a year and half through the filing of Lead Plaintiff's Second Consolidated Amended Complaint (Dkt. No. 128) (the "SAC"), as well as substantial post-Settlement confirmatory discovery.

46.     At the time of the Settlement, Lead Counsel had conducted an extensive fact investigation and synthesized its findings in two amended complaints, and had consulted at length with an accounting expert as well as a damages expert on the best possible recovery if Lead Plaintiff were to proceed and succeed at trial. Further, after reaching a Settlement in principle, Lead Counsel conducted substantial confirmatory discovery to ensure that the documents in Defendants' possession which, until then, had been shielded by the PSLRA's discovery stay, were consistent with the strengths and weaknesses of the case as Lead Plaintiff and Lead Counsel had assessed it, and warranted proceeding with the Settlement. Lead Plaintiff and Lead Counsel were thus in an ideal position to evaluate the strengths and weaknesses of the Settlement, guided by an experienced mediator who concluded that the Settlement Amount of $9,100,000 was in the interests of the Class. Melnick Decl., ¶ 8.

### B. Notice to the Class Meets the Requirements of Due Process and Rule 23 of the Federal Rules of Civil Procedure

47. As required by the Court's Preliminary Approval Order, beginning on June 9, 2016, the Claims Administrator, Epiq Systems, Inc. ("Epiq"), notified potential Class Members of the Settlement by mailing a copy of the Notice to them. The Claims Administrator notified potential Class Members based on a list provided by counsel for Navistar of record holders obtained from Navistar's transfer agent, containing 13,880 unique names and addresses of potential Class Members.

48. The Court-approved Notice requires nominees (*i.e.*, entities that held shares in the name of beneficial owners), within fourteen days of receipt of the Notice, to either (i) send copies of the Notice and the Proof of Claim Form to the beneficial owners of Navistar common stock, or (ii) provide to Epiq the names and addresses of such persons. Villanova Decl., ¶ 8.

49. In the aggregate, as of today, Epiq has disseminated 141,826 copies of the Notice and Proof of Claim Form to potential Class Members and their nominees. *Id.* ¶ 11. In return, Epiq has received a total of 15,940 Proof of Claim Forms.

50. In addition, a Summary Notice was published once in the *Investor's Business Daily* and disseminated on *PR Newswire* on June 20, 2016. *See id.*, ¶ 12. Information regarding the Settlement, including downloadable copies of the Notice and Proof of Claim Form, was also posted on the website established by the Claims Administrator specifically for this Settlement, www.NavistarSecuritiesSettlement.com, *id.*, ¶ 15. This method of giving notice, previously approved by the Court, is appropriate because it directs notice in a "reasonable manner to all class members who would be bound by the propos[ed judgment]." Fed. R. Civ. P. 23(e)(1).

51. The Notice advises Class Members of the essential terms of the Settlement, sets forth the procedure for objecting to or opting out of the Settlement, and provides specifics on the

date, time and place of the final approval hearing. The Notice also contains information regarding Lead Counsel's fee application and the proposed plan of allocating the Settlement proceeds among Class Members.

52.     As explained in the accompanying Settlement Memorandum, the Notice fairly apprises Class Members of their rights with respect to the Settlement and therefore is the best notice practicable under the circumstances and complies with the Court's May 25, 2016 Preliminary Approval Order (Dkt. 163), Federal Rule of Civil Procedure 23, and due process.

## IV.     THE APPLICATION FOR ATTORNEYS' FEES AND EXPENSES

53.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is also applying to the Court for an award of attorneys' fees, reimbursement of litigation expenses, and reimbursement of Lead Plaintiff's costs and expenses pursuant to 15 U.S.C. § 78u-4(a)(4).

54.     Specifically, Lead Counsel is applying for a fee of 22% of the Settlement Fund, *i.e.*, $2,002,000, plus interest at the same rate as that earned on the Settlement Fund; reimbursement of $150,764.40 for Lead Counsel's litigation expenses; and reimbursement of $8,715.50 for Lead Plaintiff Central States' costs and expenses.

### A.     Application for Attorneys' Fees

#### 1.     The Requested Fee of 22% of the Settlement Fund Is Fair and Reasonable

55.     For the extensive efforts on behalf of the Class, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis. As set forth in the accompanying Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees, Reimbursement of Litigation Expenses and Reimbursement of Lead Plaintiff's Costs and Expenses (the "Fee Memorandum"), the percentage method is the appropriate method of fee

recovery because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the Class in achieving the maximum recovery in the shortest amount of time required under the circumstances, is supported by public policy, has been recognized as appropriate by the U.S. Supreme Court for cases of this nature and represents the current trend in the Seventh Circuit and most other circuits.

56.     Based on the result achieved for the Class, the extent and quality of work performed, the risks of the litigation, and the contingent nature of the representation, Lead Counsel submits that a 22% fee award is justified and should be approved. Lead Plaintiff, a sophisticated institutional investor, approves of Lead Counsel's fee request. *See* Condon Decl., ¶ 10.

57.     As discussed in the Fee Memorandum, a 22% fee award is fair and reasonable for attorneys' fees in common fund cases such as this, and is well within, or below, the range of the percentages typically awarded in securities class actions in this Circuit.

58.     I personally devoted substantial time to the litigation of this case, including by overseeing and monitoring work that other experienced attorneys at my firm undertook commensurate with their expertise, skill and experience.

59.     I respectfully submit that the work undertaken by Lead Counsel in prosecuting this case and arriving at this Settlement has been time-consuming and challenging. From the outset, Lead Counsel and Lead Plaintiff appreciated the risks inherent in this type of litigation.

60.     As described in Lead Counsel's Fee Memorandum, the requested fee is not only fair and reasonable under the percentage approach, but results in a lodestar multiplier of slightly less than 1, which confirms the reasonableness of the fee.

61.     Immediately below and at ¶ 71 are schedules that summarize Lead Counsel's lodestar, as well as the expenses incurred by category (the "Fee Schedule" & "Expense Schedule" respectively). The Fee Schedule indicates the amount of time spent by each attorney and paraprofessional employed by Lead Counsel, and the lodestar calculations based on their current billing rates and titles. The Fee Schedule and this Declaration were prepared from contemporaneous daily time records regularly prepared and maintained by my firm. The hourly rates for attorneys and paraprofessionals included in these schedules are the same as the current rates charged for their services in non-contingent matters and/or which have been accepted in other securities or shareholder litigation. For attorneys or paraprofessionals who are no longer employed by Lead Counsel, the lodestar calculations are based upon the billing rates for such persons in their final year of employment. The Fee Schedule sets forth all time spent litigating the Action, but does not include time spent preparing briefing in support of final approval of the Settlement or Lead Counsel's request for attorneys' fees and reimbursement of expenses.

|  | Hours | Current Rate | Lodestar |
|---|---|---|---|
| **Partners** |  |  |  |
| S. Douglas Bunch [5] | 847.50 | $560 | $474,600.00 |
| Joshua Devore | 4.00 | $685 | $2,740.00 |
| Carol V. Gilden | 782.00 | $845 | $660,790.00 |
| Daniel S. Sommers | 8.25 | $845 | $6,971.25 |
| Steven J. Toll | 322.25 | $945 | $304,526.25 |
| **Total Partner Lodestar** | **1,964.00** |  | **$1,449,627.50** |
|  |  |  |  |

---

[5] Mr. Bunch was an associate until December 31, 2015.

|  | Hours | Current Rate | Lodestar |
|---|---|---|---|
| **Of Counsel** | | | |
| Catherine Torrell | 33.00 | $700 | $23,100.00 |
| **Total Of Counsel Lodestar** | **33.00** | | **$23,100.00** |
| | | | |
| **Associates** | | | |
| Kenneth Rehns | 89.50 | $530 | $47,435.00 |
| Genevieve Fontan | 490.75 | $475 | $233,106.25 |
| **Total Associate Lodestar** | **580.25** | | **$280,541.25** |
| | | | |
| **Paralegals** | | | |
| Robin Bleiweis | 2.50 | $270 | $675.00 |
| Cameron Clark | 10.00 | $245 | $2,450.00 |
| Jordan V. Hill | 103.00 | $260 | $26,780.00 |
| JiHoon Lee | 1.00 | $280 | $280.00 |
| Ryan Marchbank | 70.25 | $270 | $18,967.50 |
| Rhys Tucker | 16.00 | $270 | $4,320.00 |
| Asha Williams | 71.00 | $250 | $17,750.00 |
| **Total Paralegal Lodestar** | **278.25** | | **$71,222.50** |
| | | | |
| **Investigator** | | | |
| Thea Bournazian | 83.00 | $440 | $36,520.00 |
| **Total Investigator Lodestar** | **83.00** | | **$36,520.00** |
| | | | |
| **Securities Analyst** | | | |
| John Lu | 4.50 | $250 | $1,125.00 |
| Daniel Sutter | 32.50 | $270 | $8,775.00 |
| Andrew Twigg | 9.00 | $270 | $2,430.00 |

|  | Hours | Current Rate | Lodestar |
|---|---|---|---|
| **Total Securities Analyst Lodestar** | **41.50** | | **$12,330.00** |
| | | | |
| **Law Clerks** | | | |
| Justin Simeone | 16.00 | $260 | $4,160.00 |
| Michael Nelson | 60.25 | $250 | $15,062.50 |
| Andrew Noll | 37.25 | $245 | $9,126.25 |
| **Total Law Clerk Lodestar** | **113.50** | | **$28,348.75** |
| | | | |
| **Contract Attorneys** | | | |
| Thomas Owens | 371.75 | $390 | $144,982.50 |
| **Total Contract Attorney Lodestar** | **371.75** | | **$144,982.50** |
| | | | |
| **Total Lodestar** | **3,465.25** | | **$2,046,672.50** |

62.    Lead Counsel took this case on a contingency basis, fully committed the firm's resources and then aggressively litigated it for more than three years without any compensation or guarantee of success. Based on the excellent result achieved for the Class, the quality of work performed, the risks of the Action and the contingent nature of the representation, Lead Counsel submits that the request for a 22% fee award is fair and reasonable and consistent with cases of similar size in the Seventh Circuit.

**2.    The Complexity, Length and Expense of Litigation Supports Approval of the Requested Fee**

63.    As noted above, the Action was undertaken on a wholly contingent basis. From the outset, Lead Counsel understood that we were embarking on a complex and expensive litigation with no guarantee of compensation for the investment of time, money and effort that the case would require.

64.     In undertaking the responsibility for prosecuting the Action, Lead Counsel assured that sufficient attorney resources were dedicated to the investigation of the Class claims against the Defendants and that sufficient funds were available to advance the expenses required to pursue and complete such complex litigation. As set forth below, Lead Counsel received no compensation for its costs in prosecuting this Action for the benefit of the Class, which, as described in more detail below, total $150,764.40.

65.     Lead Counsel also bore the risk that no recovery would be achieved. As discussed herein, this case presented a number of risks and uncertainties which could have prevented any recovery whatsoever. Despite the vigorous and competent efforts of Lead Counsel, success in contingent-fee litigation, such as this, is never assured.

66.     Lead Counsel firmly believes that the commencement of a securities class action does not guarantee a favorable outcome to a class. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations.

67.     Courts have repeatedly recognized that it is in the public interest to have experienced and able counsel available to enforce the securities laws. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private plaintiffs—particularly institutional investors—take an active role in protecting the interests of securities purchasers. If this important public policy is to be carried out, plaintiffs' counsel should be adequately compensated, taking into account the risks undertaken in prosecuting securities class actions.

68. In sum, given the complexity and magnitude of the Action; the responsibility undertaken by Lead Counsel; the difficulty of proof on liability and damages; the experience of Lead Counsel and counsel for Defendants; and the contingent nature of Lead Counsel's agreement to prosecute this Action, Lead Counsel respectfully submit that the attorneys' fees requested here are reasonable and should be approved.

## V. THE PLAN OF ALLOCATION SHOULD BE APPROVED

69. The proposed Plan of Allocation was prepared with the assistance of Lead Plaintiff's consultant, Dr. Michael Hartzmark, described *supra*, ¶ 8, who has significant experience in drafting plans of allocation. The Plan of Allocation provides a fair and rational basis for Class Members to recover their *pro rata* damages for shares of Navistar common stock purchased during the Class Period based upon the dates of their Navistar stock transactions and pursuant to the formula set forth in the Notice. For Class Members who purchased their shares during the Class Period but sold or continued to hold their shares after the Class Period, the Plan of Allocation calculates damages based on the methodology set forth in the PSLRA. *See* 15 U.S.C. § 78u-4(e) (providing methodology for limiting damages). Thus, the Plan of Allocation outlines the maximum losses an investor can recover, which are equivalent to the estimated artificial inflation of Navistar's share price during the Class Period.

## VI. LEAD COUNSEL'S AND LEAD PLAINTIFF'S APPLICATION FOR REIMBURSEMENT OF COSTS AND EXPENSES SHOULD BE GRANTED

70. Lead Counsel also seeks reimbursement of $150,764.40 in litigation expenses reasonably and actually incurred by Lead Counsel in connection with commencing and prosecuting the claims against Defendants over the course of the last several years. The Notice apprised potential Class Members that Lead Counsel would be seeking reimbursement of expenses in an amount not to exceed $175,000. The amount of the unreimbursed litigation

expenses actually requested is less than what was stated in the Notice and, to date, no objection has been raised to Lead Counsel's request for reimbursement of litigation expenses.

71.     As detailed below, Lead Counsel has incurred a total of $150,764.40 in expenses in connection with the prosecution of this litigation. These expenses were all reasonably and necessarily incurred in connection with the prosecution of this Action on behalf of the Class.

| Description[6] | Billed Value |
|---|---|
| Court Fees | $200.00 |
| Transportation | $8,442.86 |
| Hotel | $2,311.67 |
| Taxis, Tips | $1,917.35 |
| Meals | $822.43 |
| WiFi (on travel) | $115.58 |
| Parking Charges | $171.00 |
| Investigator | $61,516.96 |
| Accounting and Damages Experts | $57,609.15 |
| Mediation | $17,657.40 |
| | |
| **Total** | **$150,764.40** |

72.     From the beginning of the case, Lead Counsel was aware that we might not recover any of our expenses, and would not recover anything until the Action was partially or fully resolved. Lead Counsel also understood that, even assuming that the case was ultimately

___

[6] The Expense Schedule includes a total of $550 for already-booked airfare and accommodation, plus conservatively-estimated incidentals, for attorney travel from Cohen Milstein's New York, New York office to attend the final approval hearing before this Court on October 25, 2016. Separately, pursuant to Lead Counsel's retention agreement with Lead Plaintiff, the Expense Schedule omits $14,698.33 in standard administrative costs, including computerized research, telephone and facsimile charges, and photocopying charges, which are otherwise commonly approved by courts. *See, e.g., Beesley v. Int'l Paper Co.*, No. 3:06-CV-703-DRH- CJP, 2014 WL 375432, at *3 (S.D. Ill. Jan. 31, 2014) ("It is well established that counsel who create a common fund like this one are entitled to the reimbursement of litigation costs and expenses, which includes such things as expert witness costs; computerized research; court reports; travel expense; copy, phone and facsimile expenses and mediation.").

successful, reimbursement for expenses would not compensate us for the lost use of the funds advanced to prosecute this Litigation. Thus, Lead Counsel was motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

73.     As set forth in the Expense Schedule above, Lead Counsel has incurred a total of $150,764.40 in unreimbursed litigation expenses through the date of the accompanying motion in connection with the prosecution of this Action. These expenses are reflected on the books and records maintained by Lead Counsel. These books and records are prepared from expense vouchers, check records and other source materials, and are an accurate record of the expenses incurred.

74.     The litigation expenses for which Lead Counsel seeks reimbursement were largely incurred for professional fees, including the costs of experts and consultants. Lead Plaintiff's experts on accounting and damages provided substantial assistance to Lead Counsel in the prosecution and resolution of this Litigation. This involved analyzing relevant accounting and economic literature, drafting reports, and otherwise assisting Lead Counsel in connection with Lead Plaintiff's complaints, mediation, and settlement. The assistance of Lead Plaintiff's experts was crucial to establishing potential liability and damages, among other things.

75.     The other expenses for which Lead Counsel seek reimbursement are also the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.

76.     All of these litigation expenses, which total $150,764.40, were necessary to the successful prosecution and resolution of the claims against Defendants. In view of the complex nature of the Litigation, the expenses incurred were reasonable and necessary to pursue the

interests of the Class. Accordingly, we respectfully submit that the litigation expenses incurred by Lead Counsel should be reimbursed in full.

### 3. Application for Reimbursement of Lead Plaintiff's Costs and Expenses

77. Included in Lead Counsel's request for reimbursement of litigation expenses is a request for reimbursement of Lead Plaintiff's reasonable costs and expenses, including lost wages, in recognition of Lead Plaintiff's contribution to the prosecution and successful resolution of this securities class action, pursuant to 15 U.S.C. § 78u-4(a)(4). Lead Plaintiff Central States requests reimbursement of $8,715.50 for 58.55 hours of time, as set forth in the Condon Declaration. *See* Condon Decl., ¶ 13. These costs were reasonably incurred by the staff of Lead Plaintiff and were directly related to the representation of the Class, including, but not limited to, closely reviewing briefing drafted by Lead Counsel, conferring with Lead Counsel about case strategy, and participating in and monitoring settlement negotiations. Condon Decl., ¶ 10. Accordingly, we respectfully submit that the costs and expenses reasonably incurred by Lead Plaintiff should be reimbursed in full.

## VII. CONCLUSION

78. In view of the outstanding recovery for the Settlement Class, the very substantial risks of this Action, the efforts of Lead Counsel, the quality of work performed, the contingent nature of the fee, the complexity of the case, and the standing and experience of Lead Counsel, Lead Counsel respectfully submit that the Settlement should be approved as fair, reasonable and adequate; that the Plan of Allocation should be approved as fair and reasonable; that a fee in the amount of 22% of the Settlement Fund, plus interest at the same rate as earned by the Settlement Fund, should be awarded to Lead Counsel; and that Lead Counsel's and Lead Plaintiff's litigation expenses should be reimbursed in full.

I declare, under penalty of perjury, that the foregoing facts are true and correct.


Dated: September 23, 2016


_____

Carol V. Gilden